AVENTURE COMMUNICATIONS TECHNOLOGY, LLC, Plaintiff/Counterclaim Defendant,

v.

SPRINT COMMUNICATIONS COMPANY L.P., and Qwest Communications Corporation, Defendants/Counterclaim Plaintiffs.

No. 4:08–cv–00005–JEG [1]

United States District Court, S.D. Iowa, Central Division.

Signed 03/19/2015

1. Substantial portions of this Court's Order of February 17, 2015, filed in 4:07–cv–00078, ECF No. 793, apply equally to this case and have, therefore, been included in this Order.

Paul D. Lundberg, Lundberg Law Firm P.L.C., Sioux City, IA, for Plaintiff.

Bret Alan Dublinske, Fredrikson & Byron, P.A., Des Moines, IA, Charles W. Steese, Armstrong Teasdale LLP, Denver, CO, for Defendants.

## ORDER

JAMES E. GRITZNER, Senior Judge

### TABLE OF CONTENTS

I. INTRODUCTION . . . . 712

II. JURISDICTION . . . . 712

III. BACKGROUND . . . . 712

A. Telecommunication Regulatory Backdrop . . . . 712

1. Communications Act of 1934 . . . . 712

2. Anti–trust Litigation . . . . 713

3. Telecommunications Act of 1996 . . . . 714

4. The Act: IXCs, ILECs, and CLECs . . . . 714

5. Relevant Provisions of the Act. . . .716

B. "Traffic Pumping" Litigation. . . .718

1. Farmers v. Qwest. . . .719

 a. FCC: Farmers I. . . .719

 b. FCC: Farmers Reconsideration I. . . .720

 c. FCC: Farmers II. . . .721

 d. FCC: Farmers Reconsideration II. . . .724

 e. D.C. Circuit: Farmers & Merchants v. FCC. . . .724

2. FCC: All American Tel. Co. v. AT & T Corp. . . . .725

 a. All American I. . . .725

 b. All American Reconsideration I. . . .727

 c. FCC: All American II. . . .728

 d. FCC: All American Reconsideration II. . . .731

3. FCC: AT&T v. YMax. . . .732

4. Northern Valley Cases. . . .734

 a. FCC: Qwest v. Northern Valley (N. Valley I). . . .734

 b. FCC: N. Valley Reconsideration I. . . .736

 c. FCC: Sprint v. N. Valley (N. Valley II). . . .738

 d. FCC: N. Valley Reconsideration II. . . .738

 e. D.C. Circuit: Northern Valley v. FCC. . . .738

5. Sancom and Splitrock Cases. . . .739

 a. FCC: Qwest v. Sancom (Sancom I). . . .740

 b. FCC: Sancom Reconsideration I. . . .743

 c. Sancom v. Qwest v. Free Conferencing, 4:07–cv–04147–KES (D.S.D). . . .743

6. Tekstar Cases. . . .743

7. Connect America Order. . . .744

C. Procedural History. . . .748

D. Factual Background. . . .750

1. Factual Allegations in Aventure's Third Amended Complaint. . . .750

 a. Aventure's Claims. . . .751

2. Factual Allegations in Qwest's Second Amended Complaint. . . .751

 a. Qwest's Claims. . . .758

3. Factual Allegations in Sprint's Amended Complaint. . . .758

 a. Sprint's Claims. . . .761

4. Aventure's Tariff Definitions: Customer, End User, Switched Access. . . .762

 a. Aventure: Tariff FCC No. 1. . . .762

IV. DISCUSSION. . . .762

A. Aventure's Motions to Dismiss. . . .762

1. Standard for Motion to Dismiss. . . .762

2. 12(b)(1) Motion to Dismiss for Lack of Standing. . . .763

3. 12(b)(6) Motions to Dismiss Communications Act Claims. . . .764

 a. § 201(b) Claims. . . .764

 b. § 203(c) Claims. . . .767

4. 12(b)(6) Motion to Dismiss State Law Claims. . . .769

 a. Qwest's Unfair Competition Claim. . . .769

 b. Qwest's and Sprint's Fraudulent Concealment Claims. . . .774

 c. Qwest's Tortious Interference with Contract Claim. . . .779

 d. Qwest's and Sprint's Civil Conspiracy Claims. . . .781

 e. Qwest's Unjust Enrichment Claim. . . .783

 f. Qwest's Declaratory Judgment Claim. . . .784

B. Qwest's and Sprint's Motions for Judgment on the Pleadings. . . .784

1. Standard for Motion for Judgment on the Pleadings. . . .785

2. Communications Act Claims....785

3. Unjust Enrichment and Quantum Meruit Claims....788

V. CONCLUSION....791

## I. INTRODUCTION

Before the Court and addressed in this Order are Motions to Dismiss filed by Plaintiff/ Counterclaim Defendant Aventure Communications Technology, LLC (Aventure) against Defendants/Counterclaim Plaintiffs Qwest Communications Corporation [2] (Qwest) and Sprint Communications Company, L.P. (Sprint) pursuant to Federal Rule of Civil Procedure 12(b). Also before the Court and addressed in this Order are Motions for Judgment on the Pleadings filed by Qwest and Sprint against Aventure pursuant to Federal Rule of Civil Procedure 12(c).

On July 23 and July 24, 2014, the Court conducted omnibus hearings on the motions in this case and on the motions in related cases 4:07–cv–00043, 4:07–cv–00078, 4:07–cv–00194, and 5:07–cv–04095 (NDIA). Representing Aventure were attorneys Paul Lundberg and Gary Joye; representing Qwest were attorneys Charles Steese and Sandra Potter; and representing Sprint was attorney Bret Du-

blinske. The motions are fully submitted and ready for disposition.[3]

## II. JURISDICTION

Aventure filed this action asserting jurisdiction based on diversity of citizenship, pursuant to 28 U.S.C. § 1332, and federal question, pursuant to 28 U.S.C. § 1331. Aventure alleges claims against Qwest and Sprint that arise under the Telecommunications Act of 1996, 47 U.S.C. § 201 et seq., as well as claims that arise under Iowa state law. This Court has original jurisdiction over the federal law claims, see 28 U.S.C. § 1331, and supplemental jurisdiction over the state law claims, see id. § 1367.

## III. BACKGROUND [4]

### A. Telecommunication Regulatory Backdrop

The Communications Act of 1934, 47 U.S.C. § 151 et seq., is the comprehensive act that codified telecommunication regulations and created the Federal Communications Commission (FCC or Commission) to oversee and regulate the telecommunications industry.[5]

#### 1. Communications Act of 1934

The stated purpose of the Communications Act of 1934 was

---

**2.** Qwest Communications Company, LLC, filed a corporate disclosure statement advising the Court that Qwest Communications Company, LLC continues to be a wholly owned subsidiary of Qwest Services Corporation, which in turn continues to be a wholly-owned subsidiary of Qwest Communications International, Inc., which is now a wholly-owned subsidiary of CenturyLink, Inc. See ECF No. 106. Despite the change in the corporate structure, the Court refers to Plaintiff/Counterclaim Defendant as Qwest Communications Corporation (Qwest), which was the entity's name at the time the case was filed.

**3.** At the omnibus hearings, the Court also heard oral arguments on the pending motions

for summary judgment in this case and in the related cases, 4:07–cv–00043, 4:07–cv–00078, 4:07–cv–00194, and 5:07–cv–04095 (NDIA), which will be addressed in separate orders.

**4.** Parts III.A. and III.B. of this Order were also included in this Court's Order of February 17, 2015, entered in case number 4:07–cv–00078, ECF No. 793.

**5.** Telephone companies have been required "to provide service on request at just and reasonable rates, without unjust discrimination or undue preference," since 1910 when they were added to the list of "common carriers" subject to regulation by the Interstate Commerce Commission (ICC). Essential Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.,

regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States,[6] a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission" [FCC], which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

47 U.S.C. § 151 (1934).

The Communications Act of 1934 required telecommunications carriers to file

tariffed rates with the FCC and to provide notice to the FCC and to the public when they changed their tariffs, see § 203(c), but it did nothing to regulate or protect equipment sellers or competitors, see Essential Commc'ns Sys., 610 F.2d at 1120. Thus, American Telephone and Telegraph (AT&T), the parent company of the Bell System, continued to dominate the telecommunication industry. See id.

## 2. Anti-trust Litigation

In the 1980s, fifty years after the 1934 Communications Act was passed, and following decades of litigation between the U.S. Department of Justice (DOJ) and AT&T, the telecommunication industry confronted a massive corporate reorganization.[7] As part of a consent decree in the second of two cases between the DOJ and AT&T, United States v. Am. Tel. & Tel. Co., 552 F.Supp. 131 (D.D.C. 1982), aff'd sub nom. Maryland v. United States, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), AT&T was divested of the local arms of the Bell System—the Bell Operating Companies (BOCs)—which were reor-

610 F.2d 1114, 1117 (3d Cir. 1979) (citing Mann–Elkins Act of 1910, ss 7, 12, ch. 309, 36 Stat. 539). Legislation exclusive to telecommunications, however, did not occur until Congress passed the Communications Act of 1934 to address the ICC's minimal oversight of the telecommunications industry and the Bell System's virtual monopoly over all interstate and international telephone communications. See generally In re: Policy & Rules Concerning Rates for Competitive Common Carrier Servs. & Facilities Authorizations Therefor, 84 F.C.C. 2d 445, 459–61 (1981).

6. The 1996 Amendments to the Act added, "without discrimination on the basis of race, color, religion, national origin, or sex."

7. In 1949, with the telecommunication industry still largely regulated by state regulatory agencies and AT&T's monopoly generally remaining intact, the U.S. Department of Justice (DOJ) filed an antitrust lawsuit in the U.S. District Court for the District of New

Jersey (Civil Action No. 17–49) against AT&T for violations of the Sherman Act, 15 U.S.C. §§ 1–3. See Am. Tel. & Tel. Co., 552 F.Supp. at 135–36. The case, which resolved in 1956 by consent decree, was followed in 1975 by a second DOJ antitrust action filed in the U.S. District Court for the District of Columbia, Civil Action No. 74–1698, against AT&T and its subsidiaries, seeking to, inter alia, divest AT&T of the Bell Operating Companies (BOCs). Am. Tel. & Tel. Co., 552 F.Supp. at 139. The second case also resulted in a consent decree in 1982 that required AT&T's divestiture of the BOCs, equal access to interconnection facilities, and division of assets between the corporation and the divested companies. Id. at 139–233; see generally Joseph D. Kearney, From the Fall of the Bell System to the Telecommunications Act: Regulation of Telecommunications Under Judge Greene, 50 Hastings L.J. 1395, 1419 (1999).

ganized into seven Regional BOCs (RBOCs). United States v. W. Elec. Co., 569 F.Supp. 990, 993–94 & n.11 (D.D.C. 1983). The Bell System territories were divided into 164 local access and transport areas (LATAs) that "mark[ed] the boundaries beyond which a Bell Operating Company [could] not carry telephone calls." Id. The BOCs (1) performed exchange telecommunications, that is, transported traffic between telephones located within a LATA; and (2) provided exchange access within a LATA, that is, linked a subscriber's telephone to their long distance carrier's nearest transmission facility, but only to and from telephones located within the same LATA (intra–LATA traffic). Id. Because BOCs held local monopoly positions, they could not carry calls between different LATAs (inter–LATA traffic); only AT&T and its competitors, such as MCI and Sprint, could carry telecommunications traffic that originated in one LATA and terminated in another. Id.

Predictable obstacles and pervasive changes in technology compounded judicial oversight of the consent decree and resulted in more than a decade of subsequent litigation. See generally SBC Commc'ns, Inc. v. FCC, 154 F.3d 226, 231 (5th Cir. 1998) ("[The consent decree]'s enforcement and alteration in the light of technological progress and changing market circumstances ultimately required substantial monitoring on the part of the district court, and the extensive judicial tinkering that resulted prompted many pundits to dub District Judge Greene the country's 'telecommunication's czar.' "). "Congress— responding, in part, to the argument that competition in the huge telecommunications industry should no longer be governed by an antitrust consent decree administered by a single federal district judge, see S. Rep. No.104–23, at 5, 9 (1995)—set forth a new legislative framework, the Telecommunications Act of 1996

...." SBC Commc'ns Inc. v. FCC, 138 F.3d 410, 412 (D.C. Cir. 1998).

### 3. Telecommunications Act of 1996

The Senate Report on the Telecommunications Act of 1996 (the Act) cited several reasons for the legislation.

The 1934 Act has not been rewritten since its original passage. Its provisions are no longer adequate in a world of competition for telephone services and increasing diversity of media. Further, much of current communications policy is being set by a single Federal district court enforcing the [consent decree]. Reducing regulation of the telecommunications industry will spur the development of new technologies and increase investment in these industries, which will create jobs and greater choices for consumers. The United States telecommunications industry is competitive worldwide. By reducing regulation and barriers to competition, the bill will help ensure the future growth of these industries domestically and internationally.

S. Rep. 104–23, at 9–10 (1995).

The preamble of the Act declares it is: "[A]n Act to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub. L. No. 104–104, § 652, 110 Stat 56 (codified as amended in scattered sections of Title 47 of the United States Code).

### 4. The Act: IXCs, ILECs, and CLECs

The Act "revis[ed] the regulatory scheme under which local exchange carriers (LECs) assess costs to long-distance (IXCs) and other carriers for use of the LECs' local telephone networks to complete interstate telephone calls." Sw. Bell Tel. Co. v. FCC, 153 F.3d 523, 535 (8th Cir. 1998). The Act subdivided the LECs

into the former local telephone companies—incumbent local exchange carriers (ILECs)—and the new emergents to the local exchange arena—competitive local exchange carriers (CLECs). Id. at 536. Under § 203 of the Act, ILECs "are required to file and maintain tariffs with the Commission." In re: Establishing Just & Reasonable Rates for Local Exch. Carriers (Access Stimulation NPRM), 22 FCC Rcd. 17989, 17990 (2007). CLECs, on the other hand, are allowed "to tariff interstate access charges if the charges are no higher than the rate charged for such services by the competing incumbent LEC (the benchmarking rule)." Id. at 17994 (citing 47 C.F.R. § 61.26; In re: Access Charge Reform, Reform of Access Charges Imposed by Competitive Local Exchange Carriers, Seventh Report and Order and Further Notice of Proposed Rulemaking (Seventh Report and Order), 16 FCC Rcd. 9923, 9925 (2001)). CLECs "may not tariff rates that are higher than [the benchmark], but may negotiate any such higher charges with interexchange carriers (IXCs)." Id.

At issue in this litigation are commercial arrangements LECs formed with conference calling services (FCSCs) who advertise free services, such as, conference bridge lines, chat rooms, international calling, podcasts, and pornographic and other adult calling. Under these arrangements, the FCSCs' equipment is installed at locations controlled by the LECs, the LECs assign telephone numbers to the FCSCs, and when a consumer calls the phone number provided by the FCSC, the respective IXC is required to deliver the call to the LEC's exchange area, or in some cases, outside that area. The LEC then bills the respective IXC for the switched access service. When the LEC receives payment from the IXC, the LEC sends the FCSC an agreed upon portion of the access revenues. These arrangements, referred to as access stimulation or traffic pumping, resulted in dramatic increases in the volume of long distance calls the IXCs delivered to the LECs and for which the IXCs were billed at the LECs' higher tariffed rates.[8]

---

8. In All Am. Tel. Co. v. AT&T Corp. (All Am. Recon. I), 28 FCC Rcd. 3469, 3479 (2013), see discussion infra Part III.B.2.b., the Commission provided the following description of the ILECs' and CLECs' rate structures:

> The Commission regulates access charges that LECs apply to interstate calls. As a general matter, ILECs must file and maintain tariffs with the Commission for interstate switched access services. Commission rules provide rate-of-return LECs ... with alternate means for filing individual interstate access tariffs. One option is to participate in the traffic-sensitive pool managed by the National Exchange Carrier Association (NECA) and in the traffic-sensitive tariff filed annually by NECA. The rates in the traffic-sensitive tariff are set based on the projected aggregate costs (or average schedule settlements) and demand of all pool members and are targeted to achieve an 11.25 percent return. Each participating carrier historically received a settlement from the pool based on its costs plus a pro rata share of the profits, or based on its

> settlement pursuant to the average schedule formulas. Stated differently, all NECA pool members share revenues in excess of costs. Alternatively, a rate-of-return carrier that has 50,000 or fewer access lines in a study area may elect to file its access tariffs in accordance with Section 61.39 of the Commission's rules, which the Commission adopted in the Small Carrier Tariff Order. A carrier choosing to proceed under this rule (Section 61.39 Carrier) must file access tariffs in odd numbered years to be effective for a two-year period. Section 61.39 Carriers base their initial rates on historical costs (or average schedule settlements) and associated demand for the preceding year. They base their subsequent rates on their costs and traffic volumes for the prior two year period. Section 61.39 Carriers do not pool their costs and revenues with any other carrier. Thus, if demand increases, Section 61.39 Carriers retain the revenues to the extent they exceed any cost increases. The Commission considers CLECs ... to be nondominant carriers subject to minimal

(By way of example, as alleged in Qwest's second amended complaint in case number 4:07–cv–00078, ECF No. 318, in June 2006, Qwest delivered approximately 15,000 minutes of long distance traffic to the 180 customers of ILEC Superior Telephone Cooperative (Superior). Qwest's Second Am. Compl. 11, ECF No. 318 (4:07–CV–00078). By November 2006, after Superior entered into arrangements with several FCSCs, the traffic volume to Superior increased to over 6.4 million minutes per month, an increase of over 42,000 percent. Id. Superior billed Qwest switched access charges for this traffic.) [9]

The IXCs disputed these charges arguing the services provided were not tariffed services, and therefore the LECs could not bill the IXCs under the tariff for those services. The IXCs eventually stopped paying the LECs' billed charges. The IXCs and the LECs filed actions against one another with the FCC, state utility boards and commissions, as well as in federal and state court, alleging causes of action under the Act, state communications law, and common law.

### 5. Relevant Provisions of the Act

The IXCs allege that consequent to the LECs' arrangements with the FCSCs, the LECs violated provisions of the Act in various ways, including by billing the IXCs switched access charges for services not covered by the LECs' tariffs. Contrariwise, the LECs allege the IXCs violated

the Act by refusing to pay the switched access charges.

The sections of the Telecommunications Act relevant to these claims and discussed in this order are 47 U.S.C. §§ 201(a), (b); 203(c); 206; 207; 223(a)(1); and 254(k).

Section 201(a) (Service):

(a) It shall be the duty of every common carrier engaged in interstate or foreign communication by wire or radio to furnish such communication service upon reasonable request therefor; and, in accordance with the orders of the Commission, in cases where the Commission, after opportunity for hearing, finds such action necessary or desirable in the public interest, to establish physical connections with other carriers, to establish through routes and charges applicable thereto and the divisions of such charges, and to establish and provide facilities and regulations for operating such through routes.

Section 201(b) (Charges):

(b) All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: Provided, ... That nothing in this chapter or in any other provision of law shall be construed to prevent a common carrier subject to this chapter from entering into or oper-

---

rate regulation.... [Historically,] CLECs had two means by which to provide and charge IXCs for functionally equivalent interstate access services. A CLEC generally may tariff interstate access charges if the charges are no higher than the rate charged for such services by the competing ILEC (the benchmarking rule). Alternatively, a CLEC must negotiate and enter into agreements with IXCs to charge rates higher than those permitted under the benchmarking rule.

9. Sprint similarly alleges that in March 2006, Superior billed Sprint for approximately 14,-945 access minutes and in March 2007, the number of access minutes of use increased to 3,854,390, which represented a 25,690% increase. Sprint Am. Compl. ¶ 37, ECF No. 211 (4:07–cv–00194). Sprint and Superior have settled their claims in these related cases. 4:07–cv–00194, ECF No. 161.

ating under any contract with any common carrier not subject to this chapter, for the exchange of their services, if the Commission is of the opinion that such contract is not contrary to the public interest: Provided further, That nothing in this chapter or in any other provision of law shall prevent a common carrier subject to this chapter from furnishing reports of positions of ships at sea to newspapers of general circulation, either at a nominal charge or without charge, provided the name of such common carrier is displayed along with such ship position reports. The Commission may prescribe such rules and regulations as may be necessary in the public interest to carry out the provisions of this chapter.

Section 203(c) (Overcharges and rebates):

(c) No carrier, unless otherwise provided by or under authority of this chapter, shall engage or participate in such communication unless schedules have been filed and published in accordance with the provisions of this chapter and with the regulations made thereunder; and no carrier shall (1) charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3) extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule.

Section 203(e) (Penalty for violations):

In case of failure or refusal on the part of any carrier to comply with the provisions of this section or of any regulation or order made by the Commission thereunder, such carrier shall forfeit to the United States the sum of $6,000 for each such offense, and $300 for each and every day of the continuance of such offense.

Section 206 (Carrier's liability for damages):

In case any common carrier shall do, or cause or permit to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case.

Section 207 (Recovery of damages):

Any person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

Section 223(a)(1) (Obscene or harassing telephone calls . . . .):

(a) Prohibited acts generally. (1) Whoever—in interstate or foreign communications—(A) by means of a telecommunication device knowingly—(i) makes, creates, or solicits, and (ii) initiates the

transmission of, any comment, request, suggestion, proposal, image, or other communication which is obscene or child pornography, with intent to abuse, threaten, or harass another person . . .

Section 254(k) (Universal service—Subsidy of competitive services prohibited): (k) A telecommunications carrier may not use services that are not competitive to subsidize services that are subject to competition. The Commission, with respect to interstate services, and the States, with respect to intrastate services, shall establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide those services.

## B. "Traffic Pumping" Litigation

■ Around the same time traffic pumping cases were filed in this Court, similar cases were filed in other federal district courts. In many, if not all, cases filed in other federal district courts, the district court stayed the litigation and referred questions to the FCC.[10] Recognizing that the tariffs and the arrangements between the LECs and the FCSCs in the cases before this Court were essentially indistinguishable from those in the cases that had already referred questions to the FCC, this Court determined that referral of the same questions to the FCC would be duplicative and cause unnecessary expense and therefore stayed these cases to await the rulings in those cases already before the FCC. This procedure was also intended to retain some control over when activity could resume in this Court in what promised to be a long litigation process.

As will be discussed, see discussion infra Parts III.B.1–III.B.6, in all the referral cases, the IXCs and the LECs settled their claims during the pendency of the referral. Accordingly, the referring district courts never ruled on the merits of the dispositive motions between the LECs and the IXCs. With two exceptions, see discussion infra Parts III.B.5.c. and III.B.6., the IXCs and the FCSCs also settled their claims. Due to those settlements, the referral courts had no reason to consider dispositive motions on the claims between the LECs and the IXCs in light of the FCC's decisions. Although this Court must do so now, it does not do so in a vacuum. The Court's determinations must reflect the extensive, expert guidance provided in the FCC decisions that have been released over the years of this protracted traffic

10. More precisely, when a court "refers" a question to an agency, such as the FCC, the agency will direct the party to file an administrative complaint setting forth the issues to be considered. Reiter v. Cooper, 507 U.S. 258, 269 n.3, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) (" 'Referral' is sometimes loosely described as a process whereby a court refers an issue to an agency. But [most statutes] contain[ ] no mechanism whereby a court can on its own authority demand or request a determination from the agency; that is left to the adversary system, the court [is] merely staying its proceedings while the [party] files an administrative complaint under [the agency's enabling statute] .... Mitchell Coal [& Coke Co. v. Pennsylvania Railroad Co., 230 U.S. 247, 33 S.Ct. 916, 57 L.Ed. 1472 (1913)], spelled out the actual procedure contemplated, holding that further action by the district court should 'be stayed so as to give the plaintiff a reasonable opportunity within which to apply to the Commission for a ruling as to the reasonableness of the practice.' " (internal citations omitted)); accord Telecom Int'l Am., Ltd. v. AT&T Corp., 67 F.Supp.2d 189, 219 (S.D.N.Y. 1999) (" 'Referral' by the District Court is technically a misnomer. The District Courts do not actually refer matters to the FCC. The proper procedure is for the District Court to stay the matter, and one of the parties to the litigation files a complaint with the FCC." (citing Reiter, 507 U.S. at 268, 113 S.Ct. 1213)).

pumping litigation. Thus, in consideration of the motions before it, having stayed these cases in anticipation of this guidance, and to reflect the details of the analysis, this Court finds it essential and unavoidable to provide a comprehensive discussion of the background and dispositions of the other traffic pumping cases.[11]

### 1. Farmers v. Qwest

Farmers and Merchants Mutual Telephone Company of Wayland, Iowa (Farmers), an ILEC that served approximately 800 access lines for local residents, provided access services that Qwest purchased to terminate calls to customers located in Farmers' exchange. See Qwest Commc'ns Corp. v. Farmers & Merchs. Mut. Tel. Co. (Farmers I), 22 FCC Rcd. 17973, 17974 (2007). In June 2005, Farmers left the National Exchange Carrier Association (NECA) tariff pool and filed a tariff (the Kiesling Tariff) that contained Farmers' switched access rates. Id.

At the same time Farmers left the NECA pool, it entered into multiple commercial arrangements with several FCSCs as a method of increasing interstate switched access traffic and revenues, also referred to as traffic pumping. Id. at 17976. Under the terms of the arrangements, Farmers paid the FCSCs. Id. As result of these arrangements, the number of minutes delivered to the Farmers exchange increased exponentially and those minutes of use (MOUs) were directly attributable to the traffic delivered to the

FCSCs and not due to an increase in the number of lines Farmers serviced. Id. In June 2007, instead of revising its tariff based on its traffic for the prior two years as required by Commission Rule § 61.39, Farmers elected to reenter the NECA pool. Id. Confronted with skyrocketing monthly access charges, Qwest stopped paying the full amount of Farmers' invoices. Id. at 17973.

#### a. FCC: Farmers I

On May 7, 2007, Qwest filed a complaint with the FCC against Farmers alleging, inter alia, violations of federal tariffs.[12] Qwest asserted that beginning July 1, 2005, Farmers earned a rate of return far in excess of the prescribed maximum and that thus those rates were unjust and unreasonable in violation of § 201(b) and were not entitled to deemed lawful status or protection because Farmers' acts were a deliberate, bad-faith plan to dramatically increase its access revenues and earn a rate of return in gross excess of the Commission's precepts. Id. at 17976–77. Qwest asked the Commission to declare Farmers' rates void ab initio and to hold Farmers liable for retrospective damages. Id. at 17977. In the alternative, Qwest contended that the traffic at issue was not terminating access traffic under Farmers' tariff, and therefore Farmers violated §§ 201(b) and 203(c) of the Act by applying charges inconsistent with its tariff. Id.

In its decision dated October 2, 2007, the Commission rejected Farmers' argument

---

11. The cases discussed in this section do not purport to be an exhaustive accounting of traffic pumping litigation. Rather, this section includes those cases relied upon and cited extensively by the parties, which the Court consequently deems significant to its analysis.

12. On February 20, 2007, Qwest filed a similar complaint with the Iowa Utilities Board against several LECs, including Farmers, alleging violations of Iowa state tariffs. See

Qwest Commc'ns v. Superior Tel. Coop. (IUB I), Docket No. FCU-07-2, 2009 WL 3052208 (Iowa Util. Bd. Sept. 21, 2009), recon granted in part, (IUB Recon. I), 2009 WL 4571832 (Iowa Util. Bd. Dec. 3, 2009), further recon denied, 2011 WL 459685, (IUB Recon. II) (Iowa Util. Bd. Feb. 4, 2011), aff'd sub nom. Farmers & Merchants Mut. Tel. Co. of Wayland v. IUB, 829 N.W.2d 190 (Iowa Ct. App. 2013) (unpublished table decision).

that its tariff's deemed lawful status insulated Farmers prospectively from overcharge claims explaining that "[s]ection 204(a)(3) does not mean that tariff provisions that are deemed lawful when they take effect may not be found unlawful subsequently" because "the Commission retains its ability to find under section 208 that a rate will be unlawful if charged in the future." Id. at 17980 (internal quotation marks and citations omitted). In determining the lawfulness of Farmers' rate of return, the Commission applied the NECA average schedule formula noting that Farmers chose not to produce its actual cost data, and concluded Farmers' revenues increased many fold without a concomitant increase in costs and that Farmers vastly exceeded the prescribed rate of return. Id. at 17982–83. Although the Commission agreed with Qwest that Farmers earned an unlawful rate of return, the Commission declined to either rule that Farmers' tariff was void ab initio or award Qwest damages reasoning that to do so would be a departure from the Commission's prohibition against awarding retrospective relief in conjunction with "deemed lawful" tariffs. Id. at 17983. The Commission reasoned that while it agreed with Qwest that "Farmers manipulated the Commission's rules to achieve a result unintended by the rules," Qwest had not identified the use of any improper accounting techniques nor had Qwest alleged that Farmers' revenue-sharing arrangements with the FCSCs constituted a per se violation of § 201(b). Id. at 17984.

The Commission denied Farmers' request to rule that Qwest's withholding partial payment of Farmers' tariffed charges was unlawful self-help in violation of §§ 201(b) and 203(c), stating that the re-

quest was akin to a cross-complaint prohibited under Commission's rules and that any complaint Farmers might file to recover fees Qwest allegedly owed would constitute a collection action, which the Commission would not consider. Id. at 17984–85.

The Commission next rejected Qwest's allegation that Farmers violated §§ 201(b) and 203 by imposing terminating access charges on traffic bound for FCSCs that did not terminate in Farmers' exchange but merely passed through and terminated elsewhere. Id. at 17985. The Commission agreed with Farmers' characterization that calls using FCSC numbers were connected and then terminated at the conference bridge.[13] Id. at 17985–86. Referring to the record before it, the Commission found that under the terms of Farmers' tariff, the FCSCs were customers and end users because the FCSCs did subscribe to a service. Id. at 17987.

### b. FCC: Farmers Reconsideration I

Qwest filed a petition for partial reconsideration of Farmers I identifying evidence that Farmers withheld critical facts regarding Farmers' relationship with the FCSCs that should have been produced in the initial underlying proceeding. Qwest Commc'n Corp. v. Farmers & Merchs. Mut. Tel. Co. (Farmers' Recon. I), 23 FCC Rcd. 1615, 1615 (2008). Qwest identified statements by Farmers after the Commission released Farmers I that indicated certain contract amendments and bills were not contemporaneously created with the delivery of traffic to the FCSCs; statements contained in the April 13, 2007, affidavit of Farmers' counsel, which indicated Farmers back-billed the FCSCs to ensure compliance with its tariff; and backdated

13. "Newton's [Telecom Dictionary] describes a conference bridge as '[a] telecommunications facility or service which permits callers from several diverse locations to be connected together for a conference call.'" Farmers I, 22 FCC Rcd. at 17986 n.112 (quoting H. Newton, Newton's Telecom Dictionary 260 (2006)).

bills and contracts Farmers delivered even after the complaint proceeding began. Id. at 1616.

In granting the petition for reconsideration, the Commission explained that in Farmers I, it made the key determination that the FCSCs were end users who subscribed to services offered under Farmers' tariff, in reliance upon Farmers' representation that the FCSCs purchased interstate End User Access Service and paid federal subscriber line charges, a representation that was brought into question by evidence that purportedly showed Farmers' invoices and agreements with the FCSCs were backdated. Id. at 1617–18. The Commission initiated additional proceedings to allow review of the newly discovered evidence and ordered Farmers to produce all discovery documents submitted in discovery in the Iowa Utilities Board (IUB) proceeding. Id. at 1617. The Commission rejected Farmers' assertion that the protective order issued in the IUB proceeding insulated the documents from being produced, explaining that the Commission had the authority to order a party to produce that party's documents in a

proceeding before it irrespective of whether those same documents were produced and subject to a protective order in a different proceeding. Id. at 1619.[14]

### c. FCC: Farmers II

On November 25, 2009, the Commission released its order on reconsideration finding the evidence Qwest presented after the release of Farmers I warranted a change of that ruling and compelled the conclusion that Farmers violated §§ 203(c) and 201(b) of the Act and was liable to Qwest for damages suffered as a result of those violations. Qwest Commc'n Corp. v. Farmers & Merchs. Mut. Tel. Co. (Farmers' II), 24 FCC Rcd. 14801, 14801 (2009).

The Commission clarified that in Farmers I, it found the FCSCs were customers and thus end users based upon Farmers' representations that the FCSCs purchased tariffed access service and paid federal subscriber line charges (SLC) and that evidence came to light afterward calling those representations into question. Id. at 14803. The Commission found evidence presented on reconsideration demonstrated that the FCSCs had never taken tar-

14. References made in this Order to the IUB's proceedings and findings are included as part of the review of access stimulation proceedings that impact the cases before this Court, as well as to address arguments (made at the time these motions were filed) that the IUB's proceedings were still in the review process and were not binding because a final order had not been entered. Given the procedural posture of the motions addressed in this Order, the Court looks to the allegations made in the complaints/counterclaims and does not rely upon nor adopt the IUB's findings in resolving the present motions. Nevertheless, the Court acknowledges that the IUB's proceedings, as well as various FCC decisions, are now final and conclusive. The Court distinguishes, however, that in the Court's subsequent orders on motions for summary judgment, the Court may consider the relevance of the IUB's findings. See, e.g., In re: Request for Review by Aventure Commc'n Tech., LLC,

of A Decision of the Universal Serv. Adm'r, 29 FCC Rcd. 9536, 9538, 2014 WL 3907897, at *2 (Aug. 11, 2014) ("Aventure objects to relying on the Iowa Utilities Board Decision, arguing that the Iowa Utilities Board Decision is based on inapplicable state law. That argument misses the point: even if we were to agree with Aventure's contention that the legal conclusions reached in the Iowa Utilities Board Decision are based on inapplicable state law, we can still find persuasive the findings of fact made by the Iowa Utilities Board from its investigation into Aventure's practices." (emphasis added) (citing All Am. Tel. Co. v. AT&T (All American II), 28 FCC Rcd. 3477, 3495 (2013) (discussing the relevance of the state regulatory board's findings reasoning that the board had "conducted extensive proceedings into [the LEC]'s operations, and its findings [were] credible and independently supported by the record"))).

iffed services and that after Farmers' activities came under legal scrutiny, Farmers "undertook to fabricate evidence of a tariffed customer-carrier relationship that did not in fact exist, sending backdated bills to the [FCSCs] and executing contract 'addenda' purporting to have taken effect months or years earlier," and then selectively submitted some of the documents in the earlier proceeding without disclosing that those documents had not been issued contemporaneous with the service provided. Id. at 14804 (internal quotation marks and citations omitted).

Revisiting its Farmers I end user determination in light of the new evidence, the Commission noted that Farmers' tariff defined that (1) "[s]witched access service allows a customer to originate calls from an *end user's* premises to a customer designated premises and to terminate calls from a customer designated premises to an *end user's* premises," (2) "[a]n *end user* is any *customer* of an interstate or foreign telecommunications service that is not a carrier," and (3) "[a] *customer* is any entity that subscribes to the *services offered under this tariff.*" Id. at 14805 (internal quotation marks and citations omitted). The Commission reasoned that to be an end user, an entity must also be a customer and to be a customer the entity must subscribe to the services offered under the tariff, but because the FCSCs did not subscribe to a services offered under Farmers' tariff, the FCSCs were not customers and thus could not be end users. Id. The Commission noted that the evidence showed "Farmers expressly structured their telecommunications service contracts **to avoid** strict adherence to the terms of Farmers' filed tariff." Id. Based upon these determinations, the Commission concluded "Farmers was not entitled to charge Qwest switched access charges under the terms of Farmers' tariff." Id.

In examining the contracts between the FCSCs and Farmers, the Commission found that the FCSCs received a free service accessed by way of toll calls placed over long-distance networks that were delivered to the FCSCs over Farmers' network, and that in exchange, Farmers provided support services to the FCSCs and paid the FCSCs a per-minute fee for the traffic generated through this relationship. Id. at 14806. Notably, the Commission found that unlike ordinary end user customers under the tariff, nothing in the Farmers–FCSCs' contracts suggested the FCSCs subscribed to any Farmers' tariffed service or paid Farmers for connecting the FCSCs to the interexchange network. Id.

The Commission also noted that Farmers provided the FCSCs connections that differed from those provided to customers of Farmers' tariffed services, including high-capacity DS3 trunks that fed into a new soft switch that Farmers purchased specifically to handle traffic bound for the FCSCs rather than the standard circuit switch used to serve all of its other customers. Id.

Another difference the Commission observed was that Farmers–FCSCs' agreements did not resemble traditional tariffed switched access service agreements, noting that those agreements (1) included provisions prohibiting Farmers from providing services to the respective FCSC's competitors, which were antithetical to the nondiscriminatory notion of tariffed services; (2) the agreements contained terms not available under Farmers' tariff, which reinforced the conclusion the parties did not establish tariffed-defined carrier/customer relationships; and (3) various terms, such as, the per minute fee paid, volume of traffic generated, duration of the agreement, and terms of cancellation, varied between the different FCSC agreements.

Id. The Commission found it telling that "the parties in no way behaved as if they were operating under tariff until *after* Farmers became embroiled in litigation over the traffic stimulation plan." Id. The Commission reasoned that its conclusion that Farmers never intended to treat the FCSCs as tariff service customers was supported by Farmers having never entered FCSCs' account information into its customer billing systems, Farmers had no business records of FCSCs having purchased end user services under Farmers' tariff, Farmers did not contemporaneously bill FCSCs for any services, and Farmers did not take any steps to bill FCSCs until shortly before discovery began in the underlying proceeding. Id. at 14808. The Commission found Farmers' justification that backdating was standard practice unpersuasive given Farmers' conduct throughout its business relationships with the FCSCs and that the conduct was inconsistent with provision of tariffed services. Id. The Commission concluded that "[t]he evidence overwhelmingly demonstrates that Farmers willingly incurred all of the expenses associated with providing the underlying services to the conference calling companies, including the payment of a fee to these companies, in exchange for these companies directing the free service they offered to the public to Farmers' exchange." Id. at 14809 (internal quotation marks omitted).

The Commission squarely rejected Farmers' assertion that the application of the filed rate doctrine compelled a finding that the services it provided were pursuant to its tariff, and therefore customer status should be imputed to the FCSCs even though the services they were provided were outside the scope of the tariff. Id. at 14810. The Commission reasoned that "[t]he purpose of the filed rate doctrine is to prevent unreasonable and unjust discrimination among similarly-situated customers of a particular common carrier's service, and to ensure that carriers impose like charges for like services," but that the overwhelming evidence developed on reconsideration demonstrated "a purposeful deviation from the tariff's terms that allowed the conference calling companies to reap benefits from a free service offered only to them, which thereby enabled Farmers to dramatically increase its access charge billing to Qwest," making it abundantly clear that Farmers intentionally avoided a customer relationship under the tariff. Id. Accordingly, the Commission found Farmers did not provide Qwest switched access service for the FCSCs' calls, and therefore the filed rate doctrine did not require Farmers to charge Qwest its tariffed switched access charges nor require Qwest to pay such charges for terminating the FCSCs' calls. Id. at 14811.

Next, the Commission rejected Farmers' argument that the voluminous tariff provisions had to be construed as a whole to determine exchange access, explaining that each of the provisions Farmers relied upon were subsections of section 6.1 of the NECA tariff, which limits the scope of the tariff to traffic transmitted to end users. Id. at 14811–12 (distinguishing that under the well-established rules of construction, a service that does not constitute switched access under a section cannot constitute switched access under a subordinate section). The Commission found that neither the Act nor Commission rules bolstered Farmers' theory of what constitutes switched access because "the relevant tariff defines switched access service as providing a communications path to an end user" and "[w]hether or not this definition is narrower than that used for purposes of the Act and Commission rules, it is nonetheless the definition to which Farmers is bound for purposes of determining wheth-

er its charges are in compliance with its tariff." Id. at 14812.

The Commission summarized the factors it found to be very strong evidence that Farmers did not believe it was providing, nor intended to provide, the FCSCs tariffed services, and thus supported its conclusion that the FCSCs were not end users within the meaning of the tariff provisions: (1) Farmers' individualized contracts with the FCSCs that involved an exchange of services and business relationship quite distinct from Farmers' tariffed switched access service; (2) Farmers did not offer the same terms of service to others that requested it; (3) the parties' actual course of dealing demonstrated no tariffed services were purchased; (4) the absence of an explanation why the FCSCs were not entered into Farmers' customer systems or why over its two year relationship with the FCSCs, Farmers failed to bill and collect payment from the FCSCs as required under its tariff; and (5) Farmers having sent bills to the FCSCs only after the first round of discovery in the case and then sent no further bills until additional discovery was ordered. Id. at 14812–13. The Commission thus concluded "that Farmers' practice of charging Qwest tariffed switched access rates for its termination of traffic from the conference calling companies is unjust and unreasonable in violation of section 201(b) of the Act." Id. at 14813.

#### d. FCC: Farmers Reconsideration II

Farmers filed a petition for reconsideration of Farmers II, which the Commission denied on March 17, 2010. Qwest Commc'n Corp. v. Merchs. Mut. Tel. Co. (Farmers' Recon. II), 25 FCC Rcd. 3422, 3422 (2010). Farmers argued the FCC's Farmers II decision was arbitrary and capricious, contrary to law, and that the Commission lacked jurisdiction to issue it because it was not issued within ninety days of the

filing of the petition as required under § 405(b)(1). Id. The Commission dispensed with Farmers' jurisdiction argument, clarifying that the ninety-day requirement found in § 405(b)(1) refers to the grant or denial of a petition. The Commission noted that it had complied with § 405(b)(1) by granting Qwest's petition for reconsideration within ninety days of the date Qwest filed that petition and therein ordered additional proceedings. Id. at 3424. The Commission furthermore explained that failure to rule on a petition for reconsideration within ninety days would not have deprived the Commission of jurisdiction to consider the petition. Id. at 3425.

The Commission also rejected Farmers' assertion that the Commission should not have altered its end user finding in Farmers I without additional evidence. Id. at 3426. The Commission remarked its findings in Farmers I were based on Farmers' representations at that time that the FCSCs purchased interstate end user services and paid federal subscriber line charges but that upon reconsideration, the landscape shifted dramatically as the new evidence Farmers previously withheld made clear the FCSCs never paid subscriber line charges nor made any other payments to Farmers. Id. Disposing of Farmers' challenge that by leaving intact Farmers I regarding count one of Qwest's complaint Farmers II was rendered arbitrary and capricious, the Commission explained that its finding in Farmers I that Farmers received an excessive rate of return was an alternative basis of liability. Id. at 3427.

#### e. D.C. Circuit: Farmers & Merchants v. FCC

Farmers appealed the Farmers decisions to the U.S. Court of Appeals for the District of Columbia Circuit arguing the Commission ignored jurisdictional requirements, misread the tariff, and failed to

adhere to its own precedent and rules. Farmers & Merch. Mut. Tel. Co. of Wayland v. FCC, 668 F.3d 714 (D.C. Cir. 2011). The D.C. Circuit rejected each of Farmers' arguments, holding (1) the Commission complied with § 405(b)(1) in granting Qwest's petition for reconsideration within ninety days; (2) the Commission's determination that Farmers' services were not tariffed service and Qwest was not required to pay Farmers' tariff, did not result in the Commission being without jurisdiction to consider Qwest's complaint because § 208(a) provides the Commission the authority to adjudicate acts and omissions of common carriers; (3) the Commission properly interpreted the tariff in finding the FCSCs were not end users as the tariff's switched access service diagram illustrates, an end user is one of the sub-elements of that service; (4) Farmers' tariff rates were "deemed lawful" until the Commission determined otherwise, which it did in reviewing the new evidence; (5) the Commission found two alternate bases for § 201(b) liability: (a) Farmers did not provide switched access under its tariff making Farmers' practice of charging Qwest for such services unjust and unreasonable under § 201(b), and (b) even if traffic Farmers carried from Qwest to the FCSCs could be considered switched access service, Farmers violated § 201(b) by earning an excessive rate of return; (6) the Commission's finding that the FCSCs were not end users did not contravene prior precedent set in AT&T Corp. v. Jefferson Telephone Co., 16 FCC Rcd. 16130 (2001), because in Jefferson Telephone, end user status was assumed; and (7) the Commission properly concluded the FCSCs were not end users under the tariff, and therefore the filed rate doctrine did not apply. Farmers v. FCC, 668 F.3d at 718–24.

## 2. FCC: All American Tel. Co. v. AT&T Corp.

On February 5, 2007, All American Telephone Co. (All American), e–Pinnacle Communications, Inc., and ChaseCom (collectively referred to as CLECs or All American), CLECs located in Utah and Nevada, filed a lawsuit against AT&T, in the U.S. District Court for the Southern District of New York, 1:07–cv–00861–WHP (S.D.N.Y.), asserting claims for collection of amounts AT&T allegedly owed for interstate tariff access services, violation of § 201(b) by invoking self-help and failing to pay tariffed access services, violation of § 203(c) by failing to pay tariffed services, and compensation under the theories of quantum meruit for telecommunications services allegedly provided. See All Am. Tel. Co. v. AT&T (All American I), 26 FCC Rcd. 723, 725 (2011). AT&T filed counterclaims against the CLECs for violations of §§ 201(b) and 203(c) of the Act, state law fraud, civil conspiracy, and unjust enrichment alleging the CLECs did not provide AT&T switched access service as defined by the terms of their tariffs, and that even if the services were pursuant to the tariffs, the CLECs committed unreasonable practices by using sham arrangements to inflating access charges. See id. On February 5, 2010, the district court referred two issues to the FCC: (1) did AT&T violate § 201(b) or § 203(c), or any other provision of the Act, by refusing to pay the billed charges; and (2) did AT&T violate any provision of the Act by refusing to pay the billed charges and not filing a rate complaint with the FCC. See id.

### a. All American I

On May 7, 2010, the CLECs filed a formal complaint with the FCC against AT&T alleging AT&T violated §§ 201(b) and 203(c) by engaging in unlawful self-help by not paying the CLECs for use of

their local networks services to complete long distance calls and that AT&T violated § 201(b) by not filing a rate complaint against the CLECs. Id. at 726.

Addressing whether AT&T violated any provision of the Act by refusing to pay the CLECs' billed charges, the Commission found that the CLECs failed to state a claim reasoning that the Commission only had authority to adjudicate claims that a carrier has violated the Act, and allegations by a carrier that a customer, such as AT&T, refused to pay charges failed to give rise to a claim at the Commission under § 208 or in court under § 206. Id. at 727. The Commission remarked that "[t]his long-standing commission precedent that 'collection actions' fail to state a claim for violation of the Act has been acknowledged and followed by courts." Id. at 727 (footnote omitted). The Commission rejected the CLECs' attempt to distinguish that the allegations of AT&T's failure to pay was not a collection action because the action had been filed in district court, and the district court, not the Commission, would determine any damages owed stating, "the CLECs fail to recognize that the reason the Commission does not hear collection actions is that *a failure to pay tariffed access charges does not constitute a violation of the Act*," and therefore, "*the CLECs have no claim in a court or at the Commission* that AT&T violated the Act in its role as a customer." Id. at 728 (second emphasis added). The Commission also rejected the CLECs' assertion that the Seventh Report and Order stood for the proposition that an IXC's failure to pay a CLEC's access charges constituted a violation of the Act reiterating that while the Seventh Report and Order did observe that failures to pay *tariffed rates* may constitute *breaches of the tariff* actionable in the appropriate federal court, the Seventh Report and Order went on to say that "our tariff rules were historically intended to

protect purchasers of service from monopoly providers, not to protect sellers from monopsony purchasing power." Id. at 729 (quoting the Seventh Report and Order, 16 FCC Rcd. at 9957). The Commission noted the irony in the CLECs' reliance on the Seventh Report and Order given that the focus of the Seventh Report and Order was "to eliminate regulatory arbitrage opportunities that previously [had] existed with respect to tariffed CLEC access charges." Id. at 729–30 (quoting the Seventh Report and Order, 16 FCC Rcd. at 9925). The Commission also noted that the Commission's remark in the Seventh Report and Order that "the Act and the Commission rules require IXCs to pay *tariffed* CLEC access charges ... merely reinforce[d] the undisputed notion that tariffs govern carrier-customer relationships and that parties are precluded from negotiating separate agreements that affect the rate for services once a tariff has been filed." Id. at 730 n.47 (emphasis added) (internal citations and quotation marks omitted).

The Commission next found misplaced the CLECs' comparison to, and reliance upon, Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc., 550 U.S. 45, 127 S.Ct. 1513, 167 L.Ed.2d 422 (2007), in which the U.S. Supreme Court held a carrier's failure to pay charges for payphone usage was a violation of the Act. The Commission explained that at issue in Global Crossing was the Act's requirement that the Commission adopt rules to ensure payphone service providers received compensation for completed calls originating from their payphones and thus, as the Commission found in subsequent cases, a carrier's failure to pay those charges was a violation of the Act. Id. at 730. The Commission distinguished that "[b]y stark contrast, the provisions of the Act and the Commission's

rules apply only to the provider of the service, not to the customer; and they govern only what a provider may charge, not what the customer must pay." Id.

The Commission also dispelled the CLECs' notion that footnote 96 in Farmers II stood for the proposition that a carrier is always entitled to at least some compensation for a service rendered, whether or not that service is covered by the tariff, and that if a carrier is always entitled to some compensation for service rendered, AT&T's failure to pay any compensation must be a violation of the Act. Id. at 731 (citing Farmers II, 24 FCC Rcd. at 14812 n.96). The Commission explained that Farmers II did not hold that a carrier is *always* entitled to compensation for a service rendered, rather *depending upon the totality of the circumstances*, a carrier *may* be entitled to some compensation for non-tariffed services. Id.[15]

### b. All American Reconsideration I

The CLECs filed a petition for reconsideration, which the Commission denied finding all the CLECs' arguments had either been fully considered and rejected in All American I or the CLECs could have raised the arguments during the underlying proceeding. All Am. Recon. I, 28 FCC Rcd. at 3471–72. The Commission noted, for example, that the CLECs "persist in relying on the same out-of-context snippets from old Commission orders" that the Commission already distinguished in All American I. Id. The Commission remarked that it was perplexed by the CLECs' request to (1) reverse the All American I decision, (2) find the Commission lacked jurisdiction to hear the questions referred by the district court, and (3) dismiss the complaint without prejudice, giving that it was the CLECs, over AT&T's objection, who requested the referral from the district court but now assert that they knew all along that the Commission was precluded from ruling on the merits of the complaint because it was a collection action. Id. at 3472–73. Significantly, the Commission dispelled the CLECs' notion that a claim against an IXC for failure to pay purportedly tariffed access charges was cognizable in a court proceeding, even though the very same conduct did not constitute a cognizable claim in a § 208 Commission proceeding reasoning that "[u]nder the plain language of sections 206–208 of the Act, both the Commission and courts *can award relief only upon finding a violation of the Act.*" Id. at 3473 (emphasis added) (footnote omitted). The Commission clarified that a "federal court *can* adjudicate a local exchange carrier's claim seeking to enforce an IXC's access charge payment obligations *under a federal tariff*, whereas the Commission cannot under the long-standing precedent that 'collection actions' fail to state a claim for violation of the Act." Id. (second emphasis added).

---

**15.** Non–party Aventure filed a petition with the Commission for reconsideration of the All American I decision, and Qwest filed a petition seeking permission to file an opposition to Aventure's petition. All Am. Tel. Co. v. AT&T Corp., 26 FCC Rcd. 15016 (2011). The Commission denied Aventure's petition reasoning that Aventure's assertion that All American I was "vague" and "subject to multiple interpretations" did not meet the "adversely affected" criteria for a non-party to seek reconsideration. Id. at 15017 (internal quotation marks and citations omitted). The Commission explained that "the mere prece-dential value of an adjudicatory order in a section 208 complaint proceeding cannot 'adversely affect' a non-party to the adjudication within the meaning of section 405(a) of the Act and section 1.106 of the Commission's rules." Id. at 15018 (internal quotation marks) (citing AT&T Corp. v. Bus. Telecom, Inc., Order on Reconsideration, 16 FCC Rcd. 21750, 21754 (2001)). The Commission similarly denied Qwest's petition for reconsideration as being tantamount to a petition to intervene and that Qwest failed to satisfy the requirements for intervention. Id. at 15019.

### c. FCC: All American II

On April 30, 2010, AT&T filed a formal complaint with the FCC alleging the CLECs violated §§ 203 and 201(b) of the Act by billing AT&T for access services that were not pursuant to a valid tariff, and violated § 201(b) of the Act by participating in a traffic pumping scheme to inflate billed access charges to AT&T and other IXCs. All Am. Tel. Co. v. AT&T (All American II), 28 FCC Rcd. 3477, 3477 (2013). The Commission granted AT&T's complaint concluding the evidence showed that the CLECs participated in a traffic pumping scheme "designed to collect in excess of eleven million dollars of improper terminating access charges." Id.

The Commission described the revenue-sharing agreement between the LECs Beehive Telephone Co., Nevada, and Beehive Telephone Co., Utah (collectively, Beehive); FCSC Joy Enterprises, Inc. (Joy); and CHR Solutions (CHR), a telecommunications consulting company that provided services to Beehive (and the subsequently-created CLECs) and drafted the tariffs at issue. Id. at 3478–79.

In 1994, Beehive withdrew from the NECA pool and became a § 61.39 carrier, which meant Beehive did not have to share revenues with other ILECs in the pool. Id. at 3480. At about the same time, Beehive and Joy entered into an access revenue-sharing agreement, under the terms of which Beehive would pay Joy a portion of the access charges for the long distance traffic routed to Joy's assigned numbers. Id. As a result of this arrangement, Beehive's inter-state local switched access minutes of use (MOU) grew exponentially from 3.6 million minutes in 1994, to 313.5 million minutes in 2005. Id. Due to the significant increase in traffic between 2001 and 2005, Beehive was required to reduce its rates from 4.59 to 1.02 cents per minute, but instead of continuing to provide terminating access service, and consequently having to further reduce its rates, Beehive reentered the NECA pool in mid–2007. Id. at 3480–81.

Beehive then created the CLEC defendants—All American, ePinnacle, and ChaseCom—to assume the role of terminating access carrier and continue the traffic pumping scheme. Id. at 3481. Because they were CLECs rather than ILECs, their rates were not subject to reductions due to the large increases in traffic volume. Id. Defendants were providing the termination service, while Beehive continued charging the IXCs for tandem switching and transport of the traffic. Id.

The CLEC defendants applied for certification to operate as CLECs in Utah, representing to the Utah public service commission (PSC) that they did not intend to operate or provide services in Beehive's territory. Id. at 3482. Beehive supported and assisted the CLEC defendants in filings it made with the PSC. Id. Although the certification issued to the CLEC defendants by the PSC precluded the CLEC defendants from competing in Beehive's territory, the CLEC defendants filed switched access tariffs in Utah benchmarked for access service against Beehive's tariffed rates in Utah. Id. Beehive helped CLEC defendants establish initial operations and set up locations to maximize transport mileage they could charge. Id. at 3483. The Commission observed that Beehive (1) installed and maintained CLEC defendants' equipment, which was located at Beehive's facility; (2) coordinated and managed the CLEC defendants' billing and collections; (3) assigned its equipment to CLEC defendants and allowed them to continue using it at no cost; (4) advised CHR when to revise the CLEC defendants' tariffs after Beehive had increased its own rate; (5) advanced money to and became co-lessees with CLEC de-

fendants; and (6) decided whether CLEC defendants could relocate their equipment. Id. In addition, the CLEC defendants' operations were designed and engineered exclusively to provide service to FCSCs, and the CLECs did not market local exchange services. Id. at 3484.

Joy and All American had common directors, officers, and ownership, and shared the same business address. Id. at 3479. All American's operations only provided services to the chat line and conferencing services of its affiliate, Joy; in fact, All American never had its own operating switch, and traffic to All American's telephone numbers terminated to Joy's equipment at Beehive's facilities. Id. at 3484. ChaseCom and e–Pinnacle, likewise, served a total of five FCSCs, and the only equipment either owned was conference bridge equipment; they did not own any of the equipment typically used to provide competitive LEC services to the public. Id. All three CLEC defendants ceased operation without complying with Commission discontinuation of service rules. Id. at 3485.

In 2010, the Utah public service commission (PSC) characterized All American as a mere shell company that lacked technical, financial, and managerial resources to serve customers as it had represented it would; found that All American never intended to comply with its state authorization; revoked All American's authorization; and ordered All American to withdraw from the state. Id. The state's revocation order depicted collusion between All American and Beehive and determined Beehive was party to All American's scheme and aided All American in its illegal operation. Id. at 3486. The state rescinded All American's authorization concluding All American did not merit the privileges obtained therein,

which included the right to levy access charges. Id.

Turning to AT&T's complaint against the CLEC defendants, the Commission concluded that the extensive record in the case overwhelmingly supported the conclusion that the CLEC defendants were sham CLECs "created to capture access revenues that could not otherwise be obtained by lawful tariffs," and therefore, billing AT&T for access charges in furtherance of this scheme constituted an unjust and unreasonable practice in violation of § 201(b). Id. at 3487–88 (internal quotation marks omitted). Agreeing with the PSC's findings, the Commission held that the CLEC defendants never intended to be bona fide CLECs but instead intended to contravene the prohibition from providing service in Beehive's service areas; Beehive masterminded the sham that allowed the traffic pumping arrangements to continue at rates that would have been unsustainable if Beehive had remained a § 61.39 carrier and created the CLEC defendants who were not subject to NECA's requirements and thus could benchmark their rates. Id. at 3489. The Commission observed that even after the CLEC defendants took over, the callers still used the same telephone numbers used when Beehive carried the traffic, the calls were routed through the same facilities, Beehive still charged the IXCs for transporting the calls, and Beehive still made money off the traffic. Id.

The Commission rejected the CLEC defendants' argument that they were lawfully billing AT&T at benchmarked rates that were compliant with § 61.26(b)(1) reasoning the CLEC defendants were not competing with Beehive, rather Beehive and CLEC defendants were collaborating to circumvent the Commission's CLEC access charges and tariff rules, compliance with which would have ended the traffic

pumping scheme. Id. at 3491. The Commission also distinguished that in Jefferson Telephone, upon which the CLEC defendants relied, although the Commission held that the IXC had not demonstrated the revenue sharing violated § 201, it emphasized its narrow holding was based upon the specific facts presented and that it expressed no view whether a different record could have demonstrated the revenue sharing arrangement did, in fact, violate sections of the Act. Id. at 3491–92 (citing Jefferson Telephone, 16 FCC Rcd. at 16137). The Commission next rejected the CLEC defendants' contention that AT&T was attacking non-party Beehive's rates clarifying that the gravamen of AT&T's complaint was that the CLEC defendants were operating sham entities to purposefully inflate access charges IXCs had to pay, and thus it was the CLEC defendants' conduct, not Beehive's rates, that was at issue. Id. at 3492.

The Commission also granted count two of AT&T's complaint finding the CLEC defendants violated §§ 203 and 201(b) by billing AT&T for services not provided pursuant to a valid and applicable tariff reasoning that neither the traffic nor the billing complied with the terms of the filed tariffs. Id. The Commission dispelled the CLEC defendants' contention that as CLECs, they had unfettered ability to provide interstate services nationwide without regard to tariff limitations stating,

> CLECs have blanket Section 214 authority under Section 63.01 of our rules to provide domestic, interstate communications services, but the blanket authority extends only to entry certification requirements for initial operating authority; it does not impact CLECs' obligations under any other section of the Act or Commission rules. Accordingly, until a CLEC files valid interstate tariffs under Section 203 of the Act or enters into contracts with IXCs for the access

services it intends to provide, it lacks authority to bill for those services. In addition, Defendants' assertion that the geographic scope of their tariffs is merely "illustrative" and "not binding if the carrier actually provides the service in territory not identified in its interstate tariff" is inconsistent with Section 203 and the "filed tariff" doctrine. Finally, contrary to Defendants' characterization, the geographic limitations in their tariffs were not mere "technical defects" or "ministerial errors." Rather, they are terms fundamental to whether the access tariffs apply at all. *Defendants have offered no justification for deviating from Section 203 and the filed tariff doctrine, and they may not simply pick and choose the provisions of their Tariffs with which they will comply.*

Id. at 3493–94 (emphasis added) (footnotes omitted).

The Commission next reasoned that the CLEC defendants did not terminate calls within the meaning of their tariffs and therefore could not bill for access services thereunder. Id. at 3494. The Commission explained that although the tariffs defined switched access service as calls originating from, or terminating to, end users on the CLEC defendants' networks and it defined end users as users of local telecommunications carriers' service who are not carriers, the CLEC "[d]efendants were sham entities that did not provide local telecommunications services or terminate calls to any 'user' of local telecommunications services." Id. The Commission noted that the CLEC defendants (1) admitted they had no written agreements for, nor provided any local services to, any customers pursuant to the tariffs; (2) never registered the FCSCs accounts into their billing, accounting, and ordering systems; and (3) never billed the FCSCs for local telecommunications services, charged subscriber line

charge, universal service fee, or carrier common line charges, nor did the FCSCs ever order local telecommunications services or pay for such services from the CLEC defendants. Id. at 3494–95.

In rejecting the CLEC defendants' contention that the PSC's findings were irrelevant to its analysis, the Commission reasoned that the PSC conducted extensive proceedings into All American's operations and its findings were credible and independently supported by the record. Id. at 3495. The Commission also found no "factual basis for concluding that All American's Nevada operations or ChaseCom's and e–Pinnacle's Utah operations differed in any material respect from All American's Utah operations." Id.

The Commission dismissed the CLEC defendants' assertion that the Farmers decisions had no bearing on the case reasoning parties had to comply with the terms of their respective tariffs and under the CLEC defendants' tariffs, the FCSCs were not users of local telecommunications services provided by the CLEC defendants. Id.

### d. FCC: All American Reconsideration II

The CLEC defendants filed a petition for reconsideration of All American II, which the Commission denied on procedural grounds finding the issues raised in the petition had either been considered and rejected in All American II or should have been raised before the release of All American II. AT&T Corp. v. All Am. Tel. (All Am. Recon. II), 29 FCC Rcd. 6393, 2014 WL 2599363 (June 10, 2014). On the merits of the petition, the Commission rejected the CLEC defendants' procedural, discovery, and jurisdictional challenges as baseless. Id. at *3. The Commission specif-

ically rejected the CLEC defendants' challenge that the Commission did not have jurisdiction to consider what, or if, AT&T must pay for services provided by the CLEC defendants, clarifying that All Am. Recon. I did state that a customer-carrier's failure to pay another carrier's tariffed charges was a collection action that did not give rise to a claim under Section 208, but it said nothing about a customer's claims against carriers concerning the carriers' unjust and unreasonable conduct. All Am. Recon. II, 29 FCC Rcd. at *3.

The Commission also disposed of the CLEC defendants' allegation that the Commission was biased noting that aside from a series of orders adverse to the CLEC defendants' interests, the CLEC defendants provided no evidence of bias. Id. at *3–4. Finally, the Commission dismissed the CLEC defendants' suggestion that All American II contravened the Commission's findings in In re: Connect Am. Fund—Transformation Order (Connect America Order), 26 FCC Rcd. 17663, 17667 (2011), aff'd sub nom. In re: FCC, 753 F.3d 1015 (10th Cir. 2014), emphasizing that the Connect America Order took steps to restrict "wasteful arbitrage schemes" and identified access stimulation as "one of the 'most prevalent arbitrage activities.'" All Am. Recon. II, 29 FCC Rcd. at *4 (quoting Connect America Order, 26 FCC Rcd. at 17873). The Commission reasoned that contrary to the CLEC defendants' assertions, the Connect America Order did not "'expressly legitimize' access stimulation in every instance" nor did it insulate the CLEC "[d]efendants from the consequences of a finding that their conduct was unjust, unreasonable, and unlawful, in violation of the Act and the Commission's rules." Id.[16]

---

**16.** The Commission also dismissed a petition for reconsideration filed by Beehive holding

(1) Beehive did not satisfy the requirements of non-party petitioner, (2) Beehive had not been

732

The case in the U.S. District Court for the Southern District of New York remains stayed pending the outcome of the supplemental damages proceeding AT&T filed with the Commission. See All Am. Tel. Co. v. AT&T Corp., 1:07–cv–00861–WHP (S.D.N.Y.), ECF No. 132.

### 3. FCC: AT&T v. YMax

On September 14, 2010, YMax Communications Corp. (YMax), a nationwide CLEC, filed a complaint against AT&T in the U.S. District Court for the Northern District of California for failure to pay charges for switched access services it purportedly provided to AT&T. See YMax Commc'ns, Corp. v. AT&T & Bellsouth Long Distance, Inc., 4:10–cv–04115 (N.D. Cal.), ECF No. 1. On October 26, 2010, AT&T answered the complaint and filed six counterclaims against YMax, including claims for violations of §§ 203(c) and 201(b) of the Act. Id., ECF No. 15.

On November 9, 2010, AT&T filed a fourteen-count formal complaint with the FCC under § 208 of the Act against YMax alleging, inter alia, YMax violated §§ 203(c) and 201(b) of the Act by assessing AT&T interstate switched access charges that were not authorized under YMax's tariff. AT&T Corp. v. YMax Commc'ns Corp., 26 FCC Rcd. 5742, 5742 (2011). On January 14, 2011, the U.S. District Court for the Northern District of California stayed YMax's case pending the outcome of the FCC proceeding. YMax Commc'ns, 4:10–cv–04115 (N.D. Cal.), ECF No. 66.

In its decision, the Commission detailed that YMax, a certificated CLEC, lacked typical local exchange carrier characteristics: YMax did not provide a physical transmission facility connecting YMax to the premises of any carrier or non–ISP entity; YMax had no customers that purchased local exchange service from YMax's state tariffs; YMax did not access or collect universal service fund (USF) or end user common line (EUCL) fees; and YMax did not have the capacity to effectuate the selection of preferred IXC (PIC) and therefore did not assess or collect any PIC charges. YMax, 26 FCC Rcd. at 5743–44. Instead, YMax could only participate in the transmission of calls at issue by way of its working relationship with Magic Jack, L.P. (Magic Jack), which marketed and sold a device, the magicJack (the MJ device), for $39.95, that enabled use of the Internet to make and receive calls throughout North America. Id. at 5744. The MJ device had a USB "dongle" that plugged into a computer's USB port, and a telephone jack that could be plugged into an ordinary landline telephone. Id. Magic Jack relied on YMax to obtain telephone numbers and interconnection to the public switched network (PSTN) for purchasers of the MJ device; all the calls at issue in the case involved use of the MJ device. Id.

Purchasers of the MJ device had to register the device on Magic Jack's website by signing a terms of service click agreement that required the purchaser to separately procure high speed internet access service through a third-party ISP provider. Id. at 5745. The agreement stated that it constituted "the entire agreement between *you and magicJack and YMAX* ... and governs your use of the magicJack device ... and Software and items and/or services which may be provided by YMAX, [and] it trumps any prior agreements between you and magicJack ... and/or YMAX." Id. (alterations in original) (emphasis added).

deprived of the opportunity of having the issues regarding its tariffed heard before a neutral-decision maker, and (3) Beehive offered

no credible justification for not seeking to intervene earlier in the proceeding. All Am. Recon. II, 29 FCC Rcd. at *5–6.

In dispute were two types of calls for which YMax billed AT&T originating/terminating switched access charges: calls initiated by an AT&T long distance customers to a called party and calls received from a calling party to an AT&T toll-free long distance customer. Id. A call initiated by an AT&T long distance customer would be delivered by a LEC to AT&T's point-of-presence (POP) in the LATA where the initiating caller was located; and AT&T would transport the call and hand it off to the LEC that serviced the called party, which would then deliver the call to one of YMax's points of interconnection (POIs). Id. at 5745–46. However, most of YMax's POIs existed only on paper and had no physical presence; YMax had no equipment of its own and did not lease any space at these "empty POIs," instead, at these locations, AT&T exclusively provided YMax the equipment, facilities, configurations, and interconnections. Id. at 5746. Once at the empty POIs, the call was picked up by a private digital signal 1 (DS-1) line provided to YMax by AT&T, and then transported to Dallas, Texas, where YMax's equipment was collocated in an AT&T facility. Id. YMax's equipment (an access gateway, servers, and a router) converted the call from a time-division multiplexing (TDM) to an IP format, and then under AT&T's managed Internet service contract, the call was sent back to AT&T's Dallas facility over a single, high-capacity line, from which AT&T sent the call over the Internet to one or more ISPs, the last of which delivered the call to the called party's MJ device. Id.

YMax billed AT&T, purportedly pursuant to YMax tariff, terminating switched access charges for calls routed to, and from, the MJ devices. Id. at 5747. After unsuccessfully disputing these charges, AT&T filed a formal complaint with the FCC alleging, inter alia, that YMax did not provide switched access services as defined in its tariff and therefore violated §§ 203(c) and 201(b) of the Act by billing for services not provided pursuant to its tariff. Id.

In determining whether YMax provided AT&T switched access services, the Commission noted that under the terms of YMax's tariff, switched access was available to IXCs for use in furnishing services to end users through a two-point communication path between the IXC's premises and the end users premises, which YMax's tariff defined as "[t]he premises specified by the Customer or *End User* for termination of access services at the *End User's* physical location." Id. at 5749 (alteration in original). Based upon this definition, the Commission reasoned that "the term, 'End User' is integral to the meaning of 'Switched Access Service,'" and that "YMax provides Switched Access Service under its Tariff if—and only if—a call involves an 'End User' as defined in the Tariff." Id. The Commission concluded that YMax did not provide switched access service stating,

> YMax may assess Switched Access Service charges on AT&T pursuant to its Tariff only if YMax provided Switched Access Services to AT&T as described in the Tariff. YMax's Tariff describes Switched Access Service as a service involving originating and terminating calls to an "End User." An "End User," in turn, is defined as a person or entity who "uses" a YMax service "under the terms and conditions of [its] tariff." No such End User exists here because: (i) no Called/Calling Party uses YMax's End User Access service under section 5 of the Tariff; and (ii) no Called/Calling Party uses Switched Access Service under section 3 of the Tariff, because under the terms of the Tariff, Switched Access Service is available only to IXCs, not to any Called/Calling Party. Thus,

YMax did not provide Switched Access Service to AT&T within the meaning of the Tariff because YMax did not originate calls from, or terminate calls to, an End User. YMax's charges to AT&T for such Service therefore violate sections 203(c) and 201(b) of the Act.

Id. at 5755 (alterations in original) (footnote omitted).

The Commission went on to find that apart from the absence of end users under the tariff, YMax's charges for end office switching rate elements and switched transport rate elements were likewise not authorized by YMax's tariff. Id. at 5755–59. In concluding YMax had not provided switched access service within the meaning of the tariff, the Commission rejected YMax's construction of various terms in the tariff as "contrary to the common meaning of these terms in the telecommunications industry" and that "even if YMax's construction of these terms were plausible—and it is not—it would, at best, merely show that their meaning is ambiguous and . . . [the Commission] would be bound to resolve the ambiguities against YMax, the drafter." Id. at 5759. Thus, the Commission granted AT&T's complaint as to counts three and four and authorized AT&T to file a supplemental complaint for damages. Id. at 5743 & n. 6.

YMax timely filed a petition for reconsideration, AT&T Corp. v. YMax Commc'ns Corp., 28 FCC Rcd. 10011, 10012 (2013); however, while the petition was pending, AT&T and YMax informed the Commission that they had settled their disputes, YMax withdrew its petition for reconsideration, AT&T informed the Commission it would not file a supplemental complaint for damages, and AT&T withdrew its informal complaint. Id. The parties also filed a stipulation of dismissal in the district court proceeding. See YMax Commc'ns, 4:10–cv–04115 (N.D. Cal.), ECF No. 130.

### 4. Northern Valley Cases

Northern Valley Communications, LLC (Northern Valley), a South Dakota CLEC, filed lawsuits in the U.S. District Court for the District of South Dakota against four IXCs: N. Valley v. MCI Communications Services, Inc., d/b/a Verizon Business Services (MCI), 1:07–cv–01016–KES (D.S.D.); N. Valley v. Sprint, 1:08–cv–01003–KES (D.S.D.); N. Valley v. AT&T, 1:09–cv–01003–CBK; and N. Valley v. Qwest, 1:09–cv–01004–CBK, to recover amounts the respective interexchange carriers allegedly owed Northern Valley for unpaid originating and terminating access charges. Northern Valley asserted claims for breach of contract, breach of implied contract, violations of §§ 201 and 203 of the Act, collection actions pursuant to South Dakota tariffs, and unjust enrichment. The IXCs filed counterclaims against Northern Valley and various FCSCs for violations of §§ 201, 203, and 254 of the Act and South Dakota's tariff law, as well as claims for common law unfair competition, breach of contract, civil conspiracy, unjust enrichment, and declaratory judgment alleging the CLECs and the FCSCs engaged in traffic pumping schemes.

The district court considered various motions in each of the cases and thereafter referred questions to the FCC and stayed three cases; the fourth case, N. Valley v. MCI, 1:07–cv–04147, settled.

### a. FCC: Qwest v. Northern Valley (N. Valley I)

Qwest's formal complaint with the FCC alleged that Northern Valley's interstate access service tariff violated § 201(b) and requested that the Commission order Northern Valley to withdraw its tariff. Qwest Commc'ns Co. LLC v. N. Valley Commc'ns, LLC (N. Valley I), 26 FCC Rcd. 8332, 8332 (2011).

In considering Qwest's complaint, the Commission first distinguished ILEC and CLEC tariff regimes distinguishing that "ILECs are required to publish the rates, terms, and conditions applicable to their access service in tariffs filed with the Commission." Id. at 8334. The Commission noted that since their promulgation, Commission rules have defined "end user" as "any Customer of an Interstate or Foreign Telecommunications Service that is not a carrier," and that the Commission "also has *required* that ILEC access tariffs define 'end user' as 'any customer of an interstate or foreign telecommunications service that is not a carrier." Id. (noting the rules were promulgated in 1983 in anticipation of the AT&T divestiture). The Commission compared that although CLECs had the ability to "impose interstate access charges either through tariffs or contracts negotiated with IXCs," by 2001, CLEC rates were found on average to be well above the ILECs' rates for similar service. Id. at 8335. Thus, from that point on, the Commission prohibited "CLECs from tariffing switched access rates that were higher than the switched access rates of the ILEC serving the same geographic area in which the CLEC was located," that is, CLEC switched access rates were to be "benchmarked" against ILEC rates. Id. (citing Seventh Report and Order, 16 FCC Rcd. at 9931). The Commission noted that a CLEC could, however, impose higher switched access rates by negotiating with the respective IXCs. Id. The Commission reiterated its prior holding in the Seventh Report and Order that "a CLEC may assess tariffed switched access charges at the appropriate benchmark rate only for calls to or from the CLEC's own end users." Id.

The Commission then addressed Northern Valley's tariff, which originally defined an end user as "any Customer of an Interstate or Foreign Telecommunications Service that is not a carrier," that was amended in 2010 adding the sentence: "An End User need not purchase any service provided by [Northern Valley]." Id. (alteration in original). The Commission deemed the tariff unlawful reasoning Commission "rules and orders establish that a CLEC may tariff access charges only if those charges are for transporting calls to or from an individual or entity to whom the CLEC offers service *for a fee.*" Id. at 8336. The Commission explained that the Seventh Report and Order promulgated rules, including 61.26(a)(3), which states that "[i]nter-state switched exchange access services shall include the functional equivalent of the ILEC interstate exchange access services typically associated with the ... rate elements [found in ILEC access service tariffs]," which thus requires that "tariffed CLEC charges for 'interstate switched exchange access services' be for services that are 'the functional equivalent' of ILEC interstate switched exchange access services." Id. (second and third alteration in original) (quoting 47 C.F.R. § 61.26(a)(3)). The Commission reiterated that a CLEC provides "the 'functional equivalent' of an ILEC's access services only if the CLEC transmits the call to its own end user" and that clearly, "when a CLEC is *not* transporting traffic to or from its own end user, the CLEC is *not* providing the functional equivalent of ILEC access services and thus not entitled to charge the full tariffed benchmark rate." Id. The Commission emphasized that "[a] CLEC's 'own end-users' do not include entities that receive free services from the CLEC," rather, as repeatedly stated, " 'end user' has been defined by the Commission's ILEC access charge rules and orders for more than 25 years as a 'customer of an interstate or foreign *telecommunications service,*' " id. at 8337 (quoting 47 C.F.R. § 69.2(m)), and that

"[t]he Act, in turn, defines 'telecommunications service' as 'the offering of telecommunications *for a fee*,'" id. (quoting 47 U.S.C. § 153(53)). The Commission concluded that because Northern Valley's tariff "purports to permit Northern Valley to charge IXCs for calls to or from entities to whom Northern Valley offers its services free of charge, ... the Tariff violates the Commission's CLEC access charge rules ..., and consequently also violates section 201(b) of the Act." Id.

The Commission rejected Northern Valley's argument that the dictionary definition of "customer" is not only a person who buys, but may also be "a person with whom one has dealings," remarking that in the context relevant to this dispute, "customer clearly means a *paying* customer." Id. (internal quotation marks omitted). The Commission also dismissed Northern Valley's assertion that its tariff was lawful even if Northern Valley did not provide the "functional equivalent" of ILEC exchange access because the Act's "exchange access" definition imposes no requirement that a LEC receive payment from the individual or entity placing or receiving the call reasoning that Northern Valley must not only comply with the Act, but with the Commission's rules and orders, too. Id. at 8338. Thus, the Commission announced that "if Northern Valley wishes to charge IXCs for terminating calls to entities that pay no fees, it must do so through a negotiated contract." Id.

Northern Valley also contended that there was no authority requiring tariff definitions to mimic the definitions in the Commission's rules, and that the Commission should analyze the complaint by referencing the tariff's terms as occurred in Farmers I. Id. at 8339. The Commission noted that at issue in Farmers I was whether Farmers had complied with an otherwise valid tariff; there was no contention as to the lawfulness of the tariff as in the present case. Id.

The Commission also rejected Northern Valley's defense that the failure to act on Qwest's petition to reject, or suspend and investigate Northern Valley's tariff precluded Qwest's § 208 complaint noting that the rejection or suspension of a CLEC tariff was more demanding than the burden in a § 208 complaint proceeding. Id. at 8340. Finally, the Commission rejected Northern Valley's assertion that Qwest violated Commission Rule 1.721(a)(8) by not paying the disputed charges as set forth in the dispute resolution provisions of Northern Valley's tariff reasoning that compliance with a tariff's dispute resolution provision is not the standard for determining satisfaction of Commission Rule 1.721(a)(8). Id.

**b. FCC: N. Valley Reconsideration I**

Northern Valley filed a petition for reconsideration of Northern Valley I, which the Commission dismissed as procedurally defective noting Northern Valley repeated many of the same arguments addressed and rejected in Northern Valley I and that Northern Valley also raised new arguments that could have been raised earlier. Qwest Commc'ns Co. LLC v. N. Valley Commc'ns, LLC (N. Valley Recon. I), 26 FCC Rcd. 14520, 14522 (2011). Nonetheless, the Commission considered the merits of Northern Valley's new argument that the Seventh Report and Order, specifically Commission Rule 61.26, did not require a CLEC's tariffed access charges to be for providing telecommunication services for a fee. Id. at 14523. Rejecting the argument, the Commission reasoned that precedent and rules of statutory construction require "end user," as used in Commission Rule 61.26, to be construed as having the same meaning as when it is used in different but related Commission rules, which, for 25 years, have defined

end user to mean "an individual or entity to whom telecommunications are offered for a fee." Id. at 14524. The Commission further noted that Commission Rule 61.26 requires "tariffed CLEC access charges be for services that are the 'functional equivalent' of ILEC access services" and because the Seventh Report and Order specified that a CLEC provides the "functional equivalent" of ILEC access charges if it provides access to its end user, "a CLEC's access service is 'functionally equivalent' only if the CLEC provides access to its end user, or *paying customer*." Id. at 14524. The Commission also rejected Northern Valley's argument that because the Seventh Report and Order did not consider nor discuss whether a CLEC providing free access service to an entity provides functionally equivalent service, the order had no bearing on the issue noting that Northern Valley's argument failed to explain why the Seventh Report and Order did not, therefore, specifically redefine end user and that it defied logic to conclude the Commission "would have used 'end user' differently from how that term was used in the very rule it was clarifying." Id. at 14525. The Commission further noted that the Commission's "longstanding policy that users of the local telephone network for interstate calls should be responsible for a reasonable portion of the costs that they cause," and therefore, "construing 'end user' to mean a customer of a telecommunications services offered for a fee [was] consistent with the Commission's goal of ensuring that neither IXCs nor end users are charged an unfair share of the LEC's costs in transporting interstate calls." Id. The Commission disposed of Northern Valley's contention that its holding in N. Valley I was inconsistent with the Commission's long-standing precedent of not regulating the CLEC–end user relationship explaining that CLECs are free to offer their services for any fee or no fee at

all, but if a CLEC "chooses to assess access charges upon IXCs by *tariff*, the individuals or entities to whom Northern Valley provides access must be 'end users' (i.e., paying customers)." Id.

The Commission also dispelled Northern Valley's contention that N. Valley I was inconsistent with the Commission's Farmers decisions that pronounced that a LEC could provide a free subscription to its local customers as long as the tariff so provided. Id. The Commission pointed out that Farmers I was predicated upon the understanding that the FCSCs were obligated to pay for service and for subscriber line charges, whereas Northern Valley's tariff had no requirement that the FCSCs pay at all for services. Id. at 14526. Furthermore, upon reconsideration of Farmers I, the Commission held that the flow of money between Farmers and the FCSCs was essential to its analysis; thus, because the facts newly revealed upon reconsideration demonstrated that the FCSCs did not subscribe to any tariffed service, Farmers' reliance on the free subscription characterization was unavailing. Id. The Commission, once again, dismissed the argument that the Commission's order on reconsideration of Farmers I had no effect because it was not issued within 90 days, as a misstatement of § 405(b)(2), and that even if the Commission had not met the statutory 90–day provision, it would not nullify the effect of the subsequent order because § 405(b)(2) says nothing about losing jurisdiction if the Commission does not act within 90 days. Id. Nor did Commission Rule 1.106(n) require the Commission to suspend the effectiveness of Farmers I in order to retain authority to reconsider that decision rather Rule 1.106(n) requires regulated entities to comply with an order that is subject to a pending petition for reconsideration unless the Commission

specifically suspends the effectiveness of the order. Id.

Non–party Aventure also filed a petition for reconsideration, which the Commission dismissed as it had done with Aventure's petition for reconsideration of All American I, reasoning Aventure had shown neither of the two requirements of a non-party seeking reconsideration, that is, (1) that its interests had been adversely affected by the order, nor (2) that it had good reason for not participating in the earlier stages of the proceeding. Id. at 14527.

### c. FCC: Sprint v. N. Valley (N. Valley II)

Sprint's formal complaint with the FCC similarly alleged that Northern Valley's interstate access service tariff violated § 201(b). Sprint also requested that the Commission declare Northern Valley's tariff void ab initio, or in the alternative, to find Northern Valley's tariff access rates were unreasonable, and therefore unlawful. Sprint Commc'ns Co. LP v. N. Valley Commc'ns, LLC (N. Valley II), 26 FCC Rcd. 10780, 10780 (2011).

The Commission reiterated its holding in N. Valley I that Northern Valley's tariff violated Commission Rule 61.26 as clarified by the Seventh Report and Order and § 201(b), most significantly with respect to the tariff's definition of end user. Id. at 10783–84. The Commission also found the jurisdictional reporting requirements, deposits, billing disputes, and attorney fees provisions of Northern Valley's tariff were unreasonably vague and violated § 201(b), but that the late payment fee provision was not. Id. at 10786–87. The Commission denied Sprint's request to find the tariff void ab initio reasoning Sprint had not established that Northern Valley engaged in furtive concealment; instead, the Commission ordered Northern Valley to revise its tariff. As it had in N. Valley I, the

Commission found Northern Valley's affirmative defense of unclean hands lacked merit reasoning that even if such a defense were available in a § 208 proceeding, Northern Valley had not established that Sprint refused to pay amounts invoiced *pursuant to the tariff*. Id. at 10790. The Commission also found meritless Northern Valley's assertion that Sprint failed to negotiate in good faith explaining that Sprint's pre-complaint letter informed Northern Valley no complaint would be filed if Northern Valley withdrew its tariff and that Sprint also communicated to Northern Valley a willingness to listen and to entertain other ideas to resolve the issues. Id.

### d. FCC: N. Valley Reconsideration II

The Commission summarily denied Northern Valley's petition for reconsideration, Sprint Commc'ns Co. L.P. v. Northern Valley Commc'ns, LLC (N. Valley Recon. II), 26 FCC Rcd. 16549, 16549 (2011), explaining that it had addressed the same issue and made the same findings in N. Valley I and N. Valley Recon. I, and thus incorporated by reference the holding and discussion in those decisions.

### e. D.C. Circuit: Northern Valley v. FCC

Northern Valley sought judicial review of N. Valley I, N. Valley II, N. Valley Recon. I, and N. Valley Recon. II orders before the U.S. Court of Appeals for the District of Columbia Circuit contending the N. Valley decisions contradicted Farmers I and II, the FCC violated its own precedent by directly regulating the relationship between the CLEC and the end user, and the FCC impermissibly interpreted the Act as precluding Northern Valley's tariff provision requiring the IXC to dispute a charge in writing within ninety days. N. Valley v. FCC, 717 F.3d 1017, 1019 (D.C. Cir. 2013). The court reviewed

Northern Valley's challenges and denied the petitions for review reasoning (1) the Commission's decisions did not contradict Farmers I or Farmers II because in those decisions, the Commission construed only the tariff at issue and did not address FCC regulations as it did in the N. Valley I and N. Valley II; (2) the Commission's N. Valley decisions resulted in the FCC regulating only the relationship between the CLEC and the IXC, and not the relationship between the CLEC and the end user; and (3) the Commission properly concluded that Northern Valley's tariff provision requiring any dispute to be presented in writing within ninety days conflicted with the two-year statute of limitations contained in § 415(b) reasoning that although contracts may shorten statutes of limitation, CLEC's tariffs are unilaterally imposed and thus contract principles that permit the shortening of a statute of limitations do not apply. Id. at 1019–20 (citing MCI Worldcom Network Servs., Inc. v. Paetec Commc'ns, Inc., 204 Fed.Appx. 271, 272 (4th Cir. 2006) (unpublished per curiam)).

During the pendency of the referrals to the FCC and the petition for review to the U.S. Court of Appeals for the District of Columbia Circuit, the claims between the IXCs and Northern Valley settled in all cases before the U.S. District Court for the District of South Dakota. The IXCs also settled claims between the FCSCs in all cases, with the exception of claims between Qwest and FCSC Global Conferencing Partners, in case number 1:09–cv–01004 (D.S.D.), which were stayed on June 28, 2013, when GCP filed a notice of bankruptcy.

### 5. Sancom and Splitrock Cases

During the same general time frame as the Northern Valley cases were filed, another South Dakota CLEC, Sancom, Inc. (Sancom), filed similar lawsuits in the U.S. District Court for the District of South Dakota against MCI, Sprint, AT&T, and Qwest: Sancom v. MCI, 4:07–cv–04106–KES (D.S.D.); Sancom v. Sprint, 4:07–cv–04107–KES (D.S.D.); Sancom v. AT&T, 4:08–cv–04211–KES (D.S.D.); and Sancom v. Qwest, 4:07–cv–04147–KES (D.S.D.), respectively. South Dakota ILEC, Splitrock Properties, Inc. (Splitrock), also filed similar lawsuits against Qwest and Sprint: Splitrock v. Qwest, 4:08–cv–04172–KES (D.S.D.), and Splitrock v. Sprint, 4:09–cv–04075–KES (D.S.D.), respectively.

In Sancom's cases against Sprint, AT&T, and Qwest, the IXCs filed counterclaims against Sancom; in their respective cases, Sprint and Qwest also filed third-party claims against various FCSCs. The cases were eventually stayed for referral of questions to the FCC.[17] While the referral questions were pending before the FCC, Sancom settled its claims and counterclaims in its cases against AT&T and Sprint. Sprint also settled its third-party claims against the FCSCs. The Sancom case against Qwest, including counterclaims and third-party claims, remained.

In the Splitrock cases, Sprint and Qwest filed counterclaims against Splitrock; Qwest also filed third-party claims against South Dakota ILEC Alliance Communications Cooperative, Inc., and FCSC Free Conferencing Corporation. In March and July 2010, the district court referred questions to the FCC in both the Splitrock cases. For efficiency in considering similar

---

**17.** Sancom's case against MCI was consolidated with Northern Valley's case against MCI, 1:07–cv–01016–KES (D.S.D.). MCI amended its counterclaims against Sancom and Northern Valley and also brought third-party claims against several FCSCs. However, MCI, the CLECs, and the FCSCs settled their claims against one another, and therefore the district court did not refer questions in that case to the FCC.

issues then pending before the FCC, the FCC's Market Disputes Resolution Division determined that one IXC, Qwest, would file a complaint against the LEC, while the remaining IXCs would file informal complaints against the LEC and participate in the proceedings through amicus briefs.[18] On October 4, 2010, Sprint and Splitrock informed the district court of the status of the referral to the FCC and advised that they were exploring the possibility of mediation. On September 13, 2011, Splitrock and Sprint filed a stipulation of dismiss and the court entered an order dismissing the case. Splitrock v. Sprint, 4:09–cv–04075–KES (D.S.D.), ECF No. 49.

On January 21, 2011, Splitrock and Qwest submitted a joint status report to the district court indicating Qwest had filed its formal complaint against Sancom with the FCC and that Splitrock and Qwest agreed to await the Commission's Qwest v. Sancom decision with the expectation that resolution of issues in that case would allow for a narrowing of the issues in the Splitrock cases.

### a. FCC: Qwest v. Sancom (Sancom I)

On March 5, 2013, the Commission issued its order on the first consolidated referral question. Qwest Commc'ns Co., LLC v. Sancom, Inc., 28 FCC Rcd. 1982 (2013). The Commission found, with regard to the traffic at issue, Sancom's interstate switched access charges were unlawful because "Sancom did not have 'end users' that were billed or paid for service, as required by [Sancom's] [t]ariff." Id. at 1982–83.

The Commission described that Sancom and FCSCs Free Conferencing Corporation and Ocean Bay Marketing (Ocean Bay) entered into agreements under the terms of which Sancom and the FCSCs would split access charge revenue that was

the result of high volume originating and terminating interexchange traffic. Id. The Commission detailed that under Free Conferencing's agreement with Sancom, Free Conferencing had a bridge at Sancom's central office, Sancom assigned telephone numbers for Free Conferencing to use, Sancom provided various circuitry and equipment, and switching function; in turn, Free Conferencing would provide Sancom minutes of use, for which Sancom would pay Free Conferencing a per-minute fee once Qwest paid Sancom's related switched access charges. Id. at 1983–84. Free Conferencing did not pay Sancom any telecommunications fees, USCs, or taxes. Id. at 1984.

Ocean Bay provided advertising services to third parties by dialing 8YY calls and playing automated messages. Id. Sancom's agreement with Ocean Bay similarly involved Sancom providing a location for Ocean Bay's dialing equipment, suppling various circuitry and equipment, and switched functions; in turn, Ocean Bay provided a minimum minutes of use, for which Sancom agreed to pay Ocean Bay a per-minute fee after Qwest paid Sancom's related switched access charges. Id. at 1984–85.

Sancom's tariff during the relevant period defined switched access as follows:

> Switched Access Service, which is available to customers for their use in furnishing their services to end users, provides a two-point communications path between a customer designated premises and an end user's premises, ... provides for the ability to originate calls from an end user's premises to a customer designated premises, and to terminate calls from a customer designated premises to an end user's premises in the LATA where it is provided ....

18. The FCC also bifurcated the referred issues.

Id. at 1985. "End user" was defined as "any customer of an interstate or foreign telecommunications service that is not a carrier" and "customer" was defined as "any individual partnership, association, joint-stock company, trust, corporation, or governmental entity or other entity which subscribes to the services offered under this [T]ariff, including both [IXCs] and End Users." Id. (alterations in original) (footnotes omitted). The tariff additionally provided that "that Sancom *shall bill* on a current basis all charges incurred by and credits due to the customer under this tariff and that Sancom will establish a bill day *each month* for each customer account or advise the customer in writing of an alternate billing schedule." Id. (internal quotation marks omitted). The tariff also required Sancom to apply USCs each month to billed charges for interstate access services provided to end users. Id. The Commission noted that neither of Sancom's agreements with the FCSCs described monthly charges the FCSCs were to pay Sancom for telecommunications services, rather the only rates set forth in the agreements were those fees Sancom would pay to the FCSCs. Id.

The Commission recapped the district court case Sancom filed against Qwest for its refusal to pay the switched access charges, which included claims for unjust enrichment, tortious interference with business relations, violation of South Dakota Deceptive Trade Practices and Consumer Protection Act, and civil conspiracy, noting that the district court granted Qwest's motion to dismiss those claims finding they were barred by the filed rate doctrine. Id. The district court then granted Sancom's motion to stay and referred three questions to the FCC. Id.

The Commission, addressing the first question in Qwest's formal complaint—whether the traffic billed to Qwest falls within the terms of Sancom's Tariff—reasoned its prior decision in Farmers II controlled because the definitions of "end user" and "customer" used in Farmers' tariff were identical to those in Sancom's tariff. Id. at 1987. Recapping Farmers II, the Commission noted that in determining that the FCSCs were not end users within the meaning of Farmers' tariff, it considered six factors: (1) the parties' contracts did not contemplate that the conference calling companies would pay for service, nor did the parties pay for service; (2) Farmers never treated the FCSCs like other customers—never entered them into billing systems, Farmers' regular business records did not indicate the FCSCs purchased tariff end user service, and Farmers did not bill nor collect payment from the FCSCs; (3) the agreements contained exclusivity clauses and Farmers refused to offer its deals with the FCSCs to other similar parties; (4) Farmers handled the FCSCs' traffic differently than traffic to tariffed customers; (5) the agreements had unique terms that did not resemble traditional agreements for tariffed services—Farmers agreed to pay the FCSCs for terminated traffic, Farmers' deals included differing minimum usage commitments, duration of the agreements varied, termination notice periods varied, Farmers' board of directors approved each FCSCs' agreement, and the provisions of the agreements were kept confidential; and (6) Farmers did not timely report revenues from those services or submit universal service contributions. Id. at 1988. The Commission reiterated that it had concluded, therefore, that neither Farmers nor the FCSCs intended to operate within Farmers' tariff and had "purposefully avoided a customer relationship with Farmers' tariff." Id. (internal quotation marks omitted). Because the FCSCs were not customers nor end users within Farmers' tariff, the Commission found Farmers

was not entitled to charge Qwest switched access charges under the tariff. Id. The Commission noted that Farmers II was upheld by the U.S. Court of Appeals for the District of Columbia Circuit. Id. at 1989.

The Commission noted that under § 203(c) of the Act, a carrier is required "to provide communications services in strict accordance with the terms and conditions of its tariff," and Sancom's tariff required calls to originate or terminate with an "end user," that is, "a customer that subscribes to the services offered under the [t]ariff." Id. The Commission concluded that the FCSCs were not end users because Sancom did not bill the FCSCs for, nor did the FCSCs pay, switched access services noting that Sancom had not established any sort of genuine billing relationship with the FCSCs, did not adhere to established practices regarding transmission of monthly bills, billing system and collection efforts, and did not send monthly bills to the FCSCs. Id. at 1989–90. The Commission rejected Sancom's argument that it invoiced the FCSCs stating that the record only contains a handful of invoices, and those were not even for monthly tariffed charges. Id. at 1990. The Commission found the record "flatly contradict[ed]" Sancom's assertion that a netting process occurred by which the FCSCs generated revenue for Sancom sufficient to pay for Sancom's access charge. Id. It similarly refuted Sancom's argument that the access charge revenues it received from IXCs justified not charging the FCSCs a monthly rate explaining that such rationale "is plainly inconsistent with the Tariff's monthly rates and billing provisions," notwithstanding that the record lacked evidence the parties established any alternative payment arrangement. Id.

The Commission next found that Sancom and the FCSCs "behaved in a manner inconsistent with a tariffed carrier/customer relationship" noting Sancom's relationship with the FCSCs resembled those of business partners more than local exchange customers. Id. at 1991. The Commission considered that Sancom did not require the FCSCs to complete standardized forms other customers were required to complete, avoided similar arrangements with other entities, and had an exclusivity clause with the FCSCs—all of which undermined Sancom's contention that it evaluated potential customers on a case by case basis, but instead demonstrated that Sancom evaluated potential customers by whether they would compete with the FCSCs. Id. at 1992.

The Commission also rejected Sancom's attempt to classify its agreements with the FCSCs as Individual Case Basis (ICB) arrangements as defined in the tariff noting that while the ICB defined in the tariff denoted a condition that developed based on the circumstances in each case, Sancom's agreements with the FCSCs bore no indications at all that they pertained to the services offered under the tariff. Id. at 1993. Rather, the "agreements contain[ed] provisions that not only [were] inconsistent with the Tariff, but that appear[ed] to be *purposefully structured to avoid a traditional tariffed offering*"; that is, the agreements contained minimum usage requirements, required the FCSCs to renegotiate the agreements if Sancom was unable to collect access stimulation revenues from IXCs, and established a choice of law provision, none of which were found in the tariff. Id. (emphasis added). Acknowledging that while Sancom was not obligated to post its arrangements with the FCSCs, the Commission was reviewing Sancom's compliance with its *filed* tariff, and the fact that Sancom had confidential agreements with FCSCs served to bolster the Commission's conclusion "that Sancom was not acting as a common carrier indis-

criminately serving End Users as defined by the [t]ariff." Id. at 1993. The Commission was equally unpersuaded by Sancom's argument that Qwest had unclean hands because it failed to first pay the amounts it owed Sancom under the tariff reasoning that even if such a defense were available in a § 208 proceeding, it would have failed because Sancom unlawfully charged Qwest for tariffed switched access services, thus Qwest's failure to pay the charges before disputing them could not have violated any equitable principle. Id. at 1994.

Thus, the Commission concluded that the FCSCs "were not end users under the [t]ariff and, therefore, that Sancom was not entitled to charge Qwest for switched access under the [t]ariff" and by doing so, Sancom violated §§ 203(c) and 201(b) of the Act. Id.

### b. FCC: Sancom Reconsideration I

On April 4, 2013, Sancom filed a petition for reconsideration of Sancom I. Qwest Commc'ns Co., LLC v. Sancom, Inc., 28 FCC Rcd. 8310 (2013). However, on May 31, 2013, with the petition for reconsideration still pending, the parties filed a joint motion to dismiss informing the FCC they had resolved their dispute. The FCC granted their request to dismiss the pending claims with prejudice.

On May 1, 2013, in the Splitrock v. Qwest case, Qwest and the ILECs issued a joint status report to the district court acknowledging the FCC's issuance of Sancom I and informing that Splitrock was in the process of evaluating that decision. Splitrock v. Qwest, 4:08–cv–04172 (D.S.D), ECF No. 92. In subsequent joint status reports to the district court on November 6, 2013, February 6, 2014, June 2, 2014, and August, 29, 2014, the parties indicated they were pursuing settlement negotiations. Id., ECF Nos. 93, 96, 101, 102, and 103. The parties' most recent status report filed on March 16, 2015, indicates that Qwest and the ILECs were still pursuing settlement. Id., ECF No. 104. It appears no formal complaint was filed at the FCC by or against Splitrock.

### c. Sancom v. Qwest v. Free Conferencing, 4:07–cv–04147–KES (D.S.D)

On July 19, 2013, Qwest and Sancom filed with the district court a motion for dismissal of claims against each other indicating the petition for reconsideration before the FCC had been dismissed. 4:07–cv–04147–KES (D.S.D), ECF No. 280. The motion informed, however, that Qwest's claims against Free Conferencing remained. Id. On August 12, 2013, the district court granted Qwest and Sancom's joint motion to dismiss all claims and counterclaims against one another. Id., ECF No. 284.

Qwest's claims against Free Conferencing proceeded to a six-day bench trial in May 2014. Id., ECF No. 381. The district court entered its trial order on November 6, 2014, finding in favor of Free Conferencing. Id., ECF No. 407 (Qwest Commc'ns Corp. v. Free Conferencing Corp., No. CIV. 07-4147-KES, 2014 WL 5782543 (D.S.D. Nov. 6, 2014)). On December 4, 2014, Qwest filed a motion to vacate the judgment. Id., ECF No. 411.

### 6. Tekstar Cases

In the U.S. District Court for the District of Minnesota, AT&T and Qwest filed traffic pumping cases against Minnesota CLEC Tekstar Communications (Tekstar) and various FCSCs: AT&T v. Tekstar, 0:07–cv–02563–ADM–JSM (D. Minn.); and Qwest v. Tekstar, 0:10–cv–00490–53 MJD–SER (D. Minn.). Tekstar also filed a case against Sprint: Tekstar v. Sprint, 0:08–cv–01130–MJD–SER (D. Minn.). The district court stayed each of the cases and referred questions to the FCC. As in the Sancom and Splitrock cases, the FCC's Market

Disputes Resolution Division determined that one of the IXCs, Sprint, would file a complaint against the LEC and Qwest and AT&T would file informal complaints against the LEC and participate in the proceedings through amicus briefs. During the pendency of the referrals, however, Tekstar settled with the IXC in each of the cases. The formal complaint Sprint filed with the FCC was dismissed with prejudice. Sprint Commc'ns Co. L.P. v. Tekstar Commc'ns Inc., 27 FCC Rcd. 10123 (2012). Thereafter, AT&T settled its claims with the FCSCs and that case—0:07–cv–02563–ADM–JSM (D. Minn.)—was dismissed with prejudice. In the Qwest case—0:10–cv–00490–MJD–SER (D. Minn.)—Qwest and the FCSCs did not settle their claims. The FCSCs filed motions to dismiss Qwest's claims, which were granted in part and denied in part.[19] Motions for summary judgment on the remaining claims are pending.

### 7. Connect America Order

In 2011, responding to the need to bring "robust, affordable broadband to all Americans," the FCC acknowledged that its universal service fund (USF) rules and intercarrier compensation (ICC) procedures had been "designed for 20th century networks and market dynamics" and had "not been comprehensively reassessed in more than a decade." In re: Connect Am. Fund—Notice of Proposed Rulemaking, 26 FCC Rcd. 4554, 4557, 4559 (2011). The FCC "propose[d] to fundamentally modernize the Commission's Universal Service

Fund (USF or Fund) and intercarrier compensation (ICC) system . . . . by eliminating waste and inefficiency and reorienting USF and ICC to meet the nation's broadband availability challenge, transforming a 20th century program into an integrated program tailored for 21st century needs and opportunities." Id. at 4557.

> The Commission acknowledged that
>
> inefficient ICC rules create[d] incentives for wasteful arbitrage. In particular, because rates that local carriers receive[d] to deliver a call var[ied] widely depending on where the call originated and the classification and type of service providers involved, the carriers paying such charges may mask the origination of voice traffic to reduce or avoid payments, creating "phantom traffic." In addition, regulations allowing some carriers to assess above-cost rates for delivering traffic to their subscribers create[d] incentives for local carriers to artificially inflate their traffic volumes, thereby increasing the payments they receive[d], a practice referred to as "access stimulation" or "traffic pumping." Practices like these and the disputes surrounding them cost hundreds of millions of dollars annually that could be used for investment and more productive endeavors—costs that are ultimately borne by consumers.

Id. at 4559.

Thus, on November 18, 2011, the FCC adopted landmark reforms to modernize

---

19. On November 20, 2013, the Honorable Steven E. Rau, U.S. Magistrate Judge, filed an Amended Report and Recommendation on the FCSCs' motions to dismiss recommending that the court deny the FCSCs' Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction, to grant the Rule 12(b)(6) motions to dismiss as to Qwest's claims for unfair competition, fraudulent concealment, and unjust enrichment, and to deny the Rule 12(b)(6) motions to dismiss as to Qwest's

claims for tortious interference. Qwest Commc'ns Co. v. Free Conferencing Corp., 990 F.Supp.2d 953, 959–984 (D. Minn. 2014). On January 3, 2014, the Honorable Michael J. Davis, Chief Judge, U.S. District Court for the District of Minnesota, adopted the Amended Report and Recommendation. Id. at 953.

This Court has reviewed that order and considered that court's disposition of issues that are likewise before this Court.

universal service for the 21st century. Connect America Order, 26 FCC Rcd. at 17667 (2011). In Section XI of the Connect America Order, the Commission "adopt[ed] revisions to our interstate switched access charge rules to address access stimulation." Id. at 17874.

The Commission described the nature of access stimulation, noting

> Access stimulation occurs when a LEC with high switched access rates enters into an arrangement with a provider of high call volume operations such as chat lines, adult entertainment calls, and "free" conference calls. The arrangement inflates or stimulates the access minutes terminated to the LEC, and the LEC then shares a portion of the increased access revenues resulting from the increased demand with the "free" service provider, or offers some other benefit to the "free" service provider. The shared revenues received by the service provider cover its costs, and it therefore may not need to, and typically does not, assess a separate charge for the service it is offering. Meanwhile, the wireless and interexchange carriers (collectively IXCs) paying the increased access charges are forced to recover these costs from all their customers, even though many of those customers do not use the services stimulating the access demand.

> Access stimulation schemes work because when LECs enter traffic-inflating revenue-sharing agreements, they are currently not required to reduce their access rates to reflect their increased volume of minutes. The combination of significant increases in switched access traffic with unchanged access rates results in a jump in revenues and thus inflated profits that almost uniformly make the LEC's interstate switched access rates unjust and unreasonable under section 201(b) of the Act....

Id. (footnotes omitted).

The order noted that the record before the Commission reflected "the need for prompt Commission action to address the adverse effects of access stimulation and to help ensure that interstate switched access rates remain just and reasonable, as required by section 201(b) of the Act," and commented that "access stimulating LECs realize significant revenue increases and thus inflated profits that almost uniformly make their interstate switched access rates unjust and unreasonable." Id. at 17875. The order further noted that access stimulation typically occurred in locations with higher than average access charges, which increases the average cost of long distance calling, but because § 254(g) of the Act prohibits long-distance carriers from passing the higher access costs directly to the customers making the calls to the access stimulating entities, all customers of long distance providers bear the costs, despite the fact that many do not use the services provided by the access stimulator, and that harm, too, was incurred by conferencing services that recover the costs of the conferencing/chat services from the user of those services rather than spreading those costs across the universe of long-distance subscribers, thus allowing "free" conferencing providers to leverage arbitrage opportunities and put companies that recover the cost of services from their customers at a distinct competitive disadvantage. Id. at 17876. Refuting the notion that access stimulation offered economic benefits by, inter alia, expanding broadband services to rural communities, the Commission explained that "how access revenues are used is not relevant in determining whether switched access rates are just and reasonable in accordance with section 201(b)," and furthermore, "excess revenues that [were] shared in access stimulation

schemes provide[d] additional proof that the LEC's rates [were] above cost." Id. at 17876–77 (footnote omitted).

Having established the need for reform, the Commission promulgated a rule that requires carriers entering into revenue sharing arrangements "to refile their interstate switched access tariffs to reflect a rate more consistent with their volume of traffic." Id. at 17875. Thus, for rate-of-return LECs, i.e. ILECs, "the rate would be adjusted to account for new demand and any increase in costs," whereas, "[f]or competitive LECs, that rate would be benchmarked to that of the BOC in the state, ... or to the largest incumbent LEC in the state." Id.

To identify when access stimulating LECs were required to refile their interstate access tariffs, the Commission defined access stimulation as occurring when two conditions were met: (1) the LEC enters into an access revenue sharing agreement (as also defined in the order), and (2) where the LEC had a terminating-to-originating traffic ratio of three-to-one interstate in a calendar month or a greater than 100 percent increase in interstate originating and/or terminating switched access minutes of use (MOUs) in a month compared to the same month in the preceding year. Id. at 17877. The revenue sharing agreement definition is met if an ILEC or a CLEC, has an agreement, "that, over the course of the agreement, would directly or indirectly result in a net payment to the other party (including affiliates) to the agreement, in which payment by the [ILEC] or [CLEC] is based on the billing or collection of access charges from interexchange carriers or wireless carriers." Id. at 17878. The Commission clarified that the "rule focuses on revenue sharing that would result in a net payment to the other entity over the course of the agreement arising from the sharing of ac-

cess revenues" and "does not encompass typical, widely available, retail discounts offered by LECs through, for example, bundled service offerings." Id. (footnotes omitted). The Commission declined to "declare revenue sharing to be a *per se* violation of section 201(b) of the Act," noting that such a ban could be overly broad, but that the rules adopted were part of a comprehensive intercarrier compensation reform, and that as the transition unfolded, the Commission would "address remaining incentives to engage in access stimulation." Id. at 17879. The Commission refuted the contention that it had explicitly approved revenue sharing in CLEC Access Charge Reconsideration Order, where it found that commission payments from CLECs to toll-free traffic generators, "such as hotels and universities, did not create any incentives for the individuals who use those facilities to place excessive or fraudulent calls." Id. (footnote omitted) (citing CLEC Access Charge Reconsideration Order, 19 FCC Rcd. 9108, 9142–43, para. 70, (2004)). The Commission reasoned that case was inapposite because the Commission was responding to the IXC's assertions regarding incentives to artificially inflate 8YY calling and found "that it did not appear that the payments would affect calling patterns because the commissions did not create any incentive for those actually placing the calls to artificially inflate their 8YY traffic," whereas, "when access traffic is being stimulated, the party receiving the shared revenues has an economic incentive to increase call volumes by advertising the stimulating services widely." Id. (footnotes omitted).

The Commission also declined to address the potential that instead of making contracts with third parties, LECs may try to evade the access stimulation prohibition by integrating high call volume operations within the same corporate entity, thereby enabling the characterization of the ar-

rangement as other than revenue sharing. Id. at 17880. The Commission noted that the rules it was adopting pursuant to §§ 201 and 202 of the Act, addressed conferencing services provided by a third party, whether or not affiliated with the LEC and that § 254(k) applies "to a LEC's operation of an access stimulation plan within its own corporate organization," in which case terminating access would be a monopoly service. Id. The Commission reasoned that in contrast, the conferencing activity as portrayed by access stimulating parties would be a competitive service, and therefore "the use of non-competitive terminating access revenues to support competitive conferencing service within the LEC operating entity would violate section 254(k) . . . ." Id. Validating the addition of a traffic measurement component to the access stimulation definition, the Commission noted that such a component created "a bright-line rule that responds to record concerns about using access revenue sharing alone," and concluded "that these measurements of switched access traffic of all carriers exchanging traffic with the LEC reflect the significant growth in traffic volumes that would generally be observed in cases where access stimulation is occurring and thus should make detection and enforcement easier." Id.

Under the Connect America Order, LECs that meet both conditions of access stimulation definition must file a revised tariff: an ILEC "must file its own cost-based tariff under section 61.38 of the Commission's rules and may not file based on historical costs under section 61.39 of the Commission's rules or participate in the NECA traffic-sensitive tariff," and a CLEC "must benchmark its tariffed access rates to the rates of the price cap LEC with the lowest interstate switched access rates in the state, rather than to the rates of the BOC or the largest incumbent LEC in the state." Id. at 17882. Addressing the deemed lawful status of § 204(a)(3), the Commission "proposed that LECs that meet the revenue sharing definition be required to file revised tariffs on not less than 16 days' notice" and that failure to comply with the tariffing requirements would result in the Commission finding "such a practice to be an effort to conceal its noncompliance with the substantive rules that would disqualify the tariff from deemed lawful treatment." Id. at 17888. The Commission further proposed that ILECs "would be subject to refund liability for earnings over the maximum allowable rate-of-return," and CLECs "would be subject to refund liability for the difference between the rates charged and the rate that would have been charged if the carrier had used the prevailing BOC rate, or the rate of the independent LEC with the largest number of access lines in the state if there is no BOC." Id. (footnotes omitted). Regarding compliance, the Commission concluded "that a LEC's failure to comply with the requirement that it file a revised tariff if the trigger is met constitutes a violation of the Commission's rules, which is sanctionable under section 503 of the Act" and "that such a failure would constitute 'furtive concealment,' " thus putting the parties "on notice that if we find in a complaint proceeding under sections 206–209 of the Act, that such 'furtive concealment' has occurred, that finding will be applicable to the tariff as of the date on which the revised tariff was required to be filed and any refund liability will be applied as of such date." Id. at 17888–89 (footnotes omitted). The Commission declined to address a CLEC's request for a declaratory ruling "that commercial agreements involving the sharing of access revenues between LECs and 'free' service providers did not violate the Communications Act" reasoning that the rules adopted in the order defined access revenue sharing

agreement and prescribed the conditions under which a LEC that met that definition must file revised tariffs. Id.

Finally, regarding enforcement of the rules adopted, the Commission unequivocally noted that "[b]ecause the rules we adopt are prospective, they will have no binding effect on pending complaints." Id. at 17889 n. 1182.

## C. Procedural History

On October 23, 2007, Aventure filed this action in the U.S. District Court for the Northern District of Iowa against Sprint [20] and Qwest asserting their respective failures to pay billed charges for the tariffed services Aventure provided represented illegal self help under FCC regulations. 4:07–cv–04094 (IAND), ECF No. 2.[21] At that time, actions had already been filed in this Court by IXCs AT&T, Qwest, and Sprint against several FCSCs and against several LECs, including Aventure: AT&T—4:07–cv–00043; Qwest—4:07–cv–00078; and Sprint—4:07–cv–00194. On January 3, 2008, the U.S. District Court for the Northern District of Iowa granted pre-answer motions filed by Qwest and Sprint and transferred this action to this Court under the first filed doctrine. The case was assigned case number 4:08–cv–00005.

Shortly after this case was transferred, Aventure, as it had done in the related cases, 4:07–cv–00043; 4:07–cv–00078; and 4:07–cv–00194, filed a motion to stay and refer questions to the FCC. While the motions were pending, the FCC released Farmers I. In recognition of the potential impact Farmers I had on the issues in the cases before it, the Court stayed the proceedings in this case and in the related cases until the FCC ruled on Qwest's petition for reconsideration of Farmers I. After the FCC granted Qwest's petition for reconsideration, the Court continued the stay in this and the related cases awaiting the FCC's reconsideration order. During the stay, more than a dozen cases similar to this case were filed in the U.S. District Courts for the Northern and Southern Districts of Iowa by various LECs against the four IXCs for collection of unpaid switched access charges (collection actions). Upon joint motions of the parties, several collection actions were consolidated with the associated tariff actions. The Court also lifted the stay, in part, to allow the parties to file counterclaims.

In September 2009, the IUB issued its decision in Qwest v. Superior, and in November 2009, the FCC issued its order on reconsideration—Farmers II; Farmers' petition for reconsideration—Farmers Recon. II—was denied on March 2010.[22] On July 26, 2010, after affording the parties the opportunity to state their respective positions on the need to amend pleadings or supplement pending motions in light of the recent agencies' decisions, this Court denied without prejudice those motions that had been filed prior to November 2009, preserving the parties' rights to file

---

**20.** Aventure originally named Nextel West Corporation (Nextel) d/b/a Sprint as Defendant but amended its complaint terminating Nextel and naming Sprint Communications Company, L.P. as Defendant.

**21.** On October 23, 2007, Aventure filed another action in the U.S. District Court for the Northern District of Iowa against MCI similarly alleging that MCI's failure to pay billed charges for the tariffed services Aventure provided represented illegal self help under FCC regulations. 4:07–cv–04095 (IAND), ECF No. 2.

**22.** In May 2010, Farmers filed a petition with the U.S. Court of Appeals for the District of Columbia for review of the FCC's Farmers decisions. On December 7, 2011, that court denied Farmers' petition and affirmed the FCC. See discussion supra Part III.B.1.e.

renewed or substituted motions, reasoning those pleadings and motions had been significantly impacted or mooted by recent developments.

In the same general time frame, the district courts in the All American, N. Valley, Sancom, and Tekstar cases stayed those cases and referred questions to the FCC, see discussion supra Part III.B.2.–III.B.6. On April 26, 2011, this Court held a hearing in the related cases on the motions to stay and refer questions to the FCC, during which the LECs, including Aventure, acknowledged that the questions referred in Sancom, N. Valley, All American, and Tekstar were the same questions the LECs in this case proffered in their motions for referral, see, e.g., Aventure's Mot. Ref. to FCC, ECF No. 36, including whether the revenue sharing agreements between CLECs and the FCSCs were per se illegal and, more generally, whether CLECs were entitled to collect federal tariffed charges from IXCs for switched access services to/from numbers the CLECs assigned to FCSCs in connection with those revenue sharing agreements (essentially, whether the Farmers decisions applied to CLECs, since Farmers involved arrangements between an ILEC and FCSCs).[23]

Shortly after the April 26, 2011, hearing, while the motions for referral were still pending, the Commission released N. Valley I and N. Valley II, see discussion supra Part III.B.4. Subsequently, in this case, Qwest and Sprint filed a motions for judg-

ment on the pleadings on non-tariff counterclaims arguing in light of the Commission's holdings in YMax, All American, N. Valley I, and N. Valley II, Aventure's non-tariff claims against Qwest and Sprint failed as a matter of law.

On November 18, 2011, while the parties were still briefing Qwest's motion for judgment on the pleadings, Aventure withdrew its motion to stay and for referral of questions to the FCC; the same day, the Commission issued the Connect America Order, see discussion supra Part III.B.7. On December 30, 2011, the D.C. Circuit issued its order in Farmers v. FCC, denying Farmers' petition and affirming the FCC. After those developments, the parties each filed notices with the Court regarding the impact, or lack thereof, that the Connect America Order and the Farmers v. FCC decision had on the claims before this Court. Aventure was granted leave to amend its claims against Qwest and Sprint. Aventure then filed motions to dismiss seven of eleven counts in Qwest's second amended complaint and four of seven counts in Sprint's amended complaint.

Given the outpouring of notices and motions to supplement the record in regard to the Connect America Order, the Court held a status conference on June 14, 2012, and based upon the information presented at that status conference, the Court entered an order on June 15, 2012, lifting the previously imposed stay in its entirety and directing each party to advise the Court

23. Notably, in its motion for referral, Aventure stated that both the Tekstar and the All American cases raised questions identical to those Aventure raises in the present case and asked this Court to refer to the FCC the same questions referred by the district courts in those cases. See Aventure's Mot. Ref. to FCC 4–5, ECF No. 36 ("The Tekstar Complaint raised issues identical to the issues raised in Aventure's Complaint in this case.... Collec-

tion actions identical to Aventure's action here are pending against AT&T in the Southern District of New York. [citing, inter alia, All American]. Aventure and the other plaintiffs are filing a Motion for Referral to the FCC with respect to identical issues of telecommunication law and policy as are at issue in the Southern District of Iowa cases." (emphasis added)).

which motions that party was still prosecuting, withdrawing, and resisting.

Over the course of the next several months, the Honorable Ross A. Walters, U.S. Magistrate Judge, set scheduling orders and navigated the parties' discovery disputes. In addition to the then-pending motions, the parties filed various dispositive motions: Qwest and Sprint filed motions for summary judgment on all claims under the Act and all tariff claims and counterclaims by and against Aventure. In this case, and in each of the related cases, Aventure filed a combined motion for summary judgment on its claims and counterclaims against Qwest, Sprint, and AT&T.

In the latter half of 2013, while the parties briefed the various motions, the Commission issued decisions in the San-com and All American cases and the D.C. Circuit filed N. Valley v. FCC affirming the Commission's N. Valley I and N. Valley II decisions, see discussion supra Part III.B.4. In addition, on April 24, 2013, the Iowa Supreme Court issued an order denying further review of the IUB's decision. By the end of 2013, in related case 4:07–cv–00078, after joint motions of voluntary dismissal had been filed between Qwest and various LECs, only Aventure and two other LECs remained in that case. In the same time frame, in related case 4:07–cv–00194, Sprint and various LECs similarly filed joint motions for voluntary dismissal, leaving Aventure as the only LEC remaining in that action.

On April 14, 2014, the Court conducted a status conference in the related cases. The parties informed the Court that while many of the parties originally named in these related cases had settled their claims against one another, the parties that remained in each of five related cases were not actively pursuing settlement.[24] Following the status conference, the Court set the pending motions for omnibus hearings, which the Court held on July 23 and 24, 2014.

## D. Factual Background

### 1. Factual Allegations in Aventure's Third Amended Complaint

Aventure alleges that beginning on September 1, 2006, and on the first day of each month thereafter, it billed Sprint and Qwest, respectively, for use of Aventure's access services in accordance with the applicable rates set forth in its tariffs filed with the FCC and that as of March 20, 2012, the total amount due to Aventure from Sprint for interstate access services billed was $15,033,222.43; and the total amount due to Aventure from Qwest for interstate access services billed was $1,772,839.73, including access charges and late fees. Aventure's Third Am. Compl. ¶¶ 12, 26, ECF No. 139. Aventure contends that Sprint and Qwest, respectively, continue to utilize the originating and/or terminating services provided by Aventure despite Sprint's and Qwest's respective intentional failure and refusal to pay Aven-

---

**24.** More than twenty access stimulation and/or collection actions were initially filed in this district; some cases were consolidated, the majority of the cases eventually settled. The AT&AT&T case, 4:07–cv–00043, initially involved over ten defendants; only two remain. The Qwest case, 4:07–cv–00078, initially involved over fifteen defendants; only seven remain. The Sprint case, 4:07–cv–00194, initially involved more than sixteen defendants; only two remain. Aventure's case

against MCI, 5:07–cv–04095 (NDIA), initially involved four defendants; Aventure settled all its claims and the only remaining claims are third-party claims/counterclaims between MCI and Futurephone. In this case, the only named defendants are Qwest and Sprint. As previously noted, Aventure's claims in this case are the same as Aventure's counterclaims against Qwest in 4:07–cv–00078 and against Sprint in 4:07–cv–00194.

ture lawfully billed charges for access services provided and that the respective amounts Sprint and Qwest owe Aventure continues to accrue. Id. ¶¶ 14, 28. Aventure alleges that Sprint's and Qwest's respective refusal to pay for the services is intentional, willful and malicious, and constitutes illegal self-help under the Act and applicable FCC Rules and Regulations. Id. ¶¶ 15, 29. Aventure further alleges that Sprint's and Qwest's respective intentional failure and refusal to pay Aventure its lawfully billed charges is an unreasonable and discriminatory practice. Id. Aventure additionally alleges that Aventure's interstate tariff required interexchange carriers such as Sprint and Qwest to pay specified rates for Aventure's originating and/or terminating access services for interstate traffic and, but for obligations Aventure was prevented from performing, which were excused or waived by Sprint's and Qwest's respective misconduct, Aventure fully performed its obligations under its federal access tariff. Id. ¶¶ 17–18, 32–33.

### a. Aventure's Claims

Aventure asserts four causes of action against Sprint and Qwest: Count one (Sprint) and count three (Qwest)—violation of §§ 201(b) and 203(c) of the Act for failure to pay billed access charges; count two (Sprint) and count four (Qwest)— breach of tariff for failure to pay for billed access services; count five (Sprint and Qwest)—quantum meruit; and count six (Sprint and Qwest)—unjust enrichment.

### 2. Factual Allegations in Qwest's Second Amended Complaint [25]

As previously described in more detail, see discussion supra Part III.A.4., telephone calls are divided into local calls that originate and terminate in the same local exchange and long distance calls that are carried by a long distance carrier from one local calling area to another local calling area. Qwest's Second Am. Compl. ¶ 36, ECF No. 318 (4:07–cv–00078). At issue in this litigation are long distance calls that either originated on equipment and/or facilities owned by the LEC serving the end user customer making the call (originating switched access) or terminate over equipment and/or facilities owned by the LEC serving the end user customer receiving the call (terminating switched access). Id. ¶ 38. IXCs, such as Qwest, pay originating switched access charges to the LECs that serve end user customers who initiate long distance calls from an end user premises within the LEC's certificated local calling area, and pay terminating switched access charges to the LECs that serve end user customers who receive long distance calls delivered to an end user premises within the LEC's certificated local calling area. Id. ¶ 39. The LECs charge IXCs switched access charges to recover from interstate customers the LECs' share of the cost incurred originating and/or terminating interstate calls. Id. ¶ 40. LECs sharing revenue with FCSCs for the purpose of sub-

---

**25.** As stated, at the time Aventure filed this action, Qwest had already filed its lawsuit, 4:07–cv–00078, against several FCSCs and several LECs, including Aventure. Consequently, Qwest did not file counterclaims in this case, but defers to its affirmative claims against Aventure alleged in its second amended complaint in case number 4:07–cv–00078, ECF No. 318. Four FCSCs remain in 4:07–cv–00078: Audiocom, LLC (Audiocom), Free Conferencing Corporation (Free Conferencing), Futurephone.com, LLC (Futurephone),

and Hometown Telecom, Inc. (Hometown), and are collectively referred to in Qwest's second amended complaint as "the FCSC Defendants." Three LECs remain in 4:07–cv–00078: Aventure, Dixon Telephone Company (Dixon), and Reasnor Telephone Company, LLC (Reasnor) and are collectively referred to in Qwest's second amended complaint as "the LEC Defendants." In this case, the allegations made in Qwest's second amended complaint against "the LEC Defendants" only apply to Aventure.

stantially increasing long distance traffic is not a stated purposes for which switched access services are invoiced or billed. Id. ¶ 41.

As alleged in Qwest's second amended complaint, the switched access rate charged by many LECs is less than $0.01 per minute; whereas, the LEC Defendants, premised upon their status as rural LECs and accordant low traffic volumes, charged Qwest access rates between $0.05 and $0.136 per minute interstate and $0.09 per minute intrastate. Id. ¶ 43. Because the LEC defendants exclusively service telephone customers in their local calling area, Qwest had no choice but to use the respective LEC defendants' facilities to deliver traffic to the telephone number assigned by the respective LEC defendant. Id. ¶ 44. During the relevant time period, ILEC Dixon, which had been participating in the NECA Tariff No. 5 and charging Qwest a terminating access rate of $0.05 per minute, dropped out of the NECA pool, and created its own terminating switched access rates. Id. ¶ 46. By dropping out of the NECA pool, instead of having to pool its switched access charge revenues and obtaining only a pro rata portion of the pooled assets, Dixon could instead keep all the money generated from its invoices for terminating switched access charges billed to Qwest and other IXCs. Id. ¶ 45. Similarly, ILEC Reasnor, which had been served by Sully Telephone Company, was purchased and then, in anticipation of the tremendous traffic volume increase due to its business relationship with FCSC One Rate Conferencing, set its terminating switched access rates at over $0.10 per minute. Id. ¶ 47. CLEC Aventure had a tariff that allowed collection of terminating access charges in excess of $0.05 per minute. Id. ¶ 48. According to Qwest, Aventure was in business for two and one-half years "before ever serving an actual end user and was formed for the purpose of traffic pumping." Id. Qwest asserts that by deliberately establishing individual tariffs that generate revenues far exceeding what was necessary to compensate the LEC defendants for the use of their local network, and with knowledge that their arrangements with the FCSC defendants would stimulate massive increases in long distance telephone calls, the LEC defendants abused their regulatory status as common carriers to intentionally extract massively-increased fees from Qwest. Id. ¶ 49.

Qwest alleges that the LEC defendants' tariffs applicable during the relevant time period contained the following definitions in § 2 and provisions in §§ 3, 4, and 6: [26]

**Access Minutes:**

For the purpose of calculating chargeable usage, the term "Access Minutes" denotes customer usage of exchange facilities in the provision of interstate or foreign service. On the originating end of an interstate or foreign call, usage is measured from the time the originating end user's call is delivered by the Telephone Company to and acknowledged as received by the customer's facilities connected with the originating exchange. On the terminating end of an interstate or foreign call, usage is measured from the time the call is received by the end user in the terminating exchange. Timing of usage at both originating and terminating ends of an interstate or foreign call shall terminate when the calling or called party disconnects, whichever event is recognized first in the originating and terminating exchanges, as applicable. § 2.6.

**Common Line:**

26. See Qwest's First Amended Complaint— Exhibit 3, ECF No. 225–3 (4:07–cv–00078).

The term "Common Line" denotes a line, trunk, pay telephone line or other facility provided under the general and/or local exchange service tariffs of the Telephone Company, terminated on a central office switch. A common line-residence is a line or trunk provided under the residence regulations of the general and/or local exchange service tariffs. A common line-business is a line provided under the business regulations of the general and/or local exchange service tariffs. § 2.6.

**Customers:**

The term "Customer(s)" denotes any individual, partnership, association, joint-stock company, trust, corporation, or governmental entity or other entity which subscribes to the services offered under this tariff, including both Interexchange Carriers (ICs) and End Users. § 2.6.

**End User:**

The term "End User" means any customer of an interstate or foreign telecommunications service that is not a carrier, except that a carrier other than a telephone company shall be deemed to be an "end user" when such carrier uses a telecommunications service for administrative purposes, and a person or entity that offers telecommunications service exclusively as a reseller shall be deemed to be an "end user" if all resale transmissions offered by such reseller originate on the premises of such reseller. § 2.6.

**Premises:**

The term "Premises" denotes a building or buildings on continuous property (except Railroad Right-of-Way, etc.) not separated by a public highway. § 2.6.

**Federal Universal Service Charge.**

The Federal Universal Service Charge (FUSC) recovers the [LEC]'s contribution to various federal universal service funds. FUSC will be billed by only those [LECs] contributing to the universal service funds and listed in Section 17.7 . . . . § 3.9.

**End User Access Service.**

The Telephone Company will provide End User Access Service (End User Access) to end users who obtain local exchange service from the Telephone Company under its general and/or local exchange tariffs. § 4.

> **General Description**. End User Access provides for the use of an End User Common Line (EUCL). § .1.

> **Rate Regulations. Who is Billed.** EUCL per month charges will be billed to the end user of the associated Local Exchange Service. § 4.6.1.

**Switched Access Service—General.**

Switched Access Service, which is available to customers for their use in furnishing their services to end users, provides a two-point communications path between a customer designated premises and an end user's premises. It provides for the use of common terminating, switching, and trunking facilities and for the use of common subscriber plant of the Telephone Company. Switched Access Service provides for the ability to originate calls from an end user's premises to a customer designated premises, and to terminate calls from a customer designated premises to an end user's premises in the LATA where it is provided. § 6.1

Qwest alleges that the LEC Defendants entered into relationships with the FCSC defendants, and other FCSCs, for the purpose of exploiting the LEC defendants exclusive ownership of facilities associated with the telephone numbers the LEC defendants assigned to those FCSCs. Id. ¶ 58. Qwest alleges ILEC Dixon provided connections for FCSC Defendants Audio-

com and Free Conferencing, id. ¶ 21; CLEC Aventure provided connections for FCSC defendants Future–phone and Audiocom,[27] id. ¶ 25; and Reasnor provided connections for FCSC One Rate Conferencing. Id. ¶ 23.

According to Qwest, the intended goal of the LEC defendants–FCSCs relationship was to dramatically increase the amount of long distance traffic delivered by and through the LEC defendants' switches to their FCSC partners, and to then bill the IXC, here Qwest, the higher tariffed switched access rate for each call. Id. Qwest further asserts that as the IUB has already found, while purporting to be the FCSCs' local exchange provider, the LEC defendants never provided the FCSCs tariffed local exchange services. Id. ¶ 59. Qwest explains that in executing this scheme, the LEC defendants would assign to the FCSCs, telephone numbers that had, in turn, been assigned to the LEC defendants for use in a particular local exchange by the FCC's authorized administrator, Neustar, and then the FCSCs would connect their equipment to the LEC defendants' network facilities. Id. ¶¶ 60–61. The LEC defendants' placement of the FCSCs' equipment differed: Dixon placed their FCSC partners' equipment, which included routers, call-recorded playback equipment, and other voice recognition equipment, in its own central office, which is within its certificated exchange; Reasnor placed their FCSC partners' equipment in other LECs' buildings, and thus the calls destined for telephone numbers assigned to FCSCs were delivered to locations where Reasnor was not certificated; and Aventure delivered all or a portion of calls destined for telephone numbers assigned to FCSCs to locations where Aven-

ture was not certificated. Id. ¶ 62. Qwest asserts that as the IUB has already expressly found, the FCSCs' equipment, routers, call-recorded playback equipment and other voice recognition equipment, was often actually located outside the LEC defendant's certificated service territory. Id.

The FCSC defendants and other FCSCs advertised through various mediums to encourage their customers and potential customers to call one of the LEC defendants' assigned telephone numbers, which connected to the FCSCs' equipment and allowed the caller to conduct conference calls, chat rooms, voice mail systems, adult content calls, and international calls. Id. ¶¶ 63–64. The FCSC defendants reside in large metropolitan areas in California, Nevada, and/or Texas, and not in Iowa; in fact, none of the FCSCs that partnered with the LEC defendants resided in Iowa or ever had an agent or employee visit the communities supported by the LEC defendants. Id. ¶ 66–67. Qwest further alleges that, for the most part, the FCSCs' equipment in Iowa does not terminate a call but instead forwards the communication to a distant or foreign location, or otherwise facilitates communication between multiple parties, none of whom reside in the LEC defendant's local service area. Id. ¶ 69.

Qwest asserts that the following factors, which were included in the IUB's findings, indicate the LEC defendants and the FCSCs' relationships were actually analogous to partnerships, joint ventures, or business arrangements, and not tariffed end user relationships:

1. The LEC defendants did not issue monthly invoices for local exchange services to the FCSCs, did not bill the FCSCs for the right to place

---

**27.** Other FCSCs Aventure is alleged to have provided connections for include Global Conference Partners, Magellan, Blue Pacific, Rip- ple, Blue Mile, Zip Global, and Metro International.

equipment in their central offices or their use of power from their central offices, and did not input the FCSCs into their traditional billing system;

2. The FCSCs did not pay the LEC defendants EUCL or universal service charges, taxes (sales, municipal, state, excise, or other), or mandatory telephone-related surcharges for the local exchange service purportedly provided;

3. The LEC defendant's local exchange tariffs did not include a category of customers that equates to FCSCs nor did their local tariffs define their relationships with their FCSCs partners, rather the terms of their relationships were defined in individual and confidential contracts;

4 The LEC defendants did not offer or provide any local exchange service to the FCSCs pursuant to their local tariffs;

5. The FCSCs received the right to place equipment in a LEC defendant central office (or another location control by a LEC defendant) free of charge;

6. The LEC defendants paid the FCSCs millions of dollars in kickbacks to route traffic to or through the LEC defendants; and

7. The LEC defendants did not pay any true end user customers for delivery of calls to them. Id. ¶ 72.

Qwest avers that the LEC Defendants' tariffs provide that terminating switched access revenue can only be obtained when the LEC terminates a telephone call, but that some, if not all, of the services provided by the FCSCs do not terminate in the LEC defendants' respective local exchange area. Id. ¶ 73. Qwest points out that Reasnor, for example, has billed Qwest for switched access on calls that were deliv-ered to affiliates in other exchange areas, taking advantage of an affiliate's higher access rates and/or inflating the mileage component of the switched access rates. Id. Qwest argues that this strategy is traffic laundering, and thus by charging Qwest terminating switched access charges for calls they did not terminate in the certificated local exchange area, the LEC defendants violated the law and their own state and federal tariffs. Id. According to Qwest, Aventure, which had business relationships with FCSCs including FCSC defendants Hometown and Futurephone, routed the credit card, international, voice mail, and recorded call playback calls on to the called parties, who were located outside the exchange area, outside of Iowa, and in many cases, out of the country, and not at the local Iowa telephone number associated with the FCSC defendant. Id. ¶ 74. Qwest asserts that like Reasnor, Aventure was also charging Qwest for terminating switched access in violation of its own tariff because it did not terminate such calls. Id.

Qwest contends that the LEC defendants and the FCSCs, including the FCSC defendants:

1. Entered into confidential contractual arrangements allowing the FCSCs without charge to place their equipment in the central office either of a LEC defendant or that of a company related to the LEC defendant; id. ¶ 75

2. The contracts between the LEC defendants and the FCSCs were not filed with the FCC or the IUB; id. ¶¶ 76–77.

3. The contracts between the LEC Defendants and the FCSCs were not posted on the LEC Defendants' websites or otherwise made available to the public; Id. ¶ 78.

4. The chat lines, conference calls, international calls, and adult content calling services supplied by the FCSCs require substantial financial resources to operate; id. ¶ 79.

5. The FCSCs did not collect revenue from customers but instead their primary source of revenue came from the portion of terminating switched access revenues they received from the LEC defendants and had been paid by the IXCs. The FCSCs obtained these kickbacks and offered services to their customers for free; id. ¶ 80.

6. Had they not been receiving the revenue from IXCs like Qwest, the FCSCs would have been required to collect the revenue necessary to support the services provided from the calling services customers; id. ¶ 81.

Qwest alleges that this traffic pumping scheme allowed LECs Dixon, Reasnor, and Aventure, along with FCSCs Audiocom, Free Conferencing, Futurephone, Hometown, and others, to make millions of dollars from proclaimed "free" services at the expense of IXCs, including Qwest, who subsidized the service through payments of what Dixon, Reasnor, and Aventure improperly billed as switched access charges. Id. ¶ 82. Qwest contends the LEC defendants knowingly, intentionally, and willingly conspired with their FCSC partners, including Audiocom, Free Conferencing, Futurephone, and Hometown, to create this traffic pumping scheme; that the goal of these relationships was to dramatically increase the amount of traffic delivered to or routed through these telephone numbers (traffic pumping), and to demand that IXCs (such as Qwest) subsidize this practice by paying unjustified switched access charges; and that collectively, the Defendants' fraudulent, unfair, and unreasonable schemes have increased Qwest's expenses by tens of millions of dollars. Id. ¶¶ 83–85.

Qwest describes that it is a traditional IXC that delivers calls as either a retail carrier, a wholesale carrier, or "least-cost routing" long distance carrier. Id. ¶ 86. As a retail carrier, when end user customers that have chosen Qwest as their long distance carrier make telephone calls to telephone numbers associated with FCSCs with whom the LEC defendants conduct business, Qwest delivers those calls to the LEC defendants' switches associated with the telephone numbers the LEC defendants assigned to the FCSCs, and then the LEC defendants bill Qwest switched access charges whether or not the calls satisfy the requirements of the LEC defendants' access tariffs. Id. ¶ 86.A. When Qwest acts as a wholesale carrier, another long distance carrier hands off a call to Qwest for delivery to a LEC defendant. When those other long distance carriers' end users make telephone calls to a telephone number associated with a FCSC with whom a LEC defendant has a partnership, the other long distance carrier hands the call to Qwest, who then delivers that call to the switch associated with the telephone number; the LEC defendants then bill Qwest access charges, irrespective of whether the calls meet the requirements of the LEC defendants' access tariffs. Id. ¶ 86.B. Finally, when Qwest delivers long distance calls to other long distance carriers for ultimate delivery to a LEC defendant's telephone number, that is, Qwest is using other long distance carriers to provide wholesale carriage for Qwest, also called least cost routing, the call is routed in the manner that has the least cost. When wholesale delivery by another long distance carrier costs less than delivering the call directly to a LEC defendant, the call is routed to the other long distance carrier for wholesale delivery. Id. ¶ 86.C. Qwest pays the other long

distance carrier a contract rate to deliver the calls to the LEC defendant, which includes a termination charge related to the LEC defendant's terminating switched access charge. Id.

Dixon, Reasnor, and Aventure billed Qwest for switched access for calls destined for telephone numbers assigned to FCSCs from their interstate or intrastate tariffs. Id. ¶ 87. The kickbacks to the FCSCs, and thus the traffic pumping arrangement's very existence, was premised upon the LEC defendants billing Qwest for switched access for calls destined for telephone numbers assigned to FCSCs. Id. ¶ 88. Had the LEC defendants complied with their access tariffs and not billed switched access for calls destined for telephone numbers assigned to FCSCs, Qwest could have saved money by delivering the calls to the LEC defendants itself and would not have least cost routed any of the FCSC traffic. Id. ¶ 89. The LEC defendants and the FCSC defendants exploited the least cost routing system by having the LEC defendants enter into preferential contracts with at least one long distance carrier, anticipating that carrier would pay the LEC defendants when other carriers, like Qwest, would dispute payments. Id. ¶ 90. As a result of these preferential relationships, much of Qwest's traffic was handed to another long distance provider, resulting in Qwest paying at least a portion of the LEC defendants' improperly billed switched access charges, simply through another carrier. Id.

Qwest asserts that assuming, arguendo, the FCSCs were end users, the LEC defendants' scheme unfairly, unreasonably, and illegally discriminated among end users because the LEC defendants (1) shared a portion of its switched access revenue with the FCSCs but did not share that revenue with legitimate end users in the same manner or to the same degree;

(2) provided service to FCSCs without charge while requiring legitimate end users to pay tariff rates; (3) provided service to FCSCs without requiring them to pay taxes and surcharges but required legitimate end users to pay taxes and surcharges; (4) allowed FCSCs to collocate in central offices without charge without allowing legitimate end users to do so without charge; and (5) discriminated between purported end users due to the unique manner in which it interacted with FCSCs. Id. ¶¶ 91–96. According to Qwest, the LEC defendants' discrimination was unreasonable and unjust because, inter alia, the revenue sharing with the FCSCs was tied to an effort to exploit the LEC defendants' exclusive ability to provide switched access services and collect exorbitant switched access charges from IXCs such as Qwest. Id. ¶ 97. Thus, while reasserting its firm belief that the FCSCs were not end users but functional business partners, Qwest asserts that should the Court find otherwise, the LEC defendants' conduct nonetheless constitutes "unreasonable discrimination" and is an unfair and unreasonable practice, and unreasonably discriminatory, in violation of Iowa law, see Iowa Code § 476.5 and 199 IAC 22.1(1)(a) and (d), and that the traffic pumping scheme is only possible by virtue of this unreasonable and unjust discrimination. Id. ¶ 98. Qwest avers that absent the discrimination at the very foundation of the business plan, the scheme would never take place because it would be impossible for the LEC defendants to generate kickbacks to fund their FCSC partners. Id. ¶ 99.

Aventure and Dixon entered into business relationships with certain FCSCs, particularly Audiocom, knowing those FCSCs provided adult, indecent, and pornographic calling services and they assigned telephone numbers to those FCSCs to facilitate the provision of those calling services knowing that technical mecha-

nisms had not been installed or implemented, nor steps taken, to restrict children from making calls to those telephone numbers or that parents or guardians had otherwise been provided with the ability to block children's access to these numbers. Id. ¶¶ 100–03. Qwest asserts that a substantial and material portion of calls delivered to Aventure and Dixon's FCSC partners is pornographic in nature and constitutes indecent communications and the IUB has found that LECs allowing their telephone facilities, which are under their control, to be used for purpose of indecent pornographic calling without technical mechanisms in place is contrary to the public interest. Id. ¶¶ 104–05.

Qwest explains that LECs bill long distance carriers switched access charges to compensate the LECs for the long distance carriers' use of their telecommunications network noting that the FCC has stated terminating switched access charges should be rate neutral and that its primary concern in regulating small telephone companies is to ensure that their access rates are not unreasonably high. In re: Reg. of Small Tel. Cos., 2 FCC Rcd. 1010, 1012 (1986). Qwest contends that none of the stated purposes for which switched access services are invoiced or billed include revenue sharing between the LEC defendants and their customers for the purpose of driving increased long distance traffic. Id. ¶ 106. Qwest asserts that the collection of terminating switched access tariff revenue for the purpose of sharing that revenue with the FCSCs and through the traffic pumping schemes described is inconsistent with the overall purpose of switched access charges, because that revenue is not used, nor is it intended to be used, for the purposes described in the LEC defendants' FCC or state tariffs, nor for the purposes set forth by the FCC or IUB, and that given the financial arrangements between the LEC defendants and the FCSCs, the LEC defendants are essentially delivering traffic to themselves, which is not subject to terminating switched access charges. Id. ¶ 107.

### a. Qwest's Claims

Qwest asserts eleven causes of action against Aventure: [28] Count one—violation of § 201(b) for unreasonable practice; count three—failure to comply with § 223, which prohibits obscene calls; count four—violation of § 203 for collection outside of tariff; count five—violation of § 203 for providing rebates; count six—common law unfair competition; count seven—breach of tariff/contract; count eight—common law fraudulent concealment; count nine—tortious interference with contract; count ten—civil conspiracy; count eleven—unjust enrichment; and count twelve—a declaratory judgment declaring Qwest is not responsible to pay for the interstate and intrastate access charges which Aventure has not provided and cannot collect pursuant to its tariff.

### 3. Factual Allegations in Sprint's Amended Complaint [29]

Sprint alleges it is a telecommunications carrier offering long-distance wireline services to its customers around the country.

---

**28.** Qwest withdrew Count Two for violation of § 254(k) for cross subsidization. See Qwest's Br. Resp. Suppl. Auth. 1 n.3, ECF No. 467 (4:07–cv–00078).

**29.** At the time Aventure filed this action, Sprint had already filed its lawsuit, 4:07–cv–00194, against several FCSCs and several LECs, including Aventure. Thus, in this case,

Sprint defers to the claims alleged against Aventure in 4:07–cv–00194, ECF No. 211. In its case, 4:07–cv–00194, Sprint has settled its claims against all LECs except Aventure and all FCSCs except Futurephone. Accordingly, the allegations made in Sprint's amended complaint against "the LEC defendants" now only apply to Aventure.

Sprint Am. Compl. ¶ 26, ECF No. 211 (4:07–cv–00194). Sprint describes that it generally owns the facilities over which the call travels between the local calling area of the calling customer to the local calling area of the called customer (or it enters arrangements with other carriers to route the calls over their facilities); but that in rural areas including Iowa, it delivers the call to a centralized equal access provider, who then delivers the call to the appropriate LEC and adds its own charges, which are billed to Sprint. Id. Sprint notes that it does not own the facilities within a local calling area and thus the last leg of these calls are typically provided by the called party's LEC. Id. ¶ 27. Sprint explains that it, like other long-distance carriers, purchases terminating access service either through a contract with a particular local exchange carrier that governs the terms of termination, or it purchases the service under a tariff published by the LEC that contains charges and terms for terminating access. Id. ¶ 28. Sprint asserts that a long-distance carrier has purchased access services under a tariff whenever it hands off a call to a LEC that meets the LEC's tariff's definitions of terminating access service and that the long distance carriers often have no choice but to purchase the service defined in the tariff when the calls are made from one of their customers to an end user in the calling area of the LEC. Id. Sprint asserts that because the LECs effectively have a monopoly over local telephone services in their respective calling areas, tariffs are construed narrowly and only services expressly set out in the tariff are "deemed" to be purchased. Id.

Sprint alleges that Aventure billed Sprint for services, which Aventure asserts Sprint purchased under the local carriers' tariffs. Sprint challenges that the activities Aventure and FCSCs engaged in would not pass legal muster and are not within Aventure's schedule of tariffed charges over all or most of the relevant time period. As a result, Aventure has billed Sprint for services that are not authorized in its tariff and for which it has no right to bill Sprint. Id. ¶ 29. Sprint alleges that Aventure and FCSCs devised a scheme to artificially inflate call volumes in Aventure's local calling area in order to bill Sprint inflated rates for what Aventure wrongly characterized as tariffed "terminating access" service. According to Sprint, under this scheme, Sprint does not connect a call with a called party in Iowa that is a customer of Aventure; instead, Aventure and the FCSCs' joint scheme involves advertising international, conference call, chat line, or similar services that allow callers, who typically do not reside in Iowa, to talk to one another. Id. ¶ 30.

Sprint describes that the callers access these services by dialing a ten-digit phone number with an Iowa area code, calls that appear to Sprint to be ordinary long-distance calls to a called party in Iowa. Sprint thus carries the traffic to the location close to the Iowa number, at which point Sprint causes the call to be transferred to an Iowa LEC, such as Aventure, for termination. Id. ¶ 31. Sprint asserts that it has paid these terminating access charges in the past when the service provided was true terminating access to an end user—a paying residential or business customer that resided in Aventure's territory—but insists what happens instead in this traffic pumping scheme is that Aventure does not transfer the call to an end user customer, but transfers it to its FCSC business partners, who are jointly engaged in this scheme. Id. ¶ 32. Sprint argues these business partners are not customers or end users of the local telephone company as those terms are used in the local phone companies' tariffs or in common industry parlance because the FCSCs do not pay money to the local carrier for any service

as would be the case in a true customer relationship, but instead, the FCSCs actually receive money in the form of kickbacks from the local carrier for their participation in this illegal scheme. Id. ¶ 33. Sprint further asserts that the calling parties are not making terminating calls to these businesses, but are seeking to talk to other parties almost always outside of Aventure's service territory; the FCSCs simply connect the calls, and the calls do not actually terminate in the local Iowa exchange. According to Sprint, the calls flow to the international destination or to those participating in the conference call or chat line who could be located anywhere in the nation or even in another country, which makes these calls unlike the typical scenario where a caller makes a long-distance call to a person in Iowa and Sprint pays Aventure to terminate the call, Sprint is merely delivering the call to an intermediate point, that is, delivering the call to Aventure that then delivers the call to the international provider or to a conference call or chat line provider, who then connects callers who are geographically dispersed. Id. ¶ 34.

Sprint contends that it has not expressly agreed, nor can it be deemed to have agreed, to pay terminating access charges for this service. Sprint asserts that both the FCC and IUB found the service is not a terminating access service as defined in the local companies' tariffs and, consequently, Aventure has no right to bill Sprint for this "service." Id. ¶ 35. Sprint postulates that Aventure and its FCSC partners clearly understand Aventure had no right to bill Sprint, as they engaged in numerous, often unlawful, practices to disguise the existence or nature of their scheme, which included (a) continuously changing the phone numbers involved in the scheme, to make it difficult for Sprint and other long distance carriers to determine which calls are to numbers associated with the scheme; (b) not reporting the revenue from the scheme on industry reports and tax returns; (c) misrouting traffic or misrepresenting where traffic is routed; (d) not describing the FCSC service in their tariffs; and (e) most disturbing, backdating invoices and contracts after litigation had commenced to create the illusion of a different relationship than what actually existed. Id.

Sprint explains that Aventure and the FCSCs benefit from this scheme because Aventure set its terminating access rates at such very high levels that the FCSCs are able to offer their services to calling parties for no cost, or nearly no cost, but, far from free, these call connection services are directly and unreasonably subsidized by long distance carriers, such as Sprint, who are being charged high terminating access rates, which, in turn, are subsidized by all long distance carriers' customers throughout the country, including those who never use the FCSCs' services. Id. ¶ 36. As previously noted, see discussion supra n.9, Sprint describes that as a result of offering a "free" or nearly free service, call volumes to the services offered by the FCSCs skyrocketed, and in a one-year span, from March 2006 to March 2007, the number of access MOUs billed by Superior to Sprint increased an astounding 25,690%, and that from 2004 to 2006, the MOUs billed by LEC Farmers and Merchants to Sprint increased 11,186%. Sprint posits that these dramatic increases can be traced almost entirely to the LEC–FCSCs' traffic-pumping scheme. Id. ¶ 37.

Sprint asserts that carriers' tariffs describe the services offered to all of their customers and set the rates charged for those services, and because carriers are subject to the tariffing requirements of § 203, they cannot charge customers for services not specified in their interstate

tariffs and cannot charge rates other than those set out in those tariffs. Sprint further asserts that the terms of a tariff must be strictly construed against the carrier that drafted it and in favor of customers. Id. ¶ 39. Sprint notes that Aventure's tariffs are written to describe the typical call where an IXC like Sprint delivers a call to Aventure for the call to be terminated to Aventure's local end user customer and do not authorize terminating access charges for Aventure merely transiting calls to the FCSCs who then actually connect the callers. Sprint, accordingly, asserts that the service Aventure is providing is not terminating access to one of Aventure's end users. Id. ¶ 40.

Sprint details that the relevant terms of Aventure's tariff states that "Switched Access Service provides for the ability to ... terminate calls from a Customer's Premises to an End User's Premises." Id. ¶ 41. Sprint clarifies that instead of terminating to the FCSCs, Aventure transfers the calls to FCSCs, which then utilize their own international, conference call, chat line, or other similar service to route and connect calls themselves; therefore, the calls do not *terminate* with the FCSCs and many do not even connect through to end users located in Aventure's Iowa territories. Sprint concludes that in no way is Aventure providing switched access or terminating access under its tariff. Id.

Next Sprint asserts that Aventure's tariff states that "Switched Access Service ... provides a two-point communications path between a Customer Premises and an End User's Premises," that "Switched Access Service provides for the ability to ... terminate calls from a Customer's Premises to an End User's Premises" and that an end user under the tariff does not include other carriers. Id. ¶ 42. Sprint surmises that according to those terms, Aventure must deliver the calls to end users and end users do not include other carriers, but that Aventure is performing a common carrier function when routing and connecting calls to its conference call, chat line, and international call services, which are wholly unlike typical LEC end users—a person, family, or business actually located in Iowa that subscribes to the LECs' local phone service in order to make and receive calls. Due to this practice, Sprint concludes Aventure has no basis for billing Sprint access charges for transferring calls to these entities that are not end users under the tariff. Id. Finally, Sprint asserts the FCSCs are not customers of Aventure, as is required under the tariff for Aventure to lawfully bill for these access charges and that the FCSCs are not actually paying for local phone services from Aventure; instead, Aventure is making net payments to the FCSCs. Id. ¶ 43. Sprint contends that the FCSCs in league with Aventure are not entitled to the kickbacks they reap from artificially inflating traffic to their free services; their business models are premised on advertising a free call connection service to users of their services to artificially generate high call volume, and receiving payments based on unlawfully billed terminating access charges in return; and their operations and profit are entirely subsidized by the windfall they unlawfully receive from the payments Sprint made to Aventure. Id. ¶ 45.

#### a. Sprint's Claims

Sprint alleges seven causes of action against Aventure: Count one—breach of federal tariff obligation and the Act (violation of § 203); Count two—unreasonable practices in violation of § 203(b); Count three—breach of state tariff obligations and violation of Iowa Code § 476; Count four—unjust enrichment; Count five—breach of contract; Count seven—fraudulent concealment; and Count eight—civil conspiracy.

#### 4. Aventure's Tariff Definitions: Customer, End User, Switched Access

##### a. Aventure: Tariff FCC No. 1

Customer—Any person, firm, partnership, corporation or other entity which uses service under the terms and conditions of this tariff and is responsible for the payment of charges. In most contexts, the Customer is an Interexchange Carrier utilizing the Company's Switched or Dedicated Access services described in this tariff to reach its End User customer(s).

Qwest's MSJ Pub. App. 7-2, ECF No. 574-1 (4:07-cv-00078).

End User—Any person, firm, partnership, corporation or other entity which uses the service of the Company under the terms and conditions of this tariff. In many contexts, the End User is the customer of an Interexchange Carrier who in turn utilizes the Company's Switched or Dedicated Access services described in this tariff to provide the End User with access to the IC's communication and switching systems.

Qwest's MSJ Pub. App. 7-3, ECF No. 574-1 (4:07-cv-00078).

Switched Access Service, which is available to Customers for their use in furnishing their services to End Users, provides a two-point communications path between a Customer's Premises and an End User's Premises. It provides for the use of common terminating switching and trunking facilities, and for the use of common subscriber plant of the Company. Switched Access Service provides for the ability to originate calls from an End User's Premises to a Customer's Premises and to terminate calls from a Cus-

tomer's Premises to an End User's Premises in the LATA where it is provided.

Qwest's MSJ Pub. App. 7-7, ECF No. 574-1 (4:07-cv-00078).

## IV. DISCUSSION

### A. Aventure's Motions to Dismiss

Aventure argues for dismissal [30] under Rule 12(b)(1) as to Qwest's count three and under Rule 12(b)(6) as to Qwest's counts one, three, five, six, eight, nine, and ten; and as to Sprint's counts one, two, seven, and eight.

#### 1. Standard for Motion to Dismiss

■■■■ To state a claim for relief, a party must submit "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), a party may assert, by motion, the defense of failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To defeat this motion, "a complaint must contain sufficient factual matter, ... to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); Braden v. Wal–Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009) (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937). To meet the plausibility standard, "[t]he plaintiff must assert facts that affirmatively and plausibly suggest the pleader has the right he claims ..., rather than facts that are merely consistent with such a right." Staley v. Catholic Initiatives, 509 F.3d 517, 521 (8th Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

---

**30.** Aventure filed a combined motion to dismiss claims against it filed by AT&T in 4:07-cv-00043, by Qwest in 4:07-cv-00078, and by Sprint in 4:07-cv-00194, and as to Qwest's and Sprint's counterclaims in 4:08-cv-00005.

reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

■ In evaluating the complaint, factual allegations in the complaint are taken as true, and any reasonable inferences that may be drawn are drawn in favor of the non-moving party. Id.; Gallagher v. City of Clayton, 699 F.3d 1013, 1016 (8th Cir. 2012); Braden, 588 F.3d at 594. However, legal conclusions and mere "recitation[s] of the elements of a cause of action" may be discarded. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955); Braden, 588 F.3d at 594. As part of the "context-specific task [of evaluating a complaint] that requires the reviewing court to draw on its judicial experience and common sense," the complaint should be examined in full, rather than in piecemeal. Braden, 588 F.3d at 594 (quoting Iqbal, 556 U.S. at 679, 129 S.Ct. 1937).

### 2. 12(b)(1) Motion to Dismiss for Lack of Standing

Aventure first argues that count three of Qwest's second amended complaint against Aventure and other LECs for violation of § 223, which penalizes certain obscene or harassing acts over telephone lines, must be dismissed because § 223 does not create a private right of action, and therefore, Qwest lacks standing. Aventure argues Qwest cannot avoid that bar by bootstrapping the § 223 claim to its § 201(b) unjust and unreasonable practice claim. Aventure further argues that even if § 223 did create a private right of action, Qwest would not have standing to seek damages for the complained of conduct because Qwest, which is a corporation, is not the parent or guardian of any minor children and lacks standing to assert a claim based upon § 223.

■ Qwest acknowledges that § 223 does not create a private cause of action but counters that Aventure misconstrues count three. Qwest asserts that count three alleges that Aventure's failure to comply with § 223 constitutes the predicate unjust and unreasonable practice for a violation of § 201(b). It is Qwest's contention that by entering into a business relationship with FCSCs who provide adult, indecent, and pornographic calling services, without technical means to block children's access to them, Aventure violated § 223 and thus committed an unjust and unreasonable act. Qwest argues that showing a violation of an FCC order is not the only way of demonstrating a § 201(b) violation, rather, it may show such a violation by demonstrating a carrier has violated another provision of the Act or an FCC rule. Qwest argues that Aventure's standing argument fails because count three alleges the LECs violated § 201(b) *by not complying with* § 223, and does not assert a private cause of action or remedy under § 223. Citing Northern Valley Communications, LLC v. Qwest Communications Corp., 711 F.Supp.2d 1018, 1024–25 (D.S.D. 2010); Northern Valley Communications, L.L.C. v. Sprint Communications LP, 618 F.Supp.2d 1076 (D.S.D. 2009); and Sancom, Inc. v. Qwest Communications Corp., 2008 WL 2627465, at *3 (D.S.D. Jun. 26, 2008), Qwest asserts that Aventure's argument confuses standing with whether Qwest states a claim and that courts have repeatedly rejected the standing argument Aventure raises herein. Qwest contends that to demonstrate standing only requires "at least one petitioner has 'alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.'" Horne v. Flores, 557 U.S. 433, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009) (quoting Summers v. Earth Island Inst., 555 U.S. 488, 493, 129 S.Ct. 1142, 173 L.Ed.2d

1 (2009)); see also Ariz. Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 131 S.Ct. 1436, 1442, 179 L.Ed.2d 523 (2011); Sprint Commc'ns Co., L.P. v. APCC Serv., Inc., 554 U.S. 269, 273–274, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008). Standing also requires showing prudential standing, i.e., that the plaintiff is not "raising another person's legal rights, or . . . generalized grievances." Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 12, 124 S.Ct. 2301, 159 L.Ed.2d 98, (2004) (internal quotation marks omitted), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., —— U.S. ——, 134 S.Ct. 1377, 188 L.Ed.2d 392 (2014).

Qwest further argues Aventure does not contend that Qwest lacks a cognizable injury from Aventure's failure to implement the controls required under § 223 or that Aventure's business relationships with FCSCs that provide adult content, indecent, or pornographic calling services has not injured Qwest by inflating the volume of traffic on which Aventure has wrongfully billed Qwest. Qwest contends that Aventure has committed unjust and unreasonable acts by not furnishing FCSCs who provide adult content material with "900" telephone numbers that would allow parents to block access.

Qwest's final assertion is that to demonstrate standing, courts customarily accept all factual allegations in the complaint as true and draw all inference in the plaintiff's favor. See Gray v. City of Valley Park, Mo., 567 F.3d 976, 983–84 (8th Cir. 2009); Stalley, 509 F.3d at 521 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." (quoting Lujan v. Defenders of Wildlife, 504 U.S.

555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992))).

Standing requires (1) an injury that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," (2) that the injury "be fairly traceable to the challenged action of the defendant," and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Turkish Coal. of Am., Inc. v. Bruininks, 678 F.3d 617, 621 (8th Cir. 2012) (quoting Republican Party of Minn., Third Cong. Dist. v. Klobuchar, 381 F.3d 785, 791–92 (8th Cir. 2004)).

█ Qwest's count three alleges that the LECs' "failures to comply with the requirements of 47 U.S.C. § 223 constitute an unjust and unreasonable practice in connection with their provision of interstate communication services, in violation of their 47 U.S.C. § 201(b) duties." Qwest's Second Am. Compl. ¶ 127, ECF No. 318 (4:07–cv–00078). Qwest does not assert a cause of action under § 223; rather, Qwest alleges that the LECs' conduct is contrary to their requirements under that provision of the Act, and therefore, they have violated § 201(b). Qwest has met the threshold pleading requirement of stating a cognizable injury under § 201(b).

### 3. 12(b)(6) Motions to Dismiss Communications Act Claims

#### a. § 201(b) Claims

█ Aventure also argues that Qwest's and Sprint's claims for violation of § 201(b) for sharing tariffed access charges on long distance calls with providers of conference calling and similar services fail to state claims upon which relief may be granted and are subject to dismissal under Rule 12(b)(6). According to Aven-

ture, absent an FCC order, rule, or regulation expressly finding certain conduct is unjust and unreasonable, there is no private right of action under the Act. Aventure asserts a violation of § 201(b) requires a determination by the FCC that an action constitutes an unjust and unreasonable practice. Aventure argues that because Qwest and Sprint have failed to plead the requisite FCC action, they cannot maintain claims under § 201. Aventure further asserts that the Connect America Order expressly declined the IXCs' requests to declare revenue sharing to be a violation of § 201(b) and made it clear that carriers who receive tariffed services must pay the tariffed rates.

Qwest and Sprint reject Aventure's assertion that because Qwest and Sprint have not pled prior FCC decisions that find traffic pumping conduct unjust or unreasonable, Qwest's and Sprint's causes of action for violation of 201(b) must be dismissed arguing that Aventure applies the incorrect pleading standard since Communications Act claims are subject to Rule 8 notice pleading and Qwest's and Sprint's claims have met that standard. Qwest and Sprint note that Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc., 550 U.S. 45, 53, 127 S.Ct. 1513, 167 L.Ed.2d 422 (2007), cited by Aventure for the proposition that a prior FCC decision must be pled to avoid dismissal of a § 201(b) claim, does not mandate citing a prior FCC decision or order as a pleading requirement, rather Global Crossing noted that the *success* of a § 201(b) claim depends on whether the FCC, by rule or decision, could properly hold that a carrier's conduct was unjust and unreasonable.

Qwest and Sprint also challenge Aventure's interpretation that the Connect America Order found revenue sharing was not unjust or unreasonable. Qwest and Sprint point out that the Connect America Order repeats the FCC's previous holding in All American, noting "[a]s the Commission has previously stated, '[w]e do not endorse such withholding of payment outside the context of any *applicable* tariffed dispute resolution provisions.'" Connect America Order, 26 FCC Rcd. at 17890 (second alteration in original) (emphasis added) (quoting All American I, 26 FCC Rcd. at 728). Qwest and Sprint assert that their § 201(b) claims against Aventure are premised on Aventure assessing Qwest and Sprint with switched access charges on calls that had no end users, no subscription to a service from Aventure's interstate tariff, no end user premises, and no common line, and thus failed to meet tariff requirements. Qwest and Sprint posit that the IUB agreed with these premises regarding intrastate traffic. See IUB I, 2009 WL 3052208.

Qwest and Sprint further challenge that Aventure's reading of the Connect America Order as finding revenue sharing lawful contradicts that order. Qwest and Sprint argue that the new access stimulation rules use revenue sharing as a trigger but do not provide that access sharing is permissible nor do the new rules immunize LECs from their duty to refrain from billing IXCs tariff charges when the subject calling does not meet the LEC's tariff requirements. See 47 U.S.C. §§ 201(b), 203(c). Qwest and Sprint continue that under the Connect America Order, IXCs continue to have the right to bring actions to address whether a LEC has complied with the *new* rule going forward, whether a LEC's traffic stimulation otherwise continues or becomes unjust or unreasonable despite the new rule, and had no effect on existing complaint actions. According to Qwest and Sprint, through the Connect America Order, the FCC merely declined to find revenue sharing was per se unlawful under § 201(b) reasoning that "[a] ban

on all revenue sharing arrangements could be overly broad, and no party has suggested a way to overcome this shortcoming." Connect America Order, 26 FCC Rcd. at 17879 (footnote omitted). But the FCC also rejected the notion that it had previously "explicitly approved revenue sharing." Id. Qwest and Sprint reiterate their positions that contrary to Aventure's assertions, the Connect America Order does not go so far as to find revenue sharing to be per se lawful, and in fact, in the Connect America Clarification Order, the FCC specifically noted that prior to the new rules, it had "adopted several orders resolving complaints concerning access stimulation under preexisting rules and compliance with the Communications Act," and clarified that the new rules order "complements these previous decisions, and nothing in the [new rules order] should be construed as overturning or superseding [those] previous [FCC] decisions." Connect America Clarification Order, 27 FCC Rcd. 605, 613 (2012).

Aventure's arguments for dismissal of Qwest's and Sprint's § 201(b) claims are premised on Qwest's and Sprint's *success* on those claims rather than, more properly, on whether those claims meet the Rule 12(b)(6) requirements of stating a claim. Global Crossing does not, as Aventure suggests, demand a heightened pleading requirement for § 201(b) claims. Rather, before the Court in Global Crossing was the gateway issue of whether § 207, which authorizes persons damaged by a violation of § 201(b) to bring a lawsuit to recover damages in federal court, would authorize payphone operators to bring a federal lawsuit

against long-distance communications carriers who refused to compensate the payphone operator for certain calls. Global Crossing, 550 U.S. at 53, 127 S.Ct. 1513. The Court found that it did. Id. The adequacy of pleading a § 201(b) claim was not before the Court in Global Crossing. Furthermore, were there such a pleading requirement, Qwest has cited the Commission's Farmers II decision, which clearly established that the type of conduct alleged in Qwest's § 201(b) claim was unjust and unreasonable. While the application of the facts herein to the Farmers II decision has yet to occur, the predicate pleading requirement appears to have been met.

Of note, Qwest attached to its resistance Aventure's "wholesale services agreement" with FCSC Global Conference Partners (GCP).[31] The terms of the agreement detail the arrangement between the parties whereby GCP would install and maintain, at its expense, equipment at the "switch site" located on Aventure's premises. In return, Aventure would provide GCP with telephone numbers and internet connectivity at the switch site that had a minimum of eight dedicated IP addresses, and would ensure internet connection to GCP's equipment would meet agreed upon service levels. The agreement detailed that Aventure would provide its services at no cost to GCP. Qwest's Resist. Ex. B, ECF No. 153–1. Exhibit B details the "marketing fee schedule" by which Aventure would pay GCP "per month based *upon revenue collected in accordance with the per minute marketing fee schedule*" to be sent to GCP "within 10 days of Aventure Communication collecting its revenue on said min-

---

31. On July 3, 2013, GCP notified the Court that it filed for bankruptcy protection. On July 8, 2013, the Court severed and stayed claims by and against GCP in 4:07–cv–00078 and in 4:07–cv–00194, see ECF No. 715 (4:07–cv–00078) and ECF No. 487 (4:07–cv–00194), respectively. While legal/fact issues may turn on the specific details of an FCSC–LEC agreement, for purposes of whether Qwest has stated a claim, the GCP–Aventure agreement provides a general overview of the workings of FCSC–LEC agreements and support Qwest's allegations.

utes," and if Aventure were to "suffer a substantial and material change in the amount of revenue it is contractually entitled to receive from its carriers," GCP agreed to accept from Aventure a payment proportionate to the amount Aventure received from its carriers. Id. (emphasis added). Another noteworthy provision of the Aventure–GCP agreement is the clause "Relationship with End Users," which details that "Aventure Communication shall have no responsibility for dealing directly with any of Global Conference [sic] customers ("End Users") for any purpose relating to the services. Global Conference is solely responsible for all products and services it provides to *its* end users." Id. (emphasis added).

Qwest and Sprint have sufficiently pled causes of action under § 201(b) to satisfy the plausibility standard and defeat a Rule 12(b)(6) motion to dismiss. See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

### b. § 203(c) Claims

▮ Aventure next argues Qwest and Sprint fail to state claims for violations of § 203(c) because Connect America affirmed that LECs have the ability to share access revenues with their end users and that Qwest and Sprint incorrectly define rebates under § 203 as being payments back to the carrier paying the tariffed charges instead of payment to third parties. According to Aventure, Qwest and Sprint confuse their relationship with Aventure, which is governed by Aventure's interstate access tariff and federal law, with Aventure's relationships with Aventure's local end user customer, which is governed by Aventure's agreement with those end users not by Aventure's tariff or by the FCC. Aventure describes that two distinct *and unrelated* transactions are at play. First, as Aventure asserts, it terminates a call brought to its network by its access-tariff customers, such as Qwest and

Sprint. This step entitles Aventure to collect access charges from Qwest and Sprint for the work Aventure performs in completing Qwest and Sprint's customers' long-distance calls. Next, Aventure delivers the call to *its own end user customer*, such as an FCSC, pursuant to the terms of the agreement with that end user. According to Aventure, § 203(c)'s prohibition on rebates only applies to customers that receive service pursuant to the tariff. Therefore, a violation would only occur if Aventure gave a refund or rebate to the IXC that took service pursuant to Aventure's interstate tariff and paid the tariffed access charges. Aventure points to the FCC's repeated position that is does not regulate the relationship between a LEC and its end user customer. See Seventh Report and Order, 16 FCC Rcd. at 9938 ("[W]e continue to abstain entirely from regulating the market in which end-user customers purchase access service"). Aventure's final assertion is that the Connect America Order "expressly" states that local exchange carriers *are permitted* to enter into revenue sharing agreements with their end user customers and that Connect America Order language suggests access revenue sharing is an "important" feature in the definition of access stimulation.

Qwest and Sprint assert that their § 203(c) claims for relief for unlawful rebates or remissions of tariff charges are premised on Aventure's practice of taking revenues paid by the IXCs and remitting them to the FCSCs with whom Aventure does business, which, Qwest and Sprint assert, meets the requirements of § 203(c). Qwest and Sprint point out that Aventure acknowledges billing Qwest and Sprint for alleged interstate switched access services that are subject to the tariff requirements of § 203(a) and (c), thus Aventure is rebating or remitting part of its interstate tariff's charges to the FCSCs whom Aventure

asserts are end users. Qwest and Sprint argue § 203(c) prohibits refunding or remitting any portion of the charges without specifying to whom the refund or remittance is made and it is not restricted to refunds or remittance to the same customer nor to customers of the same tariff under which Aventure charged Qwest and Sprint. That is, the FCC did not restrict the provision solely to remittances back to the same customer who had been billed those tariff charges nor to remittances to customers of the same tariff. Qwest distinguishes International Telecharge, Inc. v. AT&T Co., 8 FCC Rcd. 7304, 7306 (1993), cited by Aventure, noting that although in that case the FCC found private payphone commissions were not unlawful rebates, that finding was based on different facts, most importantly, the commissions were not paid to persons who AT&T alleged were end users but to private payphone owners who did not make the calls, id.[32] Qwest and Sprint also distinguish that contrary to Aventure's suggestion, Panatronic USA v. AT&T Corp., 287 F.3d 840 (9th Cir. 2002), does not stand for the proposition that § 203(c) is limited to customers covered by the tariff at issue. Rather, the issue in Panatronic was whether a long distance carrier committed unlawful price discrimination under § 202(a) by delaying the assessment of connectivity fees upon its tariff 12 customers, while assessing connectivity fees on its tariff 1 and tariff 27 customers. Id. at 843. After concluding the carrier's assessment did not constitute unlawful price discrimination, the court next considered whether the carrier violated § 203(c) by imposing the delayed connectivity fee on the tariff 12 customers after negotiating new contracts and filing amended tariffs. Id. at 845. The court "construe[d] § 203(c) as conferring a cause of action on customers covered by the tariff at issue, but not on customers covered by other tariffs." Id. However, because the plaintiff "was not a customer covered by [tariff 12], it suffered no injury under section 203(c) by [the carrier]'s delay in imposing the [connectivity] fee on its [tariff 12] customers....[and] lack[ed] standing to invoke the independent protection of this section." Id.

Aventure's argument that Qwest and Sprint have not stated claims under § 203(c) fails. First, Aventure's assertion that it is still contested whether, under the LEC–FCSCs' agreements, the FCSCs were end users has been put to rest by both the FCC and the IUB. Second, in N. Valley Recon. I, the Commission rejected the contention advanced here by Aventure that the access charge requirements impermissibly regulate the LEC–end user relationship:

In addition to arguing that the Commission's CLEC access charge rules do not address the facts at issue, Northern Valley contends that the [N. Valley I] Order's requirement that tariffed CLEC access charges be for transporting traffic to an end user "conflicts with the Commission's long-standing precedent establishing that it does not regulate the CLEC–end user relationship." According to Northern Valley, the Order "demand[s]" that CLECs assess a fee on end users. The Order does no such thing. Under the Order, Northern Valley may offer its services to individuals and businesses for any fee (or no fee). The

---

**32.** Sprint similarly distinguishes that in AT&T's Private Payphone Commission Plan, 7 FCC Rcd. 7135–36 (1992)—cited by the FCC in International Telecharge, Inc. v. AT&T Co.—the Commission likewise held that commissions paid to private payphone companies to pay for private payphone companies' costs in making "0+" operator services available to end users were not rebates because they were not paid to the end user, that is, the customer of the "0+" operator services, but paid to the private payphone companies.

*Order* provides only that, if Northern Valley chooses to assess access charges upon IXCs by *tariff*, the individuals or entities to whom Northern Valley provides access must be "end users" (i.e., paying customers).

N. Valley Recon. I, 26 FCC Rcd. at 14525 (second alteration in original) (footnotes omitted).

Third, Aventure again attempts to extend the scope of the Connect America Order suggesting it legitimizes past conduct. Aventure further ignores the FCC's clear directive that nothing in the Connect America Order vitiates or is contrary to previous FCC rulings. Connect America Clarification Order, 27 FCC Rcd. at 613 ("Prior to the [Connect America] Order, the Commission adopted several orders resolving complaints concerning access stimulation under preexisting rules and compliance with the Communications Act," and clarifying that the Connect America Order "complements these previous decisions, and nothing in the [new rules order] should be construed as overturning or superseding [those] previous Commission decisions."). The Connect America—Notice of Proposed Rulemaking order positively cited the N. Valley decision denying CLEC Northern Valley's motion to dismiss Qwest's § 203(c) claim for lack of standing, noting the Commission's longstanding prohibition on rebates as an important guard against rate discrimination. See Connect America—Notice of Proposed Rulemaking, 26 FCC Rcd. at 4773 & n. 1071 ("We note that the prohibition on rebates has long been an important guard against rate discrimination, and that the Commission has been vigilant in its review under section 203(c). We also note that section 203(c) claims have been asserted by carriers in the context of access stimulation disputes. We seek comment on whether the refund prohibition in section 203(c) of the Act has a prohibitive effect on revenue sharing arrangements between LECs and access stimulating entities, or, if there are aspects of these relationships that fall outside the scope of this statutory provision." (footnotes omitted)). Furthermore, as previously stated, the new rules set forth in the Connect America Order do not immunize LECs from their ongoing duties to provide tariffed services without discrimination among customers.

Qwest and Sprint have sufficiently pled causes of action under § 203(c) to satisfy the plausibility standard and defeat a Rule 12(b)(6) motion to dismiss. See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

#### 4. 12(b)(6) Motion to Dismiss State Law Claims

Aventure also argues that existing state law and the Connect America Order undermine Qwest's state law claims for unfair competition, fraudulent concealment, tortious interference, civil conspiracy, unjust enrichment, and declaratory judgment, and Sprint's state law claims for fraudulent concealment and civil conspiracy.[33] Aventure first asserts that each of Qwest's and Sprint's state law claims rest on the faulty premise that the LECs' revenue sharing agreements with FCSCs are somehow illegal, which is undercut by the Connect America Order that "expressly sanctions" LECs to engage in such fee sharing arrangements and collect tariffed switched access charges from IXCs.

##### a. Qwest's Unfair Competition Claim

Aventure argues that Qwest's assertion of a "myriad" of purported actions include (1) Aventure providing a "kickback," (2)

---

**33.** Aventure does not move to dismiss count four of Sprint's amended complaint, which is a claim for unjust enrichment.

the provision of a service that was "subsidized" by long distance carriers, (3) participation in a scheme that violated the Act and Iowa law in undefined ways, and (4) Aventure's provision of a service that is likely to confuse parents of minor children. Aventure argues that even prior to the Connect America Order, these conclusory allegations were insufficient to establish that Qwest was entitled to relief for unfair competition but that the Connect America Order, nonetheless, put the issue to rest, that is, if the actions delineated by Qwest were not prohibited by law, there can be no violation of common law unfair competition. Thus, whether Aventure shares a portion of its revenue, which Aventure says Qwest derisively calls "kickbacks," with FCSCs, there can be no violation of common law unfair competition. Aventure further argues that Qwest's assertions do not amount to stating a claim of unfair competition under Iowa law.

Qwest defends the adequacy of its second amended complaint to state a cognizable claim for unfair competition arguing Aventure's assertions that Qwest has to allege the time, place, and contents of false representations for unfair competition, presumes unfair competition claims must be pled with particularity under Rule 9, which is contrary to the notice pleading rules.[34] Qwest notes that only one of its claims, fraudulent concealment, see discussion infra. Part IV.A.4.b., needs to be, and is, pled with the requisite particularity.

██ Under Iowa law, "[t]he doctrine of unfair competition is based on the principle of common business integrity. It goes to the question of a defendant's methods and representations in marketing his products, not to his right to manufacture or produce them." Basic Chems., Inc. v. Benson, 251 N.W.2d 220, 231 (Iowa 1977) (citing B. H. Bunn Co. v. AAA Replacement Parts Co., 451 F.2d 1254, 1262–63 (5th Cir. 1971) ("The gist of unfair competition in Florida is 'palming off.' Actual customer confusion is not a necessary element to the establishment of this claim, but evidence of customer confusion does have probative value on the issue of 'palming off.' ")).

In Motor Accessories Manufacturing Co. v. Marshalltown Motor Material Manufac-

---

34. Allegations pertaining to Aventure in Count VI of Qwest's second amended complaint include: (1) Aventure misused its inherent and exclusive power over terminating switched access services; (2) Aventure works in concert with FCSCs who advertise and promote false and misleading information about how they are able to provide "free" services (e.g., websites stating tax dollars, a universal service fund, and/or their website advertising banners pay for the free calls, which are actually paid by kickbacks from Qwest's payments to LECs); (3) These representations will likely confuse or deceive consumers leading them to wrongfully believe they are receiving free services; (4) Aventure and the FCSCs have concealed information that prevented Qwest from understanding the nature of the calling; (5) The FCSCs have deliberately misused Aventure's inherent and exclusive power over intrastate and interstate terminating switched access services to the telephone numbers assigned to them; (6) Aventure provides kickbacks to the FCSCs but does not provide similar kickbacks to true end user customers and Aventure has absolute market power over the provision of switched access services; (7) The FCSCs knowingly participated in the scheme that depended upon kickbacks of a portion of switched access charges not authorized by tariff; (8) Aventure knowingly participated in a scheme that depended upon numerous violations of the Communications Act and Iowa law; (9) Aventure's conduct is likely to confuse parents of minors who have no way of ensuring that their minor children do not call telephone numbers associated with adult and pornographic content; and (10) Aventure's unfair competition has caused Qwest to suffer harm to its business and is therefore entitled to damages to be determined at trial. Qwest's Second Am. Compl. ¶¶ 142–151, ECF No. 318. In addition, Qwest seeks any nonduplicative gain that Aventure has obtained from its wrongful conduct.

turing Co., 167 Iowa 202, 149 N.W. 184, 186 (1914), the Iowa Supreme Court set forth the following standard regarding unfair competition claims:

The ground of the action of unfair competition is fraud, and this may be shown by direct testimony, or by facts and circumstances or inferred from the manner in which the business is carried on. *This doctrine is applied in cases where one has established a business under a particular name, or by the use of certain marks or symbols, so that it has become known, in the trade, generally as designating the goods of that person.* Courts of equity will enjoin one who fraudulently assumes the same name, device, or symbol for the purpose of stealing away from the other the business so established, and thereby depriving him of the profit which flows from the business. *The object of the law is to protect the property rights of a person from invasion by one who fraudulently, by the use of the same devices, symbols, or name, seeks to and does take from him the custom, good will, and the business by him established and maintained.* There is no practical way, other than by prohibition to prevent the filching of trade established by one in an article, through a name, symbol, or mark, than by prohibiting the use of the trade name or mark.

In Johnson Gas Appliance Co. v. Reliable Gas Products Co., 233 Iowa 641, 10 N.W.2d 23, 27 (1943), the Iowa Supreme Court further noted that there were "many cases involving unfair competition decided by the State and Federal courts" and that the consensus from those other jurisdictions was the general rule that *"the essence of unfair competition consists in palming off, either directly or indirectly, one person's goods as the goods of another,* and while this involves an intent to deceive, it is not necessary to prove intent by direct evidence, where it is clearly to be inferred from circumstances." (emphasis added).

Qwest asserts the tort of unfair competition has a broader scope as applied by the court in ProBatter Sports, LLC v. Joyner Technologies, Inc., C–05–2045–LRR, 2006 WL 140655, at *3 (N.D. Iowa Jan. 17, 2006). Qwest urges the Court to adopt the definition of unfair competition found in the Restatement (Third) of Unfair Competition § 1, comment g, which is cited in ProBatter.

Restatement (Third) of Unfair Competition § 1 (1995) in relevant part states as follows:

One who causes harm to the commercial relations of another by engaging in a business or trade is not subject to liability to the other for such harm unless:

(a) the harm results ... from other acts or practices of the actor determined to be actionable as an unfair method of competition, taking into account the nature of the conduct and its likely effect on both the person seeking relief and the public; or

(b) the acts or practices of the actor are actionable by the other under federal or state statutes, international agreements, or general principles of common law apart from those considered in this Restatement.

Qwest argues that the breadth of the tort is to ensure that the law adequately addresses ever-changing tortious conduct and is elucidated in the comment g to the Restatement, which states in relevant part,

A primary purpose of the law of unfair competition is the identification and redress of business practices that hinder rather than promote the efficient operation of the market.

. . . .

It is impossible to state a definitive test for determining which methods of competition will be deemed unfair .... Courts continue to evaluate competitive practices against generalized standards of fairness and social utility. Judicial formulations have broadly appealed to principles of honesty and fair dealing, rules of fair play and good conscience, and the morality of the marketplace. The case law, however, is far more circumscribed than such rhetoric might indicate, and courts have generally been reluctant to interfere in the competitive process. An act or practice is likely to be judged unfair only if it substantially interferes with the ability of others to compete on the merits of their products or otherwise conflicts with accepted principles of public policy recognized by statute or common law.

As a general matter, if the means of competition are otherwise tortious with respect to the injured party, they will also ordinarily constitute an unfair method of competition. A competitor who interferes with the business of another by acts or threats of violence directed at the other, for example, is subject to liability for unfair competition. So also is one who interferes by instituting or threatening to institute groundless litigation against a competitor.

. . . .

Liability at common law for acts of unfair competition has been supplemented by the widespread enactment of the Unfair Trade Practices and Consumer Protection Act, which commonly prohibits unfair methods of competition and unfair or deceptive acts or practices. The private right of action available under many of these statutes has been pursued primarily as an alternative to traditional contract and tort actions by disappointed purchasers attracted by the generous remedial provisions of the Act. In a number of jurisdictions, however, competitors also have standing to seek redress under the Act for harm to their commercial relations. Application of the Act in this latter context has thus far been generally limited to conduct falling within the traditional categories of unfair competition law. However, the broad substantive standards embodied in many of these statutes provide a flexible statutory counterpart to the general common law proscription against unfair competition.

Restatement (Third) of Unfair Competition § 1 cmt. g (1995).

■ Qwest avers that it has alleged numerous facts showing Aventure has engaged in unfair, wrongful business conduct that has a likelihood of confusing consumers into believing Aventure and the FCSCs' services are actually free and has harmed Qwest in its commercial relation by: billing Qwest for access charges that were not authorized by tariffs; violating federal and Iowa law requiring compliance with filed tariffs; entering into secret agreements touting their so-called free services to the public; and intentionally abusing Aventure's monopoly power. Qwest refutes Aventure's assertion that an unfair competition claim requires competition between the plaintiff and defendant stating that all that is required is competition "of some sort" and that the focus of the claim is on the likelihood of confusion element. Qwest argues ProBatter and the Restatement recognize that unfair competition can take many forms and that the claim has consequently evolved to protect commercial interest from a myriad of unfair competition. The Court must disagree.

The allegations of unfair competition as alleged in Qwest's second amended complaint do not square with the principles for such a claim as established by the Iowa

Supreme Court in Motor Accessories, Johnson Gas, and Basic Chemicals, which all involved competition between the plaintiff and defendant. In Motor Accessories, the plaintiff spark plug manufacturer brought an action against a former employee alleging that immediately after leaving the plaintiff's employ, the former employee formed a competing company that manufactured spark plugs containing the same essential and novel features as plaintiff's spark plugs, for which plaintiff had filed a patent application. Motor Accessories, 149 N.W. at 185. The plaintiff's complaint alleged, inter alia, that the defendants had taken this action with the intention of profiting by plaintiff's reputation, to deceive the public, and to palm off its spark plugs as those of the plaintiff. Id. at 185–86. In Johnson Gas, the plaintiff gas appliance manufacturer brought an action against former employees alleging that after leaving plaintiff's employ, the defendants had designed, manufactured, and marketed a furnace identical to plaintiff's product and that they had also taken the names and addresses of plaintiff's customers. Johnson Gas, 10 N.W.2d at 25. In Basic Chemicals, the plaintiff brought an action against a competing chemical company and its principals alleging the defendants had appropriated and removed for their benefit the plaintiff's trade secrets and had enticed the plaintiff's employees to join defendants and enter into unfair competition with the plaintiff. Basic Chems., 251 N.W.2d at 222 (Iowa 1977). Even in ProBatter, upon which Qwest relies, which was a federal case applying Iowa law, the plaintiff held two patents on a baseball video pitching simulator and brought an action against a competitor alleging claims for patent infringement, unfair competition, and unfair trade practice. ProBatter, 2006 WL 140655, at *1. The defendant alleged counterclaims of

non-infringement, unfair competition, and abuse of process. Id.

 Qwest's unfair competition claim does not allege Aventure or the FCSCs are Qwest's competitors. Nor does that claim allege that Qwest had "established a business under a particular name, or by the use of certain marks or symbols, so that it has become known, in the trade, generally as designating the goods of that person." Motor Accessories, 149 N.W. at 186. Neither does Qwest allege that the Defendants have assumed "the same name, device, or symbol for the purpose of stealing away from the other the business so established, and thereby depriving [Qwest] of the profit which flows from the business." Id. As the Iowa Supreme Court articulated, the object of the unfair competition law "is to protect the property rights of a person from invasion by one who fraudulently, by the use of the same devices, symbols, or name, seeks to and does take from him the custom, good will, and the business by him established and maintained." Id. Qwest's unfair competition claim makes no such allegations.

 Qwest's reliance on ProBatter is misplaced. As discussed above, the unfair competition claims in that case were between direct competitors and involved, inter alia, allegations of product confusion and patent infringement. ProBatter, 2006 WL 140655, at *1. Furthermore, the ProBatter court looked to the Restatement (Third) of Unfair Competition after mistakenly concluding Basic Chemicals was the only Iowa case discussing the tort of unfair competition and that the elements of the tort had not been set forth in that case. Id. at *3. As discussed above, the Iowa Supreme Court did set forth the elements of the tort in Motor Accessories, 149 N.W. at 186. The Iowa Supreme Court did not look to the Restatement (Third) of Unfair Competition in recognizing the tort,

and it would be error for this Court to do so. To the extent ProBatter applies a different standard for an unfair competition claim under Iowa law, the Court distinguishes that case.[35]

On this record, Qwest has failed to state a claim of unfair competition under Iowa law, and Aventure's motion to dismiss as to this claim will be granted.

### b. Qwest's and Sprint's Fraudulent Concealment Claims

■■■ Qwest's allegations in support of its fraudulent concealment claim include that the LECs and the FCSCs have all actively participated in, aided, and abetted a scheme to deliberately conceal the true nature of their business relationships, and to deliberately conceal information that should have been filed with the IUB and/or the FCC. The alleged concealed information includes, but is not limited to, the terms of their written agreements; the LECs failing their duty to file their agreements with the FCC/IUB; LECs not issuing monthly invoices of its local exchange services to its FCSC partners; FCSCs not paying the LECs for local exchange services; FCSCs not paying service charges for the interstate tariff; the FCSCs not paying sales and other taxes for the services the LECs provided; the FCSCs not paying mandatory telephone related surcharges for services the LECs provided; the LECs not offering local service to their FCSC partners pursuant to local tariffs; LECs' local exchange tariffs not defining the relationships between the LECs and their FCSC partners; the LECs not inputting the FCSCs into their traditional billing systems; the LECs not billing the FCSCs for the right to place equipment in the LECs' central offices; the LECs not billing the FCSCs for their use of power from the LECs' central offices; the FCSCs receiving a right to place equipment in the LECs' central offices free of charge; the LECs paying the FCSCs millions of dollars in kickbacks to route traffic to or through the LECs; many of the calls to telephone numbers assigned to the FCSCs not terminating to an end user customer's premises; none of the FCSCs who conduct business with the LECs actually residing in one of the Iowa communities supported by the LECs; FCSCs not having any employees who reside in the communities supported by the LECs; the FCSCs placing equipment within central offices and the LECs not charging the FCSCs for the power usage; many of the calls destined for telephone numbers the LECs assigned to FCSCs not terminating within one of the LECs' certificated exchanges; the LECs having thousands of telephone numbers at their disposal to assign to FCSCs but actively hiding the quantity of telephone numbers used by FCSCs (Dixon has only 595 access lines,

---

**35.** The Court notes that contrary to Qwest's assertion, a claim for unfair competition under Iowa law does contain a fraud element, see Motor Accessories, 149 N.W. at 186 ("The ground of the action of unfair competition is fraud, ...."), which must be plead with particularity under Rule 9(b), see Crest Const. II, Inc. v. Doe, 660 F.3d 346, 353 (8th Cir. 2011) ("Under Rule 9(b)'s heightened pleading standard, allegations of fraud ... [must] be pleaded with particularity. In other words, Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." (alterations in original) (quoting Summerhill v. Terminix, Inc., 637 F.3d 877, 880 (8th Cir. 2011))). Although the Court primarily finds that Qwest failed to state a claim of unfair competition under Iowa law, the Court also finds that it is a reasonable extension of the Iowa court's view in Motor Accessories, 149 N.W. at 186, that Qwest's unfair competition claim lacks the requisite specificity of time periods or locations and indication of who was making the various alleged representations, and therefore does not satisfy Rule 9(b), and thus is an alternative basis for dismissing Qwest's unfair competition claim. Id. at 889.

but 10,000 telephone numbers available to it; Reasnor has 10,000 telephone numbers available to it; and Aventure has at least 9000 telephone numbers available to it); and FCSCs routinely changing the telephone numbers that their participants call for the free services to prevent IXCs from tracking calls destined for FCSCs.

Qwest argues that concealment of these facts made it impossible for Qwest to understand that the calls destined for telephone numbers to which LECs assigned to FCSCs were not being delivered to end users, at end users' premises, over a common line ordered out of the LECs' local exchange tariff, or terminated in one of the LECs certificated exchanges and that without this concealment, Qwest would have known the calls delivered to telephone numbers LECs had assigned to FCSCs did not qualify for switched access charges and Qwest could have made informed business decisions that would have saved it millions of dollars.

Qwest further argues the LECs failed their duty to provide accurate information in support of their bills when such information was requested by Qwest and the FCSCs aided and abetted in the concealment of this information by inducing and substantially assisting the LECs to enter into confidential arrangements, requesting thousands of telephone numbers from the LECs, and frequently changing the telephone numbers they used. Qwest avers that the LECs and FCSCs performed this intentional, willful, and deliberate concealment (1) to induce Qwest and other IXCs to pay the switched access charges billed by the LECs that Qwest and other IXCs would not otherwise have paid; (2) with the expectation and intent that Qwest and other IXCs would rely upon the facts and information disclosed, and the invoices delivered to the IXCs necessarily failed to disclose true facts; (3) to cause Qwest and

other IXCs to pay the erroneous invoices to the LECs, who then kicked back a portion to the FCSCs; and (4) to induce Qwest and other IXCs to rely upon the same false appearance of the LECs compliance and thereby continue delivering calls to the telephone numbers that the LECs assigned to their FCSC business partners, in the usual manner, such as by delivering calls to the LECs via wholesale carriers through least cost routing principles.

Qwest continues that this deliberate concealment of material facts, and the continued delivery of calls to the LECs through all traditional methods, caused Qwest to pay fees to wholesale carriers, primarily Sprint and AT&T, for a portion of the terminating switched access charges that the LECs charged to the carrier who delivered the call. Qwest avers that the LECs and FCSCs knew about Qwest's use of wholesale carriers and least cost routing principles and yet received payments from these route carriers for purported switched access even though they were not entitled to those payments under the LECs' tariffs, and that had Qwest delivered the traffic directly rather than through a wholesale carrier, Qwest would not have paid switched access charges for the traffic. Qwest further alleges the LECs negotiated confidential agreements with AT&T that induced Qwest to route traffic through AT&T to receive the reduced rate AT&T would assess (as opposed to the LECs' higher tariff rate) and that the LECs' and FCSCs' fraudulent concealment caused Qwest significant harm.

In support its fraudulent concealment claim, Sprint alleges that due to the information passed between carriers in the normal course of a telephone call, the unlawful traffic in dispute would appear to Sprint to be traditional, lawful calls to an end user's

customer premises in the LEC's designated calling area. Sprint asserts, however, that Aventure and other LECs who were involved in a transaction (the exchange of traffic and billing and payment for such traffic) with Sprint had information that the LEC knew would be necessary for Sprint to be aware that the calls were not traditional calls to a local end user retail customer. Sprint describes that the LECs knew that the calls were to a conference bridge owned by the LEC, that the FCSC associated with that bridge was not paying for any of the LEC's local retail services, or that access charges being paid by Sprint were being split with the FCSC as a kickback for pumping up the access volumes above the levels assumed when the LEC's rates were set. Sprint asserts that this information, which was in the LECs' possession, was necessary to prevent the otherwise normal electronic information about the call from being misleading.

Sprint continues that the LECs and their FCSC partners engaged in contrivances intended to exclude suspicion or prevent inquiry into, or discovery of, the true nature of the traffic and their relationships, which included (1) changing the telephone number used for the pumped traffic; (2) not filing tariffs describing the FCSC services; (3) having Iowa Network Services (INS) rather than the LEC itself request that the IXCs install additional capacity; (4) misrouting traffic, also known as traffic laundering; (5) not reporting FCSC revenues on tax statements or various industry reports; and (6) backdating or falsifying invoices and contracts to disguise the nature of the relationships between the LECs and the FCSCs.

Sprint asserts that under these circumstances, the LECs, including Aventure, had a duty to disclose material information in their business transactions with Sprint that would have prevented the normal call and billing information provided by the LEC from being misleading and that the intentional failure of the LECs to do so caused harm to Sprint, which constitutes a fraudulent concealment. Sprint further asserts that Aventure and other LECs acted with reckless disregard for the rights of Sprint and other IXCs. Sprint contends that the business plan for the traffic pumping scheme between the LECs and FCSCs was, in fact, expressly predicated on abusing the law to force Sprint and other IXCs to unwittingly pay for the scheme and for the calls the FCSCs marketed to customers as "free." Sprint argues it is entitled to damages for Aventure's intentional tortuous action.

Aventure contends Qwest's and Sprint's fraudulent concealment claims fail to meet the Rule 9 pleading requirements and fail to state a claim under Iowa law because the LECs had no duty to disclose any of the information that Qwest and Sprint assert was concealed. Aventure argues that the LECs had no duty to disclose the nature and workings of their customer relationships with the FCSCs, including the terms of the agreements, in order to substantiate their bills to the IXCs and that the IXCs do not and cannot point to legal authority creating a duty to reveal contracts with third parties. Aventure further argues that fraudulent concealment is rarely found between sophisticated business entities and that Qwest and Sprint are companies with massive revenues and sophisticated legal departments; thus, they are hardly the type of inexperienced parties that would be entitled to rely upon small competitive carriers for guidance and advice. Aventure asserts that the proof that Qwest and Sprint were not deceived is demonstrated by Qwest and Sprint disputing their bills shortly after calls increased and then seeking self-help in refusing to pay for Aventure's services.

Qwest counters that its fraudulent concealment claim is based upon an active concealment of facts making a duty to disclose unnecessary.[36] Qwest argues that CLECs like Aventure have a duty to file their IXC agreements, including agreements for access services, and although Aventure would argue FCSCs are not carriers, the FCC has found otherwise. See In re: Request for Review by Intercall, Inc. of Decision of Universal Serv. Adm'r, 23 FCC Rcd. 10731, 10736 (2008) ("Indeed, all similarly situated stand-alone audio bridging service providers that offer their services to others for a fee are also providers of telecommunications . . . .")

Qwest further asserts, citing McLeodUSA Telecommunications Services, Inc. v. Qwest Corp., 469 F.Supp.2d 677 (N.D.

Iowa 2007), that concealment by trick or contrivance independently creates a duty to disclose.

The elements of a claim of fraudulent non-disclosure or concealment are essentially the same as the elements of fraud, although the first element requires a false representation or concealment of a material fact when under a legal duty to disclose that fact. Thus, where the fraud was purportedly a nondisclosure or concealment, the claimant must show that the alleged tortfeasor was under a legal duty to communicate the withheld information to prevail (or must so plead to state a claim). Iowa cases have not provided a specific test for determining when a duty to disclose arises in fraudulent nondisclosure cases. They have,

---

**36.** The Iowa Supreme Court has made the following distinction between actively concealing material information or merely being silent; one is actionable while the other is not:

> "The law distinguishes between passive concealment and active concealment, or in other words, between mere silence and the suppression or concealment of a fact, the difference consisting in the fact that concealment implies a purpose or design, while the simple failure to disclose a fact does not. Mere silence is not representation, and a mere failure to volunteer information does not constitute fraud. Thus, as a general rule, to constitute fraud by concealment or suppression of the truth there must be something more than mere silence or a mere failure to disclose known facts. Where there is no obligation to speak, silence cannot be termed 'suppression,' and therefore is not a fraud. Either party may, therefore, be innocently silent as to matters upon which each may openly exercise his judgment.
>
> Silence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances. In other words, there

> must be a concealment—that is, the party sought to be charged must have had knowledge of the facts which, it is asserted, he allowed to remain undisclosed—and the silence must, under the conditions existing, amount to fraud, because it is an affirmation that a state of things exists which does not, and because the uninformed party is deprived to the same extent that he would have been by positive assertion. Concealment or nondisclosure becomes fraudulent only when there is an existing fact or condition, as distinguished from mere opinion, which the party charged is under a duty to disclose.
>
> Concealment in the sense opposed to mere nonactionable silence may consist of withholding information asked for, or of making use of some device to mislead, thus involving act and intention, or of concealing special knowledge where there is a duty to speak. The term generally implies that the person is in some way called upon to make a disclosure. It may be said, therefore, that in addition to a failure to disclose known facts, there must be some trick or contrivance intended to exclude suspicion and prevent inquiry, or else that there must be a legal or equitable duty resting on the party knowing such facts to disclose them."

Wilden Clinic, Inc. v. City of Des Moines, 229 N.W.2d 286, 292–93 (Iowa 1975) (quoting 37 Am. Jur. 2d, Fraud and Deceit § 145).

however, observed that, to prove the necessary duty to disclose, the plaintiff need not show a fiduciary duty existed, but may, instead, establish that a duty arose from inequality of condition and knowledge, or other circumstances shown by a particular fact situation. Thus, for concealment to be actionable, the representation must relate to a material matter known to the party ... which it is his legal duty to communicate to the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances. The Iowa Supreme Court has recognized a duty to disclose in situations where the plaintiff and the defendant were involved in some type of business transaction, such as buyer/seller or owner/contractor, but only when the relative knowledge and experience of the parties warrants. The duty to disclose may also arise from the attendant circumstances, such as a contrivance intended to exclude suspicion and prevent inquiry.

McLeodUSA, 469 F.Supp.2d at 707–08 (alteration in original) (internal citations and quotation marks omitted); see also Schaller Tel. Co. v. Golden Sky Sys., Inc., 298 F.3d 736, 740 (8th Cir. 2002) (noting that Iowa law recognizes a cause of action for fraudulent misrepresentation based on nondisclosure of material facts and that to be actionable, a misrepresentation must "relate to a material matter known to the party ... which it is his legal duty to communicate to the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances." (alteration in original) (quoting Sinnard v. Roach, 414 N.W.2d 100, 105 (Iowa 1987)).

Qwest also maintains that even if direct dealing was required between itself and the FCSCs, Qwest is a party to the three-way tariff transaction with the LECs and their end users; that is, the tariff contemplates a call from the IXC to an end user, the FCSCs, terminated by a LEC. Accordingly, the LECs and FCSCs had special knowledge to which Qwest, a party to this three-way transaction, did not have access because the LECs and FCSCs hid that information. Qwest also refutes the argument that special knowledge duty only applies to inexperienced entities, which Qwest is not. See McLeodUSA, 469 F.Supp.2d at 708 ("The fatal defect in McLeodUSA's contention that Qwest's fraudulent concealment claims merely rely on a contractual duty is that the duty to disclose material facts does not necessarily arise from contract, either legally or as alleged in this case. Rather, legally, the duty may arise, for example, from inequality of condition and knowledge, or from circumstances attending the parties' relationship, including contrivance intended to exclude suspicion and prevent inquiry. Here, Qwest has alleged that the duty to disclose the true nature of the calls at issue in the fraudulent concealment claims arose, inter alia, from McLeodUSA's sole control of information relating to calls that it sends to Qwest, and Qwest's inability to identify McLeodUSA as the source of call traffic in the absence of proper information, placing the parties in a position of inequality of knowledge. These allegations are sufficient to state the necessary duty for fraudulent non-disclosure claims, independent of any contractual duty." (internal citations and quotation marks omitted)).

Sprint also refutes the contention that Aventure and other LECs had no duty to disclose information to IXCs pointing out that the Restatement (Second) of Torts, which Iowa has adopted, states that a situation giving rise to a duty to disclose "occurs when a party acquires information

'that he knows will make untrue or misleading a previous representation that when made was true or believed to be so.'" Wright v. Brooke Grp. Ltd., 652 N.W.2d 159, 174 (Iowa 2002) (quoting Restatement (Second) of Torts § 551(2)(c)). Regarding the relationships between parties to business transactions, the Iowa Supreme Court has found a duty to disclose when (1) one party to the transaction "knows that the other is about to enter into it under a mistake as to [the facts basic to the transaction], and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts," id. at 175 (quoting Restatement (Second) of Torts § 551(2)(e)); (2) "matters known to [one party to a business transaction] that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading," id. (quoting Restatement (Second) of Torts § 551(2)(b)); and (3) "a party acquires information 'that he knows will make untrue or misleading a previous representation that when made was true or believed to be so'" id. (quoting Restatement (Second) of Torts § 551(2)(c)). The Iowa Supreme Court has "also held that a duty to disclose may arise from the 'attendant circumstances,' such as a "contrivance intended to exclude suspicion and prevent inquiry."" Id. (quoting Wilden Clinic, Inc. v. City of Des Moines, 229 N.W.2d 286, 293 (Iowa 1975) (quoting 37 Am. Jur. 2d Fraud and Deceit § 145 (1968))).

As provided in great detail above, see discussion supra Parts III.D.2. and III. D.3., Qwest's and Sprint's amended complaints each summarize the conduct of Aventure and other LECs and plead active concealment, and therefore suffice to state a claims for fraudulent concealment without having to show an affirmative duty to disclose. See Wilden Clinic, 229 N.W.2d at

293 (distinguishing between passive and active concealment and reasoning that "[s]ilence, in order to be an actionable fraud, must relate to a material matter known to the party and which it is his legal duty to communicate to the other contracting party, whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances. In other words, there must be a concealment—that is, the party sought to be charged must have had knowledge of the facts which, it is asserted, he allowed to remain undisclosed—and the silence must, under the conditions existing, amount to fraud, because it is an affirmation that a state of things exists which does not, and because the uninformed party is deprived to the same extent that he would have been by positive assertion."). Based upon the record, Qwest and Sprint have pled "allegations [that] are sufficient to state the necessary duty for fraudulent non-disclosure claims, independent of any contractual duty." McLeodUSA, 469 F.Supp.2d at 708. Aventure's motions to dismiss Qwest's and Sprint's claims for fraudulent concealment are denied.

### c. Qwest's Tortious Interference with Contract Claim

Paragraphs 178 through 186 of Qwest's second amended complaint set out the following allegations in support of its intentional interference with contract claim brought against Aventure, several other LECs, and several FCSCs. Qwest asserts that it has contracts with numerous other long distance carriers, including AT&T and Sprint, that allow Qwest to use these carriers to deliver calls on Qwest's behalf to Aventure and other LECs. Qwest alleges that due to schemes between Aventure (and other LECs) and FCSCs, Qwest did not have correct information necessary to allow Qwest to make reasoned decisions

about the calls that Qwest would itself deliver to the LECs, and those that it should route through other carriers to the LECs. Qwest further asserts that Aventure and other LECs entered into contracts with AT&T and/or other IXCs to charge those IXCs less than the LECs' tariff rates for switched access services, understanding that this would lead other long distance carriers like Qwest to least cost route traffic through AT&T or other carriers to the LECs and that these agreements were executed because the LECs and FCSCs all knew it would lead Qwest and other long distance carriers to route more traffic through AT&T as a wholesale carrier, thereby increasing the LECs' and the FCSCs' unjustifiable revenue stream. Qwest argues the LECs' and the FCSCs' tortious conduct intentionally and improperly interfered with Qwest's ability to take advantage of the full rights extended to Qwest under the contracts, which has decreased the value of those contracts to Qwest, and because these contracts are commonplace in the industry, Aventure, the other LECs, and the FCSCs knew or should have known of the existence of provisions in these contracts that give Qwest the ability to deliver calls itself or through other IXCs. Qwest concludes Aventure had knowledge of facts, which, if followed by reasonable inquiry, would have led to a complete disclosure of wholesale carriage by long distance carriers.

Aventure argues Qwest's tortious interference with contract claim should be dismissed for failure to state a claim, specifically, noting that the facts alleged do not detail that (1) Aventure knew of Qwest's contract with AT&T, (2) Aventure had a confidential agreement with AT&T, or that (3) Aventure had any intention of improperly interfering with the Qwest–AT&T contract. Aventure argues, at most, Qwest has alleged that Aventure entered into a contract with AT&T to increase its own revenues, which, even if factually correct, fails to state a claim for tortious interference. See Green v. Racing Ass'n of Cent. Iowa, 713 N.W.2d 234, 244 (Iowa 2006) ("[I]f there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of the conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor or motive carries little weight towards producing any determination that the interference was improper." (quoting Berger v. Cas' Feed Store, Inc., 543 N.W.2d 597, 599 (Iowa 1996) (quoting Restatement (Second) of Torts § 767, cmt. d))).

Qwest resists arguing the facts alleged in its second amended complaint clearly meet the pleading standard to place Aventure on notice of the claim and to show the claim's plausibility. Qwest also rejects the argument that Aventure's below tariff contracts with AT&T are legal and legitimate noting that Aventure alleges it has a filed interstate access tariff; accordingly, the tariff governs the carrier-customer relationships and precludes Aventure from negotiating separate agreements that affect the rate for services once a tariff has been filed. See All American I, 26 FCC Rcd. at 730 n.47 (reiterating "the undisputed notion that tariffs govern carrier-customer relationships and that 'parties are precluded from negotiating separate agreements that affect the rate for services once a tariff has been filed'" (quoting Seventh Report and Order, 16 FCC Rcd. at 9934 n.71)); see Advamtel, LLC v. AT&T Corp., 118 F.Supp.2d 680, 688 (E.D. Va. 2000) ("Once a tariff has been validly filed with the FCC, the parties are precluded from negotiating any separate agreements that affect the rate for which services are charged.").

■ The tort of intentional interference with contract has the following elements: "(1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted." Jones v. Univ. of Iowa, 836 N.W.2d 127, 151 (Iowa 2013) (quoting Kern v. Palmer Coll. of Chiropractic, 757 N.W.2d 651, 662 (Iowa 2008)). Qwest alleges it had least cost routing contracts with AT&T, Aventure knew of those contracts, Aventure interfered with those contracts by surreptitiously entering into its own contract with AT&T, and damaged Qwest. These allegations are sufficient at the pleading stage and meet the Iqbal and Twombly plausibility standard. See Hamilton v. Palm, 621 F.3d 816, 817 (8th Cir. 2010) (" '[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.' (quoting Iqbal, 129 S.Ct. at 1949)). "As the Court held in Twombly, 550 U.S. at 544, 127 S.Ct. 1955, the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955). Aventure's motion to dismiss Qwest's tortious interference with contract claim is denied.

#### d. Qwest's and Sprint's Civil Conspiracy Claims

■ Qwest sets forth the following factual allegations in support of its claims for civil conspiracy against Aventure (and others) in paragraphs 184 through 194 of its second amended complaint, ECF No. 318 (4:07–cv–00078). Aventure and other LECs agreed with their respective FCSC partners to illicit arrangements to violate numerous federal and state Communications statutes and rules, to compete unfairly, to tortiously interfere with Qwest's contracts, and to fraudulently conceal material facts. Qwest alleges numerous actions in concert in furtherance of the LECs' agreements with their respective FCSCs included: (i) the FCSCs would place equipment behind the LECs' switches; (ii) the LECs would assign telephone numbers to the FCSCs; (iii) the LECs would bill Qwest and other long distance carriers for access charges on long distance calls that were routed to or through the FCSCs; (iv) the FCSCs would advertise services designed to increase volumes of traffic routed through the LECs' switches; (v) the LECs would bill the long distance carriers for switched access even though the calls did not qualify for such charges; and (vi) the LECs would share an agreed-upon portion of the ill-gotten switched access charges with their respective FCSC partners. The LECs' conduct in billing Qwest for access services for these calls violates the terms of Aventure's interstate and intrastate access tariffs, Aventure's local exchange tariff, as well as federal and state law.

Qwest alleges that (1) the Aventure–FCSC agreements constitute agreements to take unlawful actions; (2) the Aventure–FCSC agreements constitute a civil conspiracy or conspiracies, and Aventure is liable for the harm caused by the unlawful acts taken in furtherance of the conspiracy; and (3) the unlawful actions taken during and in furtherance of the unlawful Aventure–FCSC agreements have injured Qwest. Qwest alleges that Aventure's conduct was intentional, fraudulent, and/or malicious toward the rights of Qwest, and therefore Qwest seeks and is entitled to punitive or exemplary damages.

Sprint similarly sets forth the following factual allegation is support of its civil conspiracy claim against Aventure and other LECs, along with their FCSC partners in paragraphs 95 through 99 of its amended complaint, ECF No. 211 (4:07–cv–00194). Aventure, along with one or more FCSCs, agreed to illicit arrangements similar to the following: (a) the FCSCs would place a gateway to connect calls in Aventure's service territories; (b) Aventure would assign one or more of its telephone numbers to FCSCs; (c) the FCSCs would advertise the free or reduced-cost service, including the telephone number in Aventure's territories to increase the volume of traffic; (d) Aventure would bill Sprint for terminating access charges on long distance calls that were routed through the FCSCs; and (e) Aventure would share with its FCSC partners a portion of the monies billed to or received from Sprint. Sprint further asserts that INS, who also profited from the improperly increased traffic, provided additional facilities, planning, and material support. Sprint contends Aventure's conduct in billing Sprint for terminating access services for these calls to the FCSCs violates the terms of Aventure's federal and state access tariffs, as well as federal and state law and that Aventure's and the FCSCs' conduct has intentionally caused them to be in wrongful possession and control of monies that rightfully belong to Sprint.

Sprint alleges that the agreements reached between Aventure and one or more FCSCs constitute agreements to take unlawful actions and a civil conspiracy or conspiracies and Aventure and the FCSCs are liable to Sprint for the harm caused by their unlawful acts taken in furtherance of the conspiracy. Sprint further asserts that the unlawful actions taken during and in furtherance of the agreements between Aventure and one or more FCSCs have injured Sprint, and therefore Sprint is entitled to reasonable damages.

Aventure argues that Qwest's and Sprint's civil conspiracy claims fail because their claims are really claims for multiple conspiracies, yet fail to plead any specific agreement between defendants, that is, Qwest and Sprint improperly attempt to hold each defendant liable for the alleged conspiracies of others. Aventure alleges that the second reason the claims fail is because a civil conspiracy must be based upon underlying unlawful actionable conduct and the Connect America Order clearly demonstrates that the underlying agreements were not illegal, thus not conspiracies.

Qwest and Sprint resist, arguing their amended complaints are replete with allegations of independent tortious conduct. Qwest's independent tort claims are for criminal misconduct, and statutory violation including violations of the Communications Act, unfair competition, tortious interference, and fraudulent concealment. Sprint's independent tort claims are for violations of the Communications Act and fraudulent concealment. Qwest and Sprint allege they need not plead the agreement element with particularity because agreements are often clandestine and not information the plaintiff can plead with precision. Nonetheless, Qwest and Sprint argue the factual allegations in their respective amended complaints show Aventure agreed with its business partners to engage in a common scheme for the unlawful purposes alleged throughout the amended complaints, actually committed tortious acts in concert in furtherance of the agreements, and thereby caused Qwest and Sprint damage and injury. Qwest further distinguishes that some of the arguments raised in Aventure's challenges to the civil conspiracy claims do no more than take issue with the *form* of the claim; improper

form could be corrected by a motion for more definite statement and therefore is not the basis for dismissal. Sprint adds that details of the specific FCSCs with whom Aventure acted in concert could not have been known to Sprint at the time it filed the amended complaint but has since been obtained through discovery, but that its amended complaint, nonetheless, sufficiently alleges that Aventure acted in concert with one or more FCSCs. Qwest and Sprint argue that they *do not* attempt to impose joint liability on Aventure for the conspiracies of others.

Regarding the necessary element of an underlying tort to maintain a claim of civil conspiracy, Qwest alleges five tort claims—see counts three, five, six, eight, and nine of Qwest's Second Amended Complaint, ECF No. 318 (4:07–cv–00078)—and Sprint alleges three tort claims—see counts six,[37] seven, and eight of Sprint's Amended Complaint, ECF No. 211 (4:07–cv–00194).

 "Under Iowa law, '[a] conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose, or to accomplish by unlawful means some purpose not in itself unlawful.'" Wright, 652 N.W.2d at 171 (quoting Basic Chems., 251 N.W.2d at 232). "Under this theory of liability, 'an agreement must exist between the two persons to commit a wrong against another.'" Id. at 172 (quoting Ezzone v. Riccardi, 525 N.W.2d 388, 398 (Iowa 1994)).

> Civil conspiracy is not in itself actionable; rather it is the acts causing injury undertaken in furtherance of the conspiracy [that] give rise to the action.

Thus, conspiracy is merely an avenue for imposing vicarious liability on a party for the wrongful conduct of another with whom the party has acted in concert. Thus, the wrongful conduct taken by a co-conspirator must itself be actionable.

Id. at 172 (alteration in original) (internal citations and quotation marks omitted). "Although our cases applying a civil conspiracy theory involve agreements to commit an intentional tort, [citing cases involving interference with contract, fraud, and unfair competition], our court has never held that a claim of civil conspiracy must be based on such an agreement." Id. at 172. Rather, a "plaintiff may base a claim of civil conspiracy on wrongful conduct that does not constitute an intentional tort. Such underlying acts must, however, be actionable in the absence of the conspiracy". Id. at 174.

Based upon the record, Qwest and Sprint have sufficiently pled a cause of action for civil conspiracy under Iowa law.

**e. Qwest's Unjust Enrichment Claim[38]**

 Qwest alleges in support of its claim for unjust enrichment simply that the LECs and the FCSCs, through their wrongful, improper, unjust, fraudulent, and unfair conduct, have reaped substantial and unconscionable profits from Qwest through their tariffs, and that the LECs have all received monies from Qwest to which they are not entitled. Therefore, in equity and good conscience, it would be unjust for Aventure, other LECs, and the FCSCs to enrich themselves at the expense of Qwest.

---

37. Count six of Sprint's amended complaint in 4:07–cv–00194, alleges a tort claim for intentional interference with existing contracts against the FCSC Defendants; Futurephone is the only remaining FCSC in 4:07–cv–00194.

38. As previously indicated, in its motion to dismiss against Sprint, Aventure did not move to dismiss Sprint's claim for unjust enrichment.

Aventure argues that Qwest's unjust enrichment claim fails to state a claim and should be dismissed. Aventure asserts that the "monies" to which the Qwest refers are the very few access charges that Qwest actually paid before engaging in self-help, and the claim stands in direct contravention with the FCC's determination in the Connect America Order that tariffed access charges apply to the traffic at issue in this case. Aventure asserts that the Connect America Order by expressly rejecting the IXCs' requests to adopt arbitrary de minimis rates or to apply a bill-and-keep regime, made it clear that access minutes terminated to the LEC, and therefore, the LEC is entitled to access revenues, and that the access service provided by LECs like Aventure to IXCs like Qwest is both valuable and compensable.

Aventure bases its argument for dismissal of the unjust enrichment claim on the same misconstruction of the Connect America Order it applied in connection with its motion to dismiss other claims. Aventure's assertion that the Connect America Order found traffic pumping LECs are not unjustly enriched because IXCs are compensated by their long distance customers for delivering calls to the LECs was expressly rejected by the FCC. See Connect America Order, 26 FCC Rcd. at 17876 n. 1090 ("Whether the IXC's revenues for a call are more or less than its cost of terminating the call is not at issue. The question is whether just and reasonable rates are being charged for the provision of interstate switched access services. (citing 47 U.S.C. § 201(b)). The Connect America Order expressly stated that it did not overrule its prior rulings in Farmers II and Farmers Recon. II or its Northern Valley decisions.

Recovery based on unjust enrichment can be distilled into three basic elements of recovery. They are: (1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances.

State, Dep't of Human Servs. ex rel. Palmer v. Unisys Corp., 637 N.W.2d 142, 154–55 (Iowa 2001) (footnotes omitted).

Based on the record and at the procedural stage of the litigation, Qwest has stated a claim for unjust enrichment that meets the plausibility standard. Aventure's motion to dismiss this count must be denied.

### f. Qwest's Declaratory Judgment Claim

Aventure argues that because the request for declaratory judgment in count twelve of Qwest's second amended complaint is dependent upon Qwest's federal and state law claims that Aventure has moved to dismiss, the Court should decline to exercise supplemental jurisdiction over this claim. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction ...."). The Court has denied Aventure's motion to dismiss as to all but one count of Qwest's second amended complaint, and thus not all claims over which this Court has original jurisdiction under § 1367(a) have been dismissed. Aventure's motion to dismiss Qwest's claim for declaratory judgment is denied.

### B. Qwest's and Sprint's Motions for Judgment on the Pleadings

Qwest and Sprint move for judgment on the pleadings on Aventure's Communications Act, unjust enrichment, and quantum meruit/implied contract claims against them.

### 1. Standard for Motion for Judgment on the Pleadings

 Under Rule 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings under Rule 12(c) is evaluated using the same standard used to evaluate a motion to dismiss under Rule 12(b)(6). Gallagher, 699 F.3d at 1016; Clemons v. Crawford, 585 F.3d 1119, 1124 (8th Cir. 2009); Ashley Cnty., Ark. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009).

### 2. Communications Act Claims

 Qwest and Sprint argue Aventure's Communications Act claims against them are premised on Qwest and Sprint not paying switched access charges Aventure billed to Qwest and Sprint, respectively, for tariffed switched access charges on calls destined for telephone numbers Aventure assigned to FCSCs. Qwest and Sprint assert that these charges are not covered by tariff, as the tariffs specifically define long distance carriers who deliver calls to the LEC pursuant to access tariffs—such as Qwest and Sprint—as Aventure's "customers." Aventure's claims allege that Qwest and Sprint were obligated to pay these invoices in their roles as Aventure's "customers," and thus they violated the Communications Act by disputing Aventure's invoices and refusing to pay.

The Commission addressed this issue in All American I and held that claims pursuant to the Act are limited to claims by a customer against the carrier who provided it with service, not the other way around:

> During the past twenty years, the Commission has repeatedly held that an allegation by a carrier that a customer has failed to pay charges specified in the carrier's tariff fails to state a claim for violation of any provision of the Act, including sections 201(b) and 203(c)—even if the carrier's customer is another carrier. These holdings stem from the fact that the Act generally governs a carrier's obligations to its customers, and not vice versa. Thus, although a customer-carrier's failure to pay another carrier's tariffed charges may give rise to a claim in court for breach of tariff/contract, it does not give rise to a claim at the Commission under section 208 (or in court under section 206) for breach of the Act itself.

All American I, 26 FCC Rcd. at 727 & n. 32 (footnotes omitted) (citing cases).

> In sum, all three of the CLECs' claims rest on the assertion that AT&T's failure to pay their tariffed access charges violates section 201(b) and/or section 203(c) of the Act. That assertion is erroneous. *The law is settled that a carrier-customer's failure to pay tariffed access charges does not violate either section 201(b) or section 203(c) of the Act. Accordingly, all three of All–American's claims must be denied for failure to state a claim cognizable under section 208 (or any other provision) of the Act.*

Id. at 732 (emphasis added). Qwest and Sprint argue that the FCC's interpretation requires deference regardless of whether the FCC departs from previous precedents. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981–82, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) ("Chevron's[39] premise is that it is for agencies, not courts, to fill statutory gaps.... The better rule is to hold judicial interpretations contained in precedents to

---

39. Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

the same demanding <u>Chevron</u> step one standard that applies if the court is reviewing the agency's construction on a blank slate: Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction.... [W]hether Congress has delegated to an agency the authority to interpret a statute does not depend on the order in which the judicial and administrative constructions occur."). According to Qwest and Sprint, the FCC's <u>All American</u> decisions provide the FCC's reasoning for having already found numerous times that the Communications Act does not support claims against carriers in their roles as customers, and for overruling a previous FCC decision.

Counts one and three of Aventure's third amended complaint allege Sprint's and Qwest's respective intentional conduct of failing and refusing to pay Aventure's billed charges for access services represents illegal self help in violation of §§ 201(b), 202(a), and 203(c) of the Communications Act. <u>All American I</u>, however, expressly held that the IXC's withholding of payment of tariffed charges "fails to state a claim for violation of any provision of the Act." <u>All American</u>, 26 FCC Rcd. at 724, 726, 731. In addition, the Commission has recognized that an IXC purchasing a terminating LEC's access service does not thereby provide service to the terminating LEC's customer; rather, the IXC provides long distance service to its own long distance customer that placed the call. <u>See,</u> e.g., <u>YMax</u>, 26 FCC Rcd. at 5753–55 ("[S]witched access is a wholesale service provided to IXCs ... as an input to the end-to-end long distance service they provide to their 1+ and 8YY customers....").

In <u>N. Valley II</u>, 26 FCC Rcd. at 10786–87, the Commission held that a LEC's attempt to deny long distance carriers the ability to withhold payment and dispute charges itself independently contravenes §§ 206 and 208 of the Act, and therefore violates § 201(b). Qwest and Sprint assert that Aventure's arguments that a decision to withhold payment violates the Act is not only wrong, the argument—if successful—would violate the Act and therefore these claims simply cannot stand.

At the time these motions were briefed, Qwest and Sprint dismissed the Defendants' reliance on the possibility of reconsideration in <u>All American I</u> noting it was irrelevant to the deference owed the decision. This argument is moot since the Commission denied reconsideration in <u>All American I</u>, reiterating that the two referral questions—(1) "Did AT&T violate § 201(b), § 203(c), or any other provision of the Communications Act by refusing to pay the billed charges for the calls at issue?"; and (2) "Did AT&T violate any provision of the Communications Act by refusing to pay the billed charges for the calls at issue and not filing a rate complaint with the FCC?"—had both been answered and that "the answer to both of the Court's questions addressed in this Order is 'no.'" <u>All Am. Recon. I</u>, 28 FCC Rcd. at 3470. The Commission restated that "AT&T did not violate sections 201(b), 203(c), or any other provision of the Communications Act by refusing to pay the billed charges for the calls at issue, regardless of whether it filed a rate complaint with the FCC. Accordingly, the CLECs' claims are denied." <u>Id.</u> The final order in the <u>All American</u> case forecloses Aventure's argument that the FCC has not made a final decision on the issue.[40]

---

40. Aventure's now-outdated resistance argued that Qwest and Sprint could not rely on <u>All</u> <u>American</u> or <u>N. Valley</u> because those decisions were not final orders and thus not enti-

Aventure asserts that Qwest's and Sprint's argument that LECs cannot assert Communications Act claims against an IXC when the IXC is acting in the role of an unregulated customer of LEC services applies to carriers only, so Qwest's and Sprint's motions against the non-carriers must be denied summarily. Aventure also argues that the assertion that under the regulatory structure imposed by the FCC, LECs can only collect access charges from IXCs via a tariff or a negotiated contract is without legal substance. Citing authority that is several decades old, Aventure argues Qwest's and Sprint's interpretation of All American as standing for the proposition that a refusal by an IXC to pay tariffed charges does not violate §§ 201(b) and 203(c) of the Communications Act is contrary to precedent. Aventure quotes a large section of the Supreme Court's decision in Global Crossing, 550 U.S. at 55–56, 127 S.Ct. 1513 (discussing long distance carriers' requirement to pay compensation to payphone owners), and argues that the Supreme Court therein refuted the long distance carrier's assertion that § 201(a) and (b) concerned only practices that harm carrier customers, not carrier suppliers, as not being what those sections, nor history, showed. Aventure concludes, therefore, either Qwest and Sprint's interpretation of All American is incorrect, or the All American order is itself in error.

In reply, Qwest and Sprint reject Aventure's assertion that All American is contrary to legal precedent noting that the precedent cited is distinguishable, it is not binding on the FCC, and the Commission specifically distinguished the cases Aventure cites. Qwest and Sprint further distinguish that the cases Aventure cites simply state that customers are obligated under

the Communications Act to pay the tariff rates of tariffed services received, which is different than asserting, as Aventure does here, that § 206 provides a private right of action. Qwest and Sprint also note that the issues Aventure now raises before this Court, were addressed in All American I, wherein the Commission specifically distinguished the legal issues in Global Crossing from those present in All American I.

The CLECs also rely on several Commission orders and [Global Crossing] holding that a carrier's failure to pay per-call compensation to payphone service providers in accordance with the Commission's payphone compensation rules constitutes a violation of section 201(b) of the Act. In the CLECs' view, if a carrier's failure to pay per-call compensation to payphone service providers is a violation of section 201(b), then surely a carrier's failure to pay access charges is such a violation, as well.

The Commission has already explained why the payphone analogy raised by the CLECs fails. The Act requires the Commission to adopt rules ensuring that payphone service providers receive compensation for every completed call originated from their pay-phones. To implement that statutory directive, the Commission adopted rules requiring certain carriers to pay to originating payphone service providers a fixed amount for each completed payphone call handled by those carriers. In subsequent decisions, the Commission held that a carrier's failure to pay the amount required to be paid by the Commission's payphone compensation rules constitutes a violation of our payment rules and a violation of section 201(b) of the Act.

---

tled to Chevron deference. To the extent that was ever correct, All American and N. Valley

are now final and that argument is foreclosed.

*By stark contrast, the provisions of the Act and our rules regarding access charges apply only to the provider of the service, not to the customer; and they govern only what the provider may charge, not what the customer must pay. Thus, failure to pay does not breach any provisions of the Act or Commission rules.*

All American I, 26 FCC Rcd. at 730–31 (emphasis added) (footnotes omitted).

Despite this adverse authority, Aventure argues that All American was responding to referral questions as to whether the IXCs' refusal to pay violated §§ 201 and 203; therefore claims under other provisions of the Act were not expressly addressed by All American and Qwest and Sprint cannot extend that holding to provide the bases for dismissal of the other Communications Act claims.

All American is dispositive on not just some, but all of Aventure's Communications Act claims. Contrary to Aventure's assertion, the referred question in All American was whether AT&T violated §§ 201(b), 203(c), *or any other provision* of the Communications Act and that the FCC answered that question in full: "AT&T did not violate sections 201(b), 203(c), or any other provision of the Communications Act by refusing to pay the billed charges for the calls at issue, regardless of whether it filed a rate complaint with the FCC. Accordingly, the CLECs' claims are denied." All American I, 26 FCC Rcd. at 726; All Am. Recon. I, 28 FCC Rcd. at 3470. Furthermore, a violation of §§ 201 or 203 hinges on an analysis of §§ 206 and 208, which define the right of action and the FCC's authority to adjudicate claims that a carrier has somehow allegedly violated the Communications Act itself. In addition, All American distinguished the present traffic pumping cases wherein the LECs argue the long distance carriers were barred from withholding payment cases from those cases in which carriers and LECs were jointly providing service.

Again, Aventure's argument that All American lacks precedential or binding effect is now moot because the final order has issued. As discussed at length above, see discussion supra Part III.B., Aventure's arguments have been foreclosed by final Commission decisions. Aventure cannot maintain a cause of action against Qwest or Sprint under the Act. Qwest's and Sprint's Motions for Judgment on the Pleadings as to Aventure's Communication Act claims must be granted.

### 3. Unjust Enrichment and Quantum Meruit Claims

 Aventure asserts, in the alternative, claims for unjust enrichment and implied contract (or quantum meruit) should the Court find the LECs' tariffs do not apply to the FCSC traffic. Qwest and Sprint move for judgment on the pleadings on these claims pointing out that Aventure previously moved to refer issues to the FCC based on these equitable claims, asserting that if the tariffs do not apply, the FCC needs to determine the circumstances that will allow LECs to recover in the absence of the tariff. Qwest and Sprint argue the FCC addressed this exact issue in the Northern Valley cases and held that ILECs can only recover through tariffs and CLECs can only recover through tariffs or negotiated contracts:

> Since 1997, CLECs have been allowed to assess interstate switched access service charges upon IXCs [long distance carriers] either by filing tariffs with the Commission or by negotiating contracts with the affected IXCs. (In contrast, incumbent local exchange carriers ('ILECs') may assess interstate switched exchange access charges only by filing federal tariffs.)

N. Valley II, 26 FCC Rcd. at 10782; see also N. Valley I, 26 FCC Rcd. at 8335 ("In contrast to ILECs, CLECs may impose interstate access charges either through tariffs or contracts negotiated with IXCs."). Likewise if the service in question is not switched access under FCC rules because, for example, there was no end user customer who received the calls, the FCC has held that LECs can only recover from long distance carriers though negotiated contract. N. Valley I, 26 FCC Rcd. at 8338 (citing In re: CLEC Access Charge Reform (Eighth Report and Order), 19 FCC Rcd. 9108, 9114 (2004)). These cases thus reiterate the FCC's analysis and holding in Sprint PCS [41] and the Eighth Report and Order.

Qwest and Sprint argue that the FCC has stated that the Act requires the filing of access tariffs that contain applicable rates, terms, and conditions. See N. Valley I, 26 FCC Rcd. at 8338 (citing 47 U.S.C. § 203(a)); In re: Tariff Filing Requirements for Interstate Common Carriers, 7 FCC Rcd. 8072, 8072–73 (1992); In re: Hyperion Telecomms., Inc., 12 FCC Rcd. 8596, 8596–8601 (1997)). See also YMax, 26 FCC Rcd. at 5748 ("Consistent with these statutory provisions, a carrier may lawfully assess tariffed charges only for those services specifically described in its applicable tariff."). Thus, the only way Aventure can charge Qwest and Sprint is under the express terms of their respective tariffs (which must also comport with federal law), or, because Aventure is a CLEC, through a negotiated contract. Qwest alternatively argues that even if it were possible for Aventure to ignore its filed tariff, Aventure does not allege a negotiated contract with Qwest, and moreover, the constructive ordering doctrine requires that the service in question be covered by the express terms of the tariff. See Alliance Commc'ns Coop., Inc. v. Global Crossing Telecomms. Inc., 663 F.Supp.2d 807, 821 (D.S.D. 2009) ("[F]or a party to be deemed to have constructively ordered services, it must have actually received the services offered under the applicable tariff."). Thus, the only way a constructive ordering claim can survive is if the tariff covers the service in question—and thus the doctrine cannot support an implied contract claim.

■ Although CLECs like Aventure have the option of negotiating contracts, once a CLEC files a tariff, negotiating contracts is no longer an option for interstate access. See All American I, 26 FCC Rcd. at 730 n.47 ("[P]arties are precluded from negotiating separate agreements that affect the rate for services once a tariff has been filed" (quoting Seventh Report and Order, 16 FCC Rcd. at 9934 n.71)). See also XChange Telecom Corp. v. Sprint Spectrum L.P., No. 1:14-cv-54 (FLS/CFH), 2014 WL 4637042, at *5 (N.D.N.Y. Sept. 16, 2014) ("The 'filed rate doctrine,' then, 'forbids a regulated entity [from] charg[ing] rates for its services other than those properly filed with the appropriate federal regulatory authority.'" Marcus v. AT&T Corp., 138 F.3d 46, 58 (2d Cir. 1998) (alterations in original) (quoting Ark. La. Gas Co. v. Hall, 453 U.S. 571, 577, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981))). In other words, "[u]nder the filed-rate doctrine, federal law preempts claims concerning the price at which service is to be offered, and ... claims concerning the services that are offered." Access Telecom, Inc. v. MCI Telecomms. Corp., 197 F.3d

---

**41.** In Re Sprint PCS & AT&T, 17 FCC Rcd. 13192, 13198 (2002) ("There being no authority under the Commission's rules or a tariff for Sprint PCS unilaterally to impose access charges on AT&T, Sprint PCS is entitled to collect access charges in this case only to the extent that a contract imposes a payment obligation on AT&T.").

694, 711 (5th Cir. 1999) (citing AT&T v. Cent. Office Tel., Inc., 524 U.S. 214, 222–23, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998)). See also Iowa Network Servs., Inc. v. Qwest Corp., 466 F.3d 1091, 1097 (8th Cir. 2006) ("Under [the filed rate] doctrine, once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer." (alteration in original) (quoting Evanns v. AT&T Corp., 229 F.3d 837, 840 (9th Cir. 2000)); Freedom Ring Commc'ns, LLC v. AT&T Corp., 229 F.Supp.2d 67, 70 (D.N.H. 2002) ("[LEC] BayRing also argues that the filed rate doctrine has been 'fundamentally changed' by recent FCC rulings, which apparently allow certain communications carriers to enter negotiated agreements with other carriers in lieu of filing tariffs. Regardless of whether the application of the filed rate doctrine is altered in such circumstances, an issue which [the court] need not discuss here, BayRing simply does not allege that a non-tariff based, negotiated agreement exists in this case. To the contrary, BayRing expressly states that the rates, terms, and conditions of its filed tariffs govern the contractual relationship between BayRing and AT&T."); Advamtel, 118 F.Supp.2d at 688 n.24 ("Plaintiffs' reliance on FCC discussions of permissive detariffing as permitting off-tariff contracts fails .... Permissive detariffing permits carriers to file tariffs and thus be bound by the rate established therein or, alternatively, to negotiate separate agreements in lieu of, or rather than, filing tariffs.").

The FCC has held that CLECs who have a filed tariff cannot collect interstate access charges other than by meeting the terms of their filed tariffs, and CLECs who have not filed a tariff can only charge IXCs by negotiating contracts for the delivery of calls to FCSCs. There are no other bases for obtaining compensation on switched access services. Moreover, if the service in issue is not switched access service—because it does not comport with FCC rules—the only way in which LECs can recover from long distance carriers is through negotiated contract. In this case, the unjust enrichment and quantum meruit claims[42] allege the very same access services for which Aventure billed Qwest and Sprint *under its tariff*. Since Aventure alleges that it has filed interstate access services tariffs, the only way Aventure can recover from Qwest and Sprint is via tariff. This precludes Aventure from claiming unjust enrichment or quantum meriut.

Aventure attempts to distinguish the N. Valley decisions arguing in those cases, while the FCC addressed specific tariff language and required the LEC to change tariff language and to refile its tariff, it did not address state law quasi-contract or other equitable claims. Aventure further contends that not only do the N. Valley decisions not establish that LECs can never pursue equitable relief in federal court, but such an interpretation is flatly inconsistent with FCC and federal court precedent and that where there is no tariff, federal courts have found equitable relief is available.

The referrals cases asked both if the traffic to FCSCs qualified under the

42. Qwest cites Iowa Network Services, Inc. v. Qwest Corp., 385 F.Supp.2d 850, 909–10 (S.D. Iowa 2005) (citing Iowa Waste System, Inc. v. Buchanan Cty., 617 N.W.2d 23, 29–31 (Iowa Ct. App. 2000)), noting that it has been previously delineated that under Iowa law,

quantum meruit is a contract law claim for implied-in-fact contracts, requiring proof of assent and all other elements of a contract, while unjust enrichment lies in equity and instead requires the elements of a benefit received unjustly at the expense of another.

LEC's tariff *and* if not, was the LEC nonetheless entitled to compensation by some other vehicle. The N. Valley decisions spoke directly to both questions. N. Valley II, 26 FCC Rcd. at 10782; N. Valley I, 26 FCC Rcd. at 8335. It defies credulity that the LECs continue to maintain, despite consideration of these very traffic pumping cases by various tribunals, that the resounding theme at the very core of the matter—if the tariff access charges do not apply, are the LECs nonetheless entitled to *some* compensation—has somehow been missed by all those tribunals. It has not; the answer is no.

Aventure's unjust enrichment and quantum meruit/implied contract claims (and requests for declaratory judgment thereof) fail as a matter of law based on N. Valley I and N. Valley II, and the authorities the FCC cited therein. Qwest's and Sprint's Motion for Judgment on the Pleadings as to the unjust enrichment and quantum meruit counterclaims must be granted.

## V. CONCLUSION

For the reasons stated:

1. Aventure's Motion to Dismiss Counts One, Three, Five, Six, Eight, Nine, Ten, and Eleven of Qwest's Second Amended Complaint, ECF No. 143, is **granted** in part, and **denied** in part. The Motion is **granted** as to Count Six of Qwest's Second Amended Complaint and **denied** as to Counts One, Three, Five, Eight, Nine, Ten, and Eleven of Qwest's Second Amended Complaint;

2. Aventure's Motion to Dismiss Counts One, Two, Seven, and Eight of Sprint's Amended Complaint, ECF No. 144, is **denied**;

3. Qwest's Motions for Judgment on the Pleadings, ECF Nos. 108 and 142, must be **granted**. Accordingly, Counts Three, Five, and Six of Aventure's Third Amended Complaint as against Qwest, ECF No. 139, are **dismissed**; and

4. Sprint's Motion for Judgment on the Pleadings, ECF No. 109, must be **granted**. Accordingly, Counts One, Five, and Six of Aventure's Third Amended Complaint as against Sprint, ECF No. 139, are **dismissed**.

**IT IS SO ORDERED.**